# UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF GEORGIA
### SAVANNAH DIVISION

```
-----------------------------------------------------x
DARRYL SCOTT STINSKI,                          :
`                                              :
            Petitioner,                        :          CV418 - 066
                                               :
                                               :          Case No. _____
v.                                             :
                                               :
ERIC SELLERS, Warden Georgia Diagnostic and    :
Classification Prison, and GREGORY C. DOZIER,  :
Commissioner Georgia Department of Corrections,:
                                               :
            Respondents.                       :
-----------------------------------------------------x
```

## PETITION FOR WRIT OF HABEAS CORPUS BY PRISONER IN STATE CUSTODY UNDER DEATH SENTENCE

Petitioner Darryl Scott Stinski, now incarcerated at the Georgia Diagnostic and Classification Prison in Jackson, Georgia, respectfully petitions this Court for a writ of habeas corpus under 28 U.S.C. § 2254 to grant him relief from his conviction and death sentence, both of which were obtained in violation of his rights under the U.S. Constitution.[1]

### INTRODUCTION

1.    Petitioner Darryl Scott Stinski applies to this Court for a writ of habeas corpus under 28 U.S.C. § 2254.

2.    Mr. Stinski is on death row for a crime he committed when he was just 18 years old, after a life of severe psychological maltreatment, neglect and abandonment by his family.

---

[1] Throughout this Petition, the term "HT __–__" refers to pages of the evidentiary hearing transcript in the state habeas court; the term "TT __–__" refers to pages of the trial transcript in the state trial court; "PX" refers to Petitioner's Exhibits; and "Order" refers to the Final Order entered by the state habeas court and dated January 15, 2017.

3.     Darryl's mother had a series of relationships with abusive men who she repeatedly chose over Darryl, his older brother Donald, and his half-brother Tony Raby. Darryl's biological father, with whom the family lived in Virginia, was an alcoholic, physically and emotionally abusive, and distant. In Darryl's early childhood, his father was absent for long periods of time serving in the Navy, and neglectful and abusive when he was home.

4.     When Darryl was five, his parents separated and ultimately divorced. His mother remarried a man with whom she and her sons lived in South Carolina. Darryl's stepfather also was an alcoholic who did not want Darryl and his brothers around and was hostile and abusive toward them.

5.     When Darryl was nearly twelve years old, his mother sent him to stay with his biological father, then living in Wisconsin with his second wife, her sister and his wife's daughter from a previous relationship. Although Darryl expected to stay in Wisconsin only for the summer, his mother abandoned him there. She never picked him up or contacted him even to respond to his requests for all his clothes and other possessions. Darryl's biological father abandoned parenting while Darryl was in Wisconsin in favor of his stepmother who compared Darryl unfavorably with her own daughter. The five years Darryl spent in Wisconsin were characterized by frequent moves and rigid, arbitrary discipline.

6.     At seventeen, Darryl left Wisconsin and returned to South Carolina where he lived with his mother and stepfather. But shortly after he returned, Darryl's stepfather kicked him out of the house for the sin of staying overnight away from home to comfort someone after two young boys were tragically murdered during a robbery at a local restaurant. Darryl's mother did nothing to help her son.

2

7.      Ultimately, Darryl moved to Savannah, Georgia where he lived with his brother and sister-in-law.  Darryl's brother was also an alcoholic.  He, and his new wife, who had a newborn baby of their own, were unable to care for Darryl.  After seven months, Darryl's sister-in-law left his brother and his brother, who was then serving in the Army, moved to an apartment in the barracks on his Army base.  When Darryl asked where he was going to live, his brother replied "that's not my problem."  TT 2810:7–13.

8.      Darryl had neither the means nor the resources to live alone and care for himself.  After his brother abandoned him, Darryl's life spiraled downward as he lived from day-to-day, staying overnight with friends when he could.  Eventually, in April 2002, Darryl met a group of people, including Dorian O'Kelley who was several years older than Darryl.  On April 10, 2002, Darryl and Dorian were engaged in a burglary, which Dorian turned violent and resulted in the horrible crime for which Darryl now sits on death row.

9.      Critically, Mr. Stinski received constitutionally defective assistance from his lawyers when he needed them most during the penalty phase of his capital trial.  Even though trial counsel concluded that Mr. Stinski likely would be convicted of a capital crime and that the penalty phase, therefore, would be the most critical aspect of the trial, Mr. Stinski's lead lawyer—distracted by his own cancer diagnosis— delegated the penalty phase of Mr. Stinski's capital trial to the least experienced lawyer on the defense team.  And to make matters worse, relied heavily on that lawyer's work during the guilt phase, taking even more time from preparation of the mitigation case.

10.      Mr. Stinski's mitigation lawyer had *never* before argued or examined witnesses in a capital case and had *never* before prepared or presented evidence in the penalty phase of a capital trial.  His nervousness and inadequacy for the task were evident to others assisting with

3

Mr. Stinski's defense and to the witnesses with whom he interacted. Predictably, trial counsel's preparation for and advocacy during the penalty phase or Mr. Stinski's trial fell below the standard expected of capital defense counsel.

11.    Among other things, Darryl's trial counsel knew that it would be critical to explain to the jury how this boy, universally described as non-violent, immature for his age, highly susceptible to peer pressure, and desperate to please others, could have participated in such a crime. Trial counsel also knew that providing that explanation would require the assistance of specialists and testing. But trial counsel neglected to retain an expert or experts to perform the necessary testing to explain that to Mr. Stinski's sentencing jury how his aberrant conduct during the crime resulted from his developmental deficiencies and his lifelong psychological maltreatment.

12.    In state habeas proceedings, Mr. Stinski "presented compelling scientific evidence" (Order at 4) from three experts: a neuropsychologist, a forensic psychiatrist, and an expert in developmental psychology who focuses on abuse. As one of them put it, Darryl's "is among the most severe cases, pervasive cases of psychological maltreatment in my experience," which included the Nathaniel Brazill school shooting case and the beltway sniper case. HT 1363:12–1364:5. Together they explained that Mr. Stinski's developmental deficits and history of pervasive psychological maltreatment rendered him "an untreated, traumatized child who inhabited the body of an 18-year old boy" whose "ability to resist the influence of Dorian O'Kelley was significantly impaired" and who was unable to adapt to changed circumstances and withdraw when Dorian turned a planned burglary into murder. Testimony from those experts (or any one of them) would have materially changed the calculus for Mr. Stinski's sentencing jury.

US:145367343

13.     In failing to develop and present that evidence, trial counsel violated their duty to "explain to the jury why [Mr. Stinski] may have acted as he did—[to] connect the dots between, on the one hand, Mr. Stinski's] mental problems, life circumstances, and personal history and, on the other, his commission of the crime in question." *Hooks v. Workman*, 689 F.3d 1148, 1204 (10th Cir. 2012).  As a result, trial counsel's performance "'fell below an objective standard of reasonableness:'" *Wiggins v. Smith*, 539 U.S. 510, 521 (2003) (quoting *Strickland v. Washington*, 466 U.S. 668, 688 (1984)).  And Mr. Stinski's sentencing jury was never provided with that critical explanation to "connect the dots" between his trauma-filled life and the commission of the crime in question.  Had the jury been provided with that explanation, "there is a reasonable probability that . . . the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.

14.     The state habeas court found that Mr. Stinski "presented compelling scientific evidence which could have been presented at trial to demonstrate that Petitioner's impulsive behavior and susceptibility to the influence of this codefendant was related to the lack of development of Petitioner's near adolescent brain." Order at 4–5. The court further found that "[i]t is true trial counsel did not present the type of scientific evidence offered by Petitioner in this proceeding to 'connect the dots' between Petitioner's conduct and his adolescence, and at times Mr. Sparger's presentation and argument appeared disjointed." Order at 5.

15.     Notwithstanding that Mr. Stinski's "scientific evidence was persuasive," (*id.*), the Court denied relief to Mr. Stinski.  The state court adjudication of Mr. Stinski's claims "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2).  It also "resulted in a

US:145367343

decision that was contrary to, or involved an unreasonable application of clearly established
Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1).

16.     For that reason and others described more fully below, this Court should grant
Mr. Stinski relief from his conviction and death sentence obtained in violation of his rights under
the U.S. Constitution.

## PROCEDURAL HISTORY

17.     On June 5, 2002, Dorian O'Kelley and Petitioner Darryl Scott Stinski were
indicted on two counts of malice murder and related charges arising from events on April 10–12,
2002, including the murders of Susan and Kimberly Pittman. *Stinski v. State*, 286 Ga. 839, 939
n.1, 691 S.E.2d 854, 862 n.1 (2010); *O'Kelley v. State*, 284 Ga. 758, 758 n.*, 670 S.E.2d 388,
392 n.* (2008).

18.     In 2005, Mr. O'Kelley was convicted on two counts of malice murder and related
charges and sentenced to death. *O'Kelley*, 284 Ga. at 758 n.*, 670 S.E.2d at 392 n.*.

19.     On June 8, 2007, Mr. Stinski was convicted of two counts of malice murder, two
counts of felony murder and related charges in the Superior Court of Chatham County,

20.     On June 13, 2007, Mr. Stinski was sentenced to death.

21.     On March 1, 2010, the Georgia Supreme Court affirmed Mr. Stinski's conviction
and sentence. *Stinski*, 286 Ga. 839, 691 S.E.2d 854.

22.     The United States Supreme Court denied Mr. Stinski's petition for a writ of
certiorari on November 1, 2010. *Stinski v. Georgia*, 562 U.S. 1011 (2010).

23.     On September 12, 2011, Mr. Stinski filed a petition for a writ of habeas corpus in
the Superior Court of Butts County.  Mr. Stinski amended his petition on March 21, 2013.

6

24. From August 12 through August 15, 2013, the circuit court held an evidentiary hearing on Mr. Smith's claims. Twenty witnesses testified at the evidentiary hearing and the court admitted 161 exhibits into evidence.

25. By order dated January 15, 2017 and filed January 20, 2017, the circuit court denied Mr. Stinski's habeas petition.

26. On February 21, 2017, Mr. Stinski applied for a certificate of probable cause to appeal to the Georgia Supreme Court.

27. On February 5, 2018, the Georgia Supreme Court denied Mr. Stinski's application for a certificate of probable cause.

## JURISDICTION AND VENUE

28. This Court has jurisdiction over this Petition based on 28 U.S.C. § 2254(a).

29. Venue is proper in this District because the Superior Court of Chatham County in which Mr. Stinski was convicted and sentenced is located in this District. *See* 28 U.S.C. § 2241(d).

## GROUNDS SUPPORTING PETITION FOR RELIEF

## I.   MR. STINSKI'S TRIAL COUNSEL RENDERED INEFFECTIVE ASSISTANCE AT THE PENALTY PHASE OF HIS CAPITAL TRIAL IN VIOLATION OF HIS SIXTH AND FOURTEENTH AMENDMENT RIGHTS

30. It is clearly established federal law that the Sixth and Fourteenth Amendments to the United States Constitution guaranteed Mr. Stinski "the right to the effective assistance of counsel" at his capital trial. *Strickland v. Washington*, 466 U.S. 668, 686 (1984) (citation omitted). That right "exists, and is needed, in order to protect the fundamental right to a fair trial." *Id.* at 684. "The right to counsel plays a crucial role in the adversarial system embodied in the Sixth Amendment, since access to counsel's skill and knowledge is necessary to accord defendants 'the ample opportunity to meet the case of the prosecution' to which they are

7

entitled." *Id.* at 685 (citation omitted). To satisfy the Sixth Amendment guarantee, counsel must comport with "a duty to bring to bear such skill and knowledge as will render the trial a reliable adversarial testing process." *Id.* at 688. In a capital case "counsel has a duty to make reasonable investigations [into potential mitigating evidence] or to make a reasonable decision that makes particular investigations unnecessary." *Wiggins v. Smith*, 539 U.S. 510, 521 (2003) (quoting *Strickland*, 466 U.S. at 690–91).

31.    "An ineffective assistance of counsel claim has two components. A petitioner must show that counsel's performance was deficient and that the deficiency prejudiced the defense." *Wiggins*, 539 U.S. at 521 (citing *Strickland*, 466 U.S. at 687). The performance of Mr. Stinski's trial counsel was deficient in ways that both individually and cumulatively prejudiced Mr. Stinski.

### A.    Trial Counsel Unreasonably Failed to Retain Mental Health Experts to Explain the Effects of Mr. Stinski's Youth, Immaturity and Trauma-Filled Childhood on His Aberrant Conduct

#### 1.    Mr. Stinski's Lead Trial Counsel Unreasonably Assigned the Penalty Phase of Mr. Stinski's Trial to an Inexperienced Attorney

32.    At the time of his indictment on June 5, 2002, Mr. Stinski could not afford counsel. The trial court ultimately appointed three attorneys to represent him. In 2002, the trial court appointed Michael Schiavone as Mr. Stinski's lead lawyer. HT 26:4–7. Prior to his appointment, Mr. Schiavone had represented at least ten defendants in capital trials. HT 27:1–24. Shortly before the trial, Mr. Schiavone was diagnosed with prostate cancer, which weighed heavily on him and affected his performance. HT 104:15–105:3; *see also* HT 53:13–54:8, 54:25–55:9.

33.    The trial court also appointed Steven Sparger, an associate in Mr. Schiavone's office, to represent Mr. Stinski at trial. Prior to his appointment, Mr. Sparger had assisted Mr.

US:145367343

Schiavone and his partner, Terry Jackson, in other capital trials, mainly with legal research and preparation of pretrial motions. HT 39:2–20, 122:25–123:6, 128:4–17.

34.    In June 2002, the trial court also appointed a third attorney, Willie Yancey, to represent Mr. Stinski. Prior to his appointment, Mr. Yancey had tried 75 to 100 felony cases, including 10 to 15 murder cases, although he had never represented a defendant charged with capital murder. HT 351:12–152:5.

35.    Mr. Stinski's attorneys concluded early in their representation "that mitigation was more important than guilt and innocence" because it was likely that Mr. Stinski would be convicted of a capital crime in light of Mr. Stinski's videotaped statement and the gruesome autopsy photographs. HT 138:3–22, 145:23–147:1. As Mr. Sparger put it, "the case was going to be not won at guilt-innocence but at the sentencing phase if it was going to be won." HT 249:11–17.

36.    As the lead lawyer, Mr. Schiavone assigned responsibilities to his co-counsel for developing the case and presenting evidence at trial. HT 30:21–31:6, 38:7–11. Even though he was the most experienced member of the defense team, and even though the defense team concluded that the penalty phase of the trial would be the most important, Mr. Schiavone decided at the beginning of the case he would handle the guilt/innocence phase of the trial. HT 61:4–62:14. Mr. Schiavone asked Mr. Sparger to assist him with the "grunt work," including reviewing discovery, interviewing witnesses, and preparing pretrial motions (HT 29:1–30:3, 130:14–131:20), which mirrored the support role that Mr. Sparger had filled in prior capital trials for Mr. Schiavone.

37.    Mr. Yancey played no meaningful role in developing trial strategy or in preparing for or presenting evidence at trial, including in the penalty phase. Mr. Schiavone did not "ask[]

9

Willie [Yancey] to do much in the case in terms of actual work or courtroom time" and did not ask Mr. Yancey for strategic advice. HT 31:7–13, 52:24–53:3. Mr. Sparger "very seldom" communicated with Mr. Yancey. HT 169:25–170:22. Mr. Yancey was involved in issues regarding venue, jury selection, and pretrial motions. HT 374:14–375:12.

38.     After the case had been pending for approximately five years, just six to eight weeks before Mr. Stinski's trial, Mr. Schiavone also assigned Mr. Sparger responsibility for the penalty phase of the trial, including decisions regarding which witnesses to call and how evidence would be presented. HT 62:15–63:1, 157:24–158:5; *see also* HT 31:4–6, 38:7–11. Mr. Schiavone made this assignment even though the trial team had concluded that the penalty phase would be the most important part of the trial and even though Mr. Sparger had no experience preparing for or conducting the penalty phase of a capital trial. Despite Mr. Sparger's lack of experience, he was left to prepare the penalty phase—in addition to helping Mr. Schiavone prepare for the guilt innocence phase—by himself, receiving minimal support or direction from either Mr. Schiavone or Mr. Yancey (neither of whom themselves had prepared a capital penalty phase defense).

39.     Mr. Sparger had never before examined a witness or argued before a jury at a capital trial.

Q.     Prior to Mr. Stinski's trial—

A.     Um-hmm.

Q.     —Had you ever said a word, examined a witness, argued to a judge during a capital murder trial?

A.     Nothing in front of a jury. I may have argued, but I had never presented any witness, or made any arguments during trial, and certainly had not done any mitigation, the sentencing phase.

US:145367343

Q.    And you've certainly hadn't done anything in front of a jury in a capital murder case?

A.    Yes. Sir.

HT 340:8–20.

40.    Mr. Sparger also had no experience preparing for or presenting evidence during the penalty phase of a capital trial:

Q.    And could you tell the Court prior to representing Darryl Stinski and prior to representing Darryl Stinski during his death penalty trial—

A.    Yes, sir.

Q.    —What experience you had conducting mitigation investigations in a death penalty case?

A.    None.

Q.    What experience did you have, if any, conducting a mitigation investigation hearing in a death penalty case?

A.    None.

Q.    Had you appeared as counsel in a mitigation hearing prior to appearing on behalf of Darryl Stinski?

A.    No, sir.

Q.    Had you seen a mitigation hearing prior to representing Mr. Stinski in a death penalty case?

A.    Unfortunately, not. No, sir.

HT 128:18–129:8.

41.    In light of his inexperience, Mr. Sparger felt nervous, anxious, and inadequate to the task of handling the penalty phase of Mr. Stinski's capital trial. He confessed as much to Gail Rudolph, a therapist who had treated Mr. Stinski as a teenager. Ms. Rudolph "felt like [Mr. Sparger's] therapist" when she talked to him as "[h]e felt very worried and very anxious

11

US:145367343

because he had never done this before" and "didn't know if he had done everything he should

have done." HT 711:15–712:19.

      42.     Mr. Sparger even confessed his lack of experience and his concern over

representing Mr. Stinski during the penalty phase of his trial to the jury in his closing argument:

> I've been doing this for a few years and I've done some closing arguments, but
> nothing like these guys, Mr. McConnell, Mr. Lock or Mr. Schiavone or Mr.
> Yancey. Heck. This is my first closing argument in a murder trial. I am scared
> to death. What can I say.
>
>      . . .
>
> What can I say? And I've never—I've never had to do this. I don't know how
> many people have, but when they do it on TV or in the movies or something, you
> see they're eloquent. You have all seen me. We all know, I'm not eloquent. I
> can stumble over little words.

TT 2902:9–25; *see also* TT 2909:9 ("I want you to realize, I'm new at this").

      43.     Mr. Sparger also told the jury he had difficulty examining witnesses, and offered

that as a reason why the jury might not have heard all the available mitigation evidence:

> I have found out something. Doing direct examination is a heck of a lot harder
> than doing cross-examination. You're trying—you go in there, you know what—
> you've talk to people, you've read their reports, you know what information they
> have, and you're going through it and they give you an answer, and because it
> brings up one of your other points, you go that way, and then you miss something.
>
>      . . .
>
> And remember when you've got somebody who you all saw did not do that well
> doing some of the direct examination, asking the questions, did some of the
> evidence not come out?

TT 2911:23–2912:5, 2913:10–13.

      44.     Trial counsels' decision to assign the most important part of Mr. Stinski's capital

trial—the penalty phase—to the least experienced attorney among them had predictable

12

consequences. Mr. Sparger's investigation was inadequate, and his presentation of evidence was both incomplete and incoherent.

45.     The state habeas court's finding that "Petitioner was represented by experienced counsel" (Order at 11) ignores *Mr. Sparger's* inexperience for the responsibility assigned to him and the contemporaneous evidence demonstrating that he was not up to that task and ignores that the other assigned attorneys—who had at least some trial experience—abdicated any responsibility for preparing and presenting the case. The state court's adjudication of Mr. Stinski's claim is based on an unreasonable determination of the facts and is contrary to or an unreasonable application of clearly established federal law. *See* 28 U.S.C. §§ 2254(d)(1), (2).

### 2.     Trial Counsel had a Duty to Investigate Mr. Stinski's Mental Health Through Experts

46.     It is commonly understood that "mental health experts are essential to defending capital cases." American Bar Association, Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases, Revised Edition, 31 Hofstra L. Rev. 913, 956 (2003) ("ABA Guidelines") (Commentary to Section 4.1). "[T]he defendant's psychological and social history and his emotional and mental health are often of vital importance to the jury's decision at the punishment phase." *Id.* "Counsel must compile extensive historical data, as well as obtain a thorough physical and neurological examination" and "neuropsychological testing" and "consultation with additional mental health specialists may also be necessary." *Id.*

47.     Investigation of the defendant's mental health as potential mitigation is critical because "'in capital cases, the fundamental respect for humanity underlying the Eighth Amendment . . . requires consideration of the character and record of the individual offender and the circumstances of the particular offense as a constitutionally indispensable part of the process of inflicting the penalty of death.'" *Lockett v. Ohio*, 438 U.S. 586, 604 (1978) (quoting *Woodson*

13

*v. North Carolina*, 428 U.S. 280, 304 (1976)); *see Woodson*, 428 U.S. at 303 (capital sentencing scheme must "allow the particularized consideration of relevant aspects of the character and record of each convicted defendant before the imposition upon him of a sentence of death").

48.     A prerequisite to the jury's engaging in that constitutionally required individual consideration is that counsel supplies the jurors with the evidence necessary to do so. For example, in *Hooks v. Workman*, 689 F.3d 1148, 1204 (10th Cir. 2012), the court reversed the denial of post-conviction relief on ineffective assistance of counsel grounds, among other reasons, because even though counsel presented some mental health evidence during the penalty phase, counsel "made little effort to connect Dr. Murphy's diagnosis to the circumstances of the crime." As the court explained, "[t]he importance of counsel's role in this regard cannot be overstated, as we have repeatedly recognized. Counsel in capital cases must explain to the jury why a defendant may have acted as he did—must connect the dots between, on the one hand, a defendant's mental problems, life circumstances, and personal history and, on the other, his commission of the crime in question." *Id.* Mr. Sparger failed to fulfill that important role.

### 3.     Trial Counsel Unreasonably Ignored Red Flags Regarding Mr. Stinski's Developmental Issues

49.     It is well-settled federal law that "one of the individualized mitigating factors that sentencers must be permitted to consider is the defendant's age." *Stanford v. Kentucky*, 492 U.S. 361, 375 (1989) (Scalia, J., joined by Rehnquist, C.J., White & Kennedy, JJs.); *see Johnson v. Texas*, 509 U.S. 350, 367 (1993) ("There is no dispute that a defendant's youth is a relevant mitigating circumstance that must be within the effective reach of a capital sentencing jury . . . .").

50.     As the Supreme Court has made clear: "[y]outh is more than a chronological fact." *Eddings v. Oklahoma*, 455 U.S. 104, 115 (1982). In a capital case, "'testimony that

14

US:145367343

[youthful defendants'] mental and emotional development [are] at a level several years below his chronological age' [cannot be] excluded.'" *Tennard v. Dretke*, 542 U.S. 274, 288 (2004) (quoting *Eddings*, 455 U.S. at 116). But Mr. Stinski's sentencing jury was deprived of such evidence because, through neglect, his lawyers did not prepare, present, or explain it to the jury even though such evidence was available.

51.    Mr. Sparger retained Dale Davis as a mitigation investigator. HT 147:16–148:24. She had worked as a mitigation investigator on about 30 cases prior to her retention by Mr. Sparger. HT 808:12–15. Mr. Sparger was the lawyer to whom Ms. Davis was responsible and with whom she communicated. HT 866:4–13. Mr. Sparger had never worked with a mitigation specialist before. HT 149:4–152:22. Mr. Schiavone's involvement with Ms. Davis was "[v]ery, very limited." HT 39:21–40:8; *see also* HT 810:22–811:17, 843:23–844:3. Mr. Yancey had no involvement with Ms. Davis. HT 812:24–813:19.

52.    Ms. Davis's role was "to gather the information and give that information to the lawyers so that a theme or that sort of thing can be developed." HT 859:3–10. To that end, between the time she was retained and 2005, Ms. Davis interviewed 40 people in Georgia, Wisconsin, South Carolina, and Florida and memorialized the information she obtained in memoranda she sent to Mr. Sparger. HT 860:23–863:23, 869:14–870:3. Neither Mr. Sparger nor Mr. Schiavone responded or asked Ms. Davis to follow up on any of the information in her memoranda. HT 826:1–15, 866:18–21.

53.    A frequent topic at death penalty seminars that Ms. Davis attended was the importance of having regular defense team meetings to "exchang[e] information [and] to develop a strategy or theme that you wanted to work toward." HT 809:23–810:8. But that did not characterize her work with Mr. Stinski's lawyers. To the contrary, she had only "sporadic"

US:145367343

contact with them. A long time often elapsed between when she sent her memoranda to the lawyers and when she met with the lawyers to discuss them. When such infrequent meetings did occur, they did not involve the development of mitigation strategy, but rather "we were just discussing what the people had said, what they had told me." HT 866:2–868:14.

54.     Counsel also retained Dr. Jane Weilenman, a clinical psychologist with whom Mr. Schiavone previously had worked. HT 46:6–47:8, 88:17–25. Due to Mr. Schiavone's pre-existing working relationship with Dr. Weilenman, Mr. Sparger was not as involved with her as he was with "pretty much everything else." HT 298:12–25. However, Mr. Schiavone relied on Mr. Sparger to prepare Ms. Davis and Dr. Weilenman for their testimony at trial. HT 113:10–14.

55.     Mr. Sparger felt "based on her training and experience that Dr. Weilenman could figure out what kind of . . . preliminary testing might be worthwhile to determine [Mr. Stinski's] mental functioning capabilities . . . ." HT 160:11–161:5. Mr. Sparger concluded that such testing would be necessary given his assessment of Mr. Stinski as "young for his age:"

> He's one of the politest clients I've ever had, one of the nicest, and I don't want to say immature, because seems to—the connotation, but he was a—he was young. He was a kid and is still in a lot of ways. And so—and it seemed young for his age, and I thought—and so—Schiavone had the same impression and even Dale and Dr. Weilenman had mentioned it, you know there were those sorts of things.

HT 160:11–161:5.

56.     Similarly, Mr. Yancey recalled that Mr. Stinski "didn't act like a 19-year old, didn't act like a 17-year old. He acted like a much younger person." HT 389:3–390:1. And Dale Davis likewise concluded based on "my interviews and my interactions with Darryl, . . . his mental age seemed less to me than 18, which he was at the time." HT 830:1–831:11; *see also id.* 818:14–24 ("He was just such a kid. He was so young and seemed naïve.").

16

57.    Consistent with their first impressions of Mr. Stinski, the first time Ms. Davis met with Mr. Sparger she discussed issues involving adolescent brain development and learning disabilities. HT 829:5–25. Thereafter, Ms. Davis raised those issues "time after time." HT 831:15–18.

58.    For example, on December 3, 2004, Ms. Davis sent Mr. Sparger an email with fourteen attachments regarding adolescent brain development issues consisting of scientific studies and amicus briefs filed in a case (*Roper v. Simmons*, 543 U.S. 551 (2005)) then pending before the United States Supreme Court regarding the constitutionality of imposing the death penalty on juveniles. PX 28e at DS-0025662–63; HT 295:7–296:22. Ms. Davis wrote that the developmental issues "are very apparent in Darryl's case" and "his immaturity and mental health problems make this especially relevant." PX 28e at DS-0025662–63. Ms. Davis further advised that "we probably need a specialist in that field to explain the impulsiveness, lack of judgment, etc." and included a recommendation for an expert in adolescent brain development that had appeared on a listserv for sentencing advocates. *Id.*

59.    The following day, Mr. Sparger responded that if the United States Supreme Court established a minimum age for executions, "we can use that . . . to argue that someone who is mentally under the age of 18 should not be executed." PX 28e at DS-0025662–63. However, neither Mr. Sparger nor anyone else on his legal team ever followed up to make that argument.

60.    On January 10, 2005, Ms. Davis, Dr. Weilenman, Mr. Schiavone and Mr. Sparger met at the offices of Jackson & Schiavone. HT 834:2–835:6. Neither Mr. Schiavone nor Mr. Sparger attended the entire meeting, but at least one of them was present at all times. *Id.* At that meeting, Ms. Davis advised that Mr. Stinski "needed to have a neuropsychological exam" to assess the potential developmental issues and how those issues relate to "Darryl's background."

17

She further advised that the defense team "need[ed] to have someone testify to bring all of these things in and to show the impact, not just the factual information that we had developed, but what it means and how it impacts somebody." HT 835:7–837:5.

61.     Dr. Weilenman, Mr. Sparger, and Mr. Schiavone all agreed. HT 836:8–16. According to Ms. Davis, Dr. Weilenman contacted a neuropsychologist, Dr. Jeff Arnette, but he was not retained, "which to [Ms. Davis], the failure to do that was just a big thing." HT 909:1–913:9. Neither Mr. Sparger nor Mr. Schiavone followed up with Dr. Weilenman or Ms. Davis about the need to retain a neuropsychologist or to obtain neuropsychological testing.

62.     Although he recalled obtaining materials on the issues from seminars, Mr. Sparger recalled no detailed discussion with Ms. Davis and Dr. Weilenman regarding adolescent brain development and youth mitigation and, "more importantly . . . getting [Darryl] tested," which was "what our case was missing" because, although "we put it out there about the lesser culpability, . . . the jury never had the reason why, an explanation." HT 305:11–306:3; *see also id.* 337:17–20. According to Mr. Sparger, there was a passing reference at a meeting near the beginning of trial to the possibility of retaining a neuropsychologist to testing Mr. Stinski, which "surprised" Mr. Sparger because "[t]hat was the first mention of it that . . . I know of." Mr. Sparger was never "told that he [Mr. Stinski] didn't need to be tested for anything, and I was surprised he wasn't tested." HT 298:15–17. Mr. Sparger assumed that Dr. Weilenman "would do . . . what psychologists do: you meet with them, you talk to them, and you get an idea, and you determine the appropriate tests, and let those tests take you where they take for any further testing." HT 298:21–25. Mr. Sparger had "no idea why there was no testing." *Id.*; *see also* HT 298:12–301:13 (Dr. Weilenman never told Mr. Sparger that anyone needed to test Mr. Stinski).

18

63.     Whenever these conversations regarding neuropsychological testing occurred and despite the uniform acknowledgment by the defense team that such testing was necessary to implement their strategy to explain that Mr. Stinski was functioning as an adolescent at the time of the crime and despite Mr. Sparger's profession of "surprise[] [that Mr. Stinski] wasn't tested (HT 298:16–17), neither Mr. Sparger nor Mr. Schiavone did anything to arrange for such testing or otherwise pursued the issue. HT 159:13–21. It was trial counsel's duty to supervise Dr. Weilenman and ensure that she was conducting herself or recommending other experts who could conduct appropriate testing. But counsel failed in that duty.

64.     Trial counsel's failure to pursue a neuropsychological examination and testing was neither a function of strategy nor a "reasonable decision that ma[de] a particular investigation unnecessary." *Wiggins*, 539 U.S. at 521. Rather, failing to do so was a function of neglect even though each member of the defense team concluded that it was necessary in light of their own observations of Mr. Stinski. The state court's contrary conclusion (Order at 38) resulted in a decision that is an unreasonable determination of the facts in light of the evidence presented in the state court and contrary to, or an unreasonable application of clearly established federal law. *See* 28 U.S.C. § 2254(d)(1), (2).

### 4.     Mr. Stinski's Jury Did Not Hear How His Developmental Deficits and Psychological Maltreatment Affected His Conduct

65.     Expert witnesses who testified during Mr. Stinski's habeas proceeding were available at the time of Mr. Stinski's trial to conduct appropriate neuropsychological examinations and testing to explain how Mr. Stinski's history of psychological maltreatment and deficits in his brain development made him more susceptible to the influence of others and hindered his ability to react and adapt to unanticipated circumstances in the Pittman home. In the state court habeas proceeding, Mr. Stinski presented the testimony of (1) Dr. Joette James, an

19

expert clinical neuropsychologist; (2) Dr. Peter Ash, an expert forensic psychiatrist; and (3) Dr.

James Garbarino, an expert developmental psychologist. The State did not controvert the

conclusions reached by these experts. But Mr. Stinski's sentencing jury did not hear that

"compelling scientific evidence" (Order at 4) because trial counsel failed to develop and present

it.

<div style="margin-left: 2em;">

**a.    Darryl had Deficits in Executive Functioning, Which Affected His Ability to Act and Adapt Appropriately as Unanticipated Events Unfolded in the Pittman Home**

</div>

66.    Based on her testing, Dr. Joette James concluded that "when you look at the

totality of the neuropsychological measures that demonstrates some abnormalities in [Darryl's]

brain function." HT 1167:9-13. In particular, Darryl has weaknesses in executive functioning,

which encompasses a number of skills, including organization, planning and the ability to change

or revise a plan of action. HT 1187:6-1189:13. Darryl's deficits are genetic and are exacerbated

by his history of severe maltreatment, "which we know is something that affect[s] brain

functioning and alter[s] brain functioning" because the portions of the brain responsible for

executive functioning are still in development into the early twenties and brain systems involving

"mood regulation, impulse control, and memory, particularly are vulnerable to maltreatment."

HT 1227:8-1229:16, 1214:2-1215:17; *see also* HT 1216:21-1218:25.

67.    Based on Dr. James's testing and consistent with the records she reviewed,

Darryl's executive functioning areas that are most impaired "were working memory, difficulties

in short-term memories, and auditory attention, and also most particularly in planning and

organization" where Darryl scored in the 9th percentile on testing. HT 1189:14-1190:20; *see

also* HT 1197:18-24. In laymen's terms, it is as if Darryl has all the necessary information in his

brain but cannot access it efficiently and quickly, and "then that information ends up being less

able to . . . influence behavior in adaptive ways." HT 1183:22-1185:10. As Dr. James

<div style="text-align: center;">20</div>

explained, "deficits in those areas can put someone[] severely at risk for functioning in the real world" because "being able to plan and organize, control impulses, sustain attention and effort, learn from experience, being able to weigh pros and cons and options, being able to . . . act in an efficient and effective way, is really the stuff of everyday life." HT 1197:25-1199:17.

68.    Dr. James testified that on the night of the crime, Darryl's deficits—combined with the high level of stress he was under—compromised his ability to "reason and think of alternatives, to not become inflexibly stuck in a pattern that is going nowhere, to be able to consider pros and cons and multiple sources of information, and to act and adapt in an appropriate way." HT 1220:10-1221:8. Consistent with her opinion, when Dr. James discussed Darryl's strengths and weaknesses with him, he told her "that makes sense to me . . . the trouble keeping things in mind and getting stuck, and that's how I felt at the time of the crime. I felt stuck and I felt like there weren't – I couldn't think of a way out and that there weren't any alternatives, and that I just . . . wrongly stayed with this course of action." HT 1161:10-1162:4.

> b.    **In Light of His Executive Functioning Deficits and his Maltreatment, Darryl was Functioning Like an Adolescent at the Time of the Crime**

69.    Based on his interview with Mr. Stinski and review of records, Dr. Ash testified that certain facts concerning Mr. Stinski's history were particularly significant. The first "was that prior to the crime, there really was no history of violence towards others . . . , which was really quite striking." HT 441:3-444:3; *see also* HT 479:4-481:2 ("One of the things that is striking in Darryl's history is there's really nothing in there about prior violent episodes. He is seemingly less violent than most kids."). That fact was particularly striking because "commonly when you see people involved in violent offenses, you get a history of prior violence, and the strongest predictor of future violence is prior violence." HT 479:9-12. But Darryl "seems to be

21

a very non-violent person" and "so the high levels of violence obviously in the crime are an out-of-character phenomenon for him." HT 479:24-480:2.

70.    Second, Darryl's history is "really one of repeated psychological maltreatment," including a "history of pervasive rejection, neglect, and being isolated [that] was quite striking." HT 449:17-23. The psychological maltreatment to which Darryl was subjected was "driven by the psychopathology of his caretakers" and not by provocation on Darryl's part. HT 475:20-476:1. As Dr. Ash explained, Darryl did not present discipline problems when he was living outside his parents' homes and thus, his parents' and stepparents' treatment of him cannot be understood as sub-optimal reaction to his provocation. *Id.*

71.    Furthermore, in light of the rigid and arbitrary discipline to which he was subjected, coupled with repeated rejection, Darryl was taught to obey the instructions of others. His experience as a child taught him to be compliant without questioning. HT 442:24-444:2.

72.    Particularly when Darryl lived in Wisconsin, "this pattern became clear, of his being very compliant with others both because of this sort of rule book [developed by his father and stepmother], . . . and also that he was highly susceptible to being talked into things by his peers. That is, in an effort to gain their attention, he would just do what they wanted without thinking through." HT 446:7-25. He had been taught not to question and therefore did not, out of fear of abandonment.

73.    Dr. Ash concluded that, at the time of the crime, Darryl was functioning at the developmental level of a *thirteen to fifteen year old*, which is consistent with the results of neuropsychological testing done by Dr. James. HT 462:13-24, 492:7–493:1, 1222:25-1223:7. Dr. Ash based his opinion on several factors. First, the "global impression" of witnesses who knew Darryl was that he was immature and seemed much younger than his chronological age.

22

Second, "his peer skills were much weaker than those of his peers," which indicates "that he was functioning psychologically, interpersonally at an earlier level." Third, "all of the maltreatment he had experienced" caused a loss of self-confidence and caused him to function at a younger age level. Finally, the time leading up to and at the time of the crime was an "especially stressful" period for Darryl. Under such stress, people do not operate at their best and "tend to be at a somewhat regressed level, even for their otherwise normal functioning." HT 490:19-492:6.

74.    Consistent with Dr. Ash's conclusion, Darryl's participation in the crimes in the Pittman home exhibited all the "hallmarks of adolescent crime." As Dr. Ash explained,

> the patterns of adolescent crime and the patterns of adult crime tend to be different in that adolescents tend to offend in groups and their crimes tend to be impulsive, whereas, adults tend to offend alone and they tend to be more planned out. In addition, adults tend to have one kind of crime that they do over and over and over. Whereas, adolescents tend to be much more diversified.

HT 460:5-461:6. The crime for which Darryl was convicted involved multiple perpetrators and the violence was impulsive, at least in Darryl's mind, because it was not planned. *Id.*

75.    In addition, Darryl behaved like an adolescent on the night of the crime. Darryl was "kind of going along with Dorian, and he thought they were going to do a burglary and go in and get some stuff and leave." HT 455:11-457:6. When Darryl saw that Dorian had murdered Susan Pittman, he thought "'[i]f Dorian could kill her, then he could easily kill me'" and then "his own sense of survival, that he needed to act in some ways to protect himself kicked in." HT 458:4-22. Darryl's conduct was "related to the patterns he had had as a younger person where his real focus was just on doing what people wanted." HT 458:25-459:20.

76.    That is significant because it is "the generally accepted views of the [psychological and medical] professions" that adolescents are generally less culpable for crimes they commit than adults. HT 486:18-488:22. Adolescents tend to be impulsive because the part

23

of the brain responsible for judgment (the prefrontal cortex) develops considerably later (around the age of twenty-three) than the part of the brain responsible for emotion (the limbic system). HT 467:17-472:23; PX 71. In Darryl's case this "mismatch" in the development of the prefrontal cortex and the limbic system was exacerbated by deficits in his prefrontal cortex, which "would place him with less executive functioning than one would expect from the normal person of his age at that time." HT 473:2-22; *see also* HT 1207:22-1210:24. In addition, Darryl's "susceptibility to peer pressure is really off the charts. He is so driven to—need to do what they want, what they ask, what they say, that the intensity of that for him far exceeds what you see in any normal child of any age, really." HT 478:8-16.

77.     Adolescents also are considered less culpable than adults for the crimes they commit because adolescents have no control over environmental factors. An adolescent "cannot choose who his parents are, where he lives, where he goes to school, what neighborhood he lives in, those sorts of things. And so to the extent that environmental circumstances are adverse, they are imposed and by virtue of being imposed, . . . they reduce culpability."   HT 486:18-488:22.

78.     Finally, adolescents are less culpable than adults for crimes they commit because "adolescent personality is not fixed." HT 486:18-488:22. As Dr. Ash explained, "to the extent that you think culpability reflects a depraved character . . . in the sense [of] something that is enduring, you simply can't conclude that from adolescen[ts] because their character isn't necessarily going to continue in the same way." HT 489:13-490:11. That is particularly relevant in Darryl's case because "the violence was so out of character" for him. *Id.*

> **c.     Darryl's History of Severe Psychological Maltreatment Rendered Him an Untreated, Traumatized Child at the Time of the Crime**

79.     Dr. James Garbarino identified five categories of psychological maltreatment: isolating, terrorizing, corrupting, ignoring and rejecting. As Dr. Garbarino testified, there are

24

"multiple sources and abundant evidence that [Darryl] experienced significant, and, in many cases, severe psychological maltreatment in all five categories." HT 1363:7-11.

80.    "Isolating is cutting the child off either from existing relationships, or sort of normal appropriate, expectable relationships that a child would have." HT 1361:9-12. Darryl's early life was characterized by "incredible residential instability." HT 1338:10-13. Before his eighteenth birthday, Darryl was forced to move at least 22 times "often in isolated rural areas, with very little opportunity to establish new contacts and friends." HT 1366:19-1367:8; PX 70. The moves Darryl was forced to make were more isolating than for a "military child who moves a lot" because, in that situation, "there's a whole mechanism for welcoming people into the community and establishing new contacts." HT 1366:23-1367:1. Darryl reported that: "'I have no sense of home.'" HT 1367:5.

81.    Terrorizing means "capitalizing on the child's fear and using it as a weapon against them." HT 1361:19-1362:3. There are multiple reports of both his father and stepfather threatening his mother and his brother and "of both men, exhibiting very dramatic threatening behaviors." HT 1364:23-1366:18. Furthermore, "there's compelling evidence that witnessing child abuse is often at least as bad as being the direct victim of it." HT 1365:22-23. Indeed, "in many jurisdictions, if you have domestic violence going on between the spouses, and you expose the child to that, that's considered prima facie evidence of child abuse towards the child." HT 1366:14-17.

82.    "Corrupting is missocializing the child, encouraging values and patterns of behavior that puts a child at risk for being excluded or rejected by others in the larger society." HT 1362:4-12. For example, Darryl's father flaunted his own criminal behavior with regard to stealing. He also taught Darryl "very unfortunate messages about revenge." HT 1369:11. On

US:145367343

one occasion, Darryl's father was engaged in a dispute with someone and put sugar in that person's gas tank, delivering the message to his children that "revenge is crucial," which "is the kind of message that can put a child at odds with the world." HT 1369:17. Dr. Garbarino also identified several examples of sexual missocialization particularly relating to Darryl's stepfather "who apparently had sort of a prurient interest in girls and tried to get Darryl involved in that" and also invited Darryl to become involved in strip poker games. HT 1369:18-25. In addition, substance abuse in the family goes back generations. HT 1369:5-1370:8.

83.    Ignoring means being psychologically unavailable to the child, either because of deliberately refusing to care for the child, to respond to the child, or being so preoccupied with your own issues and problems that you're unavailable to the child to meet their needs for emotionally responsive care." HT 1361:13-18. "[I]n Darryl's case, it goes well beyond that sort of typically normal psychological unavailability, because his mother was in such desperate states for so much of her life, and thus his life, that between being depressed, being afraid, being preoccupied with her own survival, that she was unable to give Darryl the care he needed." HT 1367:24-1368:4. There also are concrete examples where Darryl's father was drinking and neglected Darryl, which is characteristic of alcoholic fathers. HT 1368:6-14.

84.    Rejecting means sending messages that convey worthlessness or unacceptability. HT 1361:4-8. Darryl was rejected repeatedly throughout his life and by the people most central to his development: his father, HT 1368:6-14, his brother, HT 1301:15-1302:1, his stepfather, HT1341:1-9, his high school principal, HT 1090:15-19. But most damaging, he was rejected by his mother. In Darryl's case, "it seems very clear, and . . . his mother implicitly acknowledges that she rejected him when she sent him to Wisconsin under false pretenses and didn't pick him up." HT 1372:21-23. "[E]ventually, even he [Darryl] had to admit that she was rejecting him."

HT 1372:24-1373:1. Darryl's mother had a pattern of "putting her own intense needs ahead of his," including by "choos[ing] her husband over her boys, and Darryl clearly came to understand that as maternal rejection." HT 1373:17-25.

85.    Considering all the factors, Darryl's was among the most severe cases of psychological maltreatment in Dr. Garbarino's experience, which includes the beltway sniper case and the Nathaniel Brazill case. HT 1363:12-1364:5. Dr. Garbarino explained that "cumulatively, the fact that [the five factors] were all present, that they were chronic, in some cases severe, really undermined [Darryl's] development as a child, and then, as an adolescent, impaired his ability to be a successful adolescent and move into adulthood successfully." HT 1380:1-5.

86.    Moreover, Darryl has "a lot of talents and abilities that could have flourished in a different family environment" and could have permitted him to realize his aspirations to become a pastor or a teacher. HT 1380:16-22. But the "cumulative effect [of his psychological maltreatment] is to have denied [Darryl] the opportunity to travel . . . positive paths, and also denied him the compensation for the vulnerabilities he does have." HT 1380:23-1381:1; *see also* HT 1380:6-15, HT 1345:3-11.

87.    Instead, given his vulnerabilities and his craving for acceptance, which created "a perfect negative storm" (HT 1396:13), Darryl was drawn to Dorian O'Kelley who "was a clearly highly-disturbed, highly-aggressive young person who . . . was generating this whole murderous scenario." HT 1396:24-1397:16. Dr. Garbarino ultimately concluded that, due to the severe maltreatment he experienced, Darryl was an "untreated, traumatized child who inhabited the body of an 18-year old boy" and whose "ability to resist the influence of Dorian O'Kelley was significantly impaired" at the time of the crime. HT 1411:4-16; *see also* HT 1443:11-1444:3.

27

5.    **Mr. Stinski Was Prejudiced by His Counsel's Failure to Present the Compelling Scientific Evidence of His Developmental Deficiencies and his Trauma-Filled Childhood**

88.    To establish prejudice, a "defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694; *Porter v. McCollum*, 558 U.S. 30, 41 (2009) ("The judge and jury at Porter's original sentencing heard almost nothing that would humanize Porter or allow them to accurately gauge his moral culpability."). In making that determination, the Court must consider "the totality of the evidence—'both that adduced at trial, and the evidence adduced in habeas proceeding[s].'" *Wiggins v. Smith*, 539 U.S. 510, 536 (2003) (citation omitted).

89.    The prejudice here is plain. Mr. Sparger failed to "connect the dots" and explain the connection between Mr. Stinski's life history, his mental health issues, and his participation in the crime. *Hooks*, 689 F.3d at 1204. The testimony of Drs. James, Ash and Garbarino (or any one of them) would have supplied that critical, missing explanation. Absent that testimony, there was no evidence presented to the jury that would have permitted them to connect the dots. The "social history" that Dr. Weilenman presented to the jury fell woefully short. As Mr. Sparger himself admitted, that was "what our case was missing" because, although "we put it out there about the lesser culpability, . . . the jury never had the reason why, an explanation." HT 305:11–306:3; *see also* HT 171:6–17 ("the part we had a problem with" was "try[ing] to explain to the jury what happened, why Darryl didn't just walk away"). Presenting no more than Dr. Weilenman's "social history" unsupported by any testing, diagnosis or objective evidence to explain why Mr. Stinski behaved as he did fell well below constitutional standards and stripped the jury of any meaningful choice in the penalty phase of Mr. Stinski's trial.

28

90.     The testimony of Drs. James, Ash and Garbarino would have assisted the jury in understanding Darryl's downward spiral into a nomadic and largely homeless existence and ultimately into the clutches of Dorian O'Kelley one week before the crimes.  It would have helped the jury to understand how this boy who all witnesses concurred had never been violent, had "never hit anybody" and had, in fact, avoided confrontation (HT 678:1–5, 777:7–778:16, 965:2–12, 967:22–968:7, 994:23–995:5, 1056:6–8 1120:3–4, 1279:2–12, 1295:19–23) would be unable to extricate him from a situation created by Mr. O'Kelley, who had a violent nature and history, but was able to draw people like Mr. Stinski who were highly susceptible to peer pressure and had a desperate desire to please others to him.  HT 1120:5–15.

91.     Had the jury heard the evidence from Drs. James, Ash and Garbarino (or any one of them), "there is a reasonable probability that at least one juror would have struck a different balance" and the jury would not have sentenced Mr. Stinski to death. *See Wiggins v. Smith*, 539 U.S. 510, 537 (2003); *accord Smith v. Mullin*, 379 F.3d 919, 943 (10th Cir. 2004) (prejudice shown where "[w]hat the jury wholly lacked was an *explanation* of how Mr. Smith's organic brain damage caused these outbursts of violence and caused this 'kind hearted' person to commit such a shocking crime" (emphasis by court)).

92.     Contrary to the state habeas court's finding (Order at 80–83), the testimony of Drs. James, Ash and Garbarino was materially different than Dr. Weilenman's trial testimony. That Dr. Weilenman might have used some of the same terms as those experts does not render the experts' testimony cumulative.

93.     An inquiry into prejudice is not foreclosed even if witnesses presented in postconviction proceedings reached the same conclusions as witnesses who testified at trial. *See Hinton v. Alabama*, 134 S. Ct. 1081, 1089 (2014) (per curiam).  In *Hinton*, the Supreme Court

US:145367343

rejected the state's argument that "Hinton could not have been prejudiced by his attorney's use of Payne rather than a more qualified expert because Payne said all that Hinton could have hoped for from a toolmark expert: that the bullets used in the crimes could not have been fired from the Hinton revolver." *Id.* As the Court explained, "[i]t is true that Payne's testimony would have done Hinton a lot of good *if the jury had believed it*. But the jury did not believe Payne. And if there is a reasonable probability that Hinton's attorney would have instilled in the jury a reasonable doubt as to Hinton's guilt had the attorney known that the statutory funding limit had been lifted, then Hinton was prejudiced by his lawyer's deficient performance and is entitled to a new trial." *Id.* at 1089–90 (emphasis by Court).

94.     At trial, Dr. Weilenman presented Mr. Stinski's "social history." TT 2769:18, 2770:16–20. A social history "is part of the raw materials from which an analysis comes, because ordinarily it doesn't have much or any analysis. It's a reporting, a kind of narrative reporting of events, and facts, and quotes from people." HT 1349:23–1350:16. As Dr. Weilenman conceded on cross-examination, her assessment of Darryl was not based on any testing and there was no objective way of determining whether it was a good assessment. Dr. Weilenman also related none of the information she provided to Mr. Stinski's relative culpability for his criminal conduct.

> Q.     And correct me if I'm wrong, but have you done any psychological test on the defendant?
>
> A.     No.

TT 2830:23–25.

> Q.     So you really haven't come to court with any kind of diagnosis; you're just giving us a social history?
>
> A.     Correct.

30

TT 2838:16–18.

> Q.    And your job was to—not to assess any criminal responsibility on this defendant's part. Is that correct?
>
> A.    Correct.
>
> Q.    And your assessment of Darryl being like a twelve year old, is that—that's not based on any testing. Is that correct?
>
> A.    Correct.
>
> Q.    So there's no objective way of determining whether yours is a good assessment or not. Is that correct?
>
> A.    Correct. It's just based on my history of working with that population, both in the YDC, in private practice, and having my own children, and being around kids.

TT 2840:1–12.

95.    In closing, the State dismissed Dr. Weilenman's testimony because she did little more than repeat facts testified to by lay witnesses.

> And then we heard a psychologist report after we heard the witnesses, but basically just repeated some of the stuff that people said, or added to it or took away from it. . . . I'd submit that the sum total of what you heard from the experts was a whole lot of nothing. I mean[], they were just trying to tell you, put a slant on the defendant's upbringing, tell you how to view it, when you had the opportunity to see the witnesses yourself.

TT 2876:7–2877:7.

96.    As Dr. Garbarino explained, a social history is a tool necessary for a proper psychological analysis—but not an end in itself. HT 1349:23–1350:7. Dr. Weilenman "had a certain amount of facts, and [she] presented a social history, but was lacking was an organizing-higher order concept to . . . highlight and make sense out of the significance of those facts." HT 1411:17–1413:7.

31

97.    Drs. James', Ash's and Garbarino's testimony, particularly against the backdrop of scientific support in the literature generally and from the testing of Darryl in particular, would have supplied the jury with that "organizing higher order concept" to explain how Mr. Stinski's developmental deficiencies and history of psychological maltreatment rendered him unable to adapt to changed circumstances as the crime unfolded.

98.    The habeas court also found that the aggravating evidence precludes a finding of prejudice. Order at 83–85. But a jury's consideration of aggravating and mitigating evidence is necessarily intertwined.

99.    In *Ferrell v. Hall*, 640 F.3d 1199, 1234 (11th Cir. 2011), the Eleventh Circuit found prejudice where "the evidence of Ferrell's mental illness measurably weakens the aggravating circumstances found by the jury." As the Court explained, the experts' conclusions that "Ferrell has increased impulsivity, decreased sound judgment, and takes actions that are not entirely volitional . . . would have served to reduce the volitional nature of the crime, as well as Ferrell's ability to plan and act rationally, and as a result, undercut the senselessness and cold-blooded nature of the crime as stressed by the prosecutor, and, importantly, explain Ferrell's odd, disaffected behavior afterwards." *Id.* at 1235; *accord Murdaugh v. Ryan*, 724 F.3d 1104, 116 (9th Cir. 2013) ("A jury's findings concerning aggravating factors are also necessarily intertwined with its findings about mitigating circumstances.").

100.    The lack of an explanation for how Mr. Stinski's mental deficiencies, age, and other life circumstances affected his behavior during the crime and his "odd, disaffected behavior afterwards" necessarily impacted the jury's decision on whether his conduct was outrageously or wantonly vile, horrible or inhuman. Had the jury heard all the evidence they could have assessed Mr. Stinski's moral culpability in full context.

32

101.    The state court's conclusion resulted in a decision that is an unreasonable determination of the facts in light of the evidence presented in the state court and contrary to, or an unreasonable application of clearly established federal law.  *See* 28 U.S.C. § 2254(d)(1), (2).

**B.    Trial Counsel's Presentation of Mitigation Evidence During the Penalty Phase of Mr. Stinski's Trial was Incomplete and Incoherent**

102.    Mr. Sparger's stated penalty phase strategy was "to show that Mr. Stinski was much less culpable than Mr. O'Kelley, that—being generous, Mr. O'Kelley, I think is a psychopath. I mean he's pure evil." HT 171:6–17. He also wanted "to be able to explain how someone could . . . still get caught up, participate in something like that, and try to explain to the jury what happened, why Darryl didn't just walk away.  And that was the part we had a problem with.  We could show his history, but never got it all to come together." *Id.* But Mr. Sparger's attempted execution of that strategy was a mishmash—isolated facts and anecdotes (some of which had no bearing on the jury's determination of Mr. Stinski's relative culpability for the crimes) outside of any context that would have permitted the jury to "connect the dots" between those facts and anecdotes and Mr. Stinski's behavior.  As such, Mr. Sparger's representation fell below constitutional standards and prejudiced Mr. Stinski.

**1.    Trial Counsel Unreasonably Failed to Obtain Testimony from Critical Witnesses**

103.    "Because the sentence in a capital case must consider in mitigation 'anything in the life of a defendant which might militate against the appropriateness of the death penalty for that defendant,' penalty phase preparation requires extensive and generally unparalleled investigation into personal and family history."  Commentary to ABA Guidelines § 10.7(a), 31 Hofstra L. Rev. at 1015.  Mr. Sparger's penalty phase presentation was incomplete because he failed to present testimony from critical witnesses, including Darry's half-brother, George Anthony ("Tony") Raby, Linda Herman and Sean Proctor.

33

a.    **Tony Raby**

104.    Mr. Sparger did not call Darryl's brother Donald or his stepfather Frank Sutton as witnesses. Nor did he question Darryl's mother or father in any detail about the dysfunction in Darryl's family. The jury heard only second-hand accounts from Darryl's grandmother, Ms. Davis and Dr. Weilenman about what it was like to grow up in the various homes in which Darryl lived.

105.    The testimony of Darryl's half-brother, Tony Raby, would have been critical to present the jury with a first-hand account concerning what it was like to grow up with Darryl's biological parents and his stepfather. Mr. Raby would have told the jury about the abuse that Darryl's father and stepfather directed toward Darryl and his brothers and his mother's indifference to and abandonment of her sons.

106.    For example, Tony would have told the jury that Darryl's father, Mike Stinski, who was in the navy when Darryl was born, was away from home for six months at a time and then home for two or three months before he was deployed at sea again. HT 602:3–9. When he was home, he was distant and neglectful. He "had a hard time . . . trying to deal with having three kids" and was more interested in dealing with cars than his children. HT 602:10–17.

107.    Mike also was an alcoholic and physically abusive. Mike would "yell at all of us," but, as the oldest child, Tony bore the brunt of Mike's physical abuse, which Darryl witnessed. HT 605:3–7. Mike would "grab something," including belts, spoons and wire and "hit us with it." HT 604:7–25. Once,, when Mike was yelling at Donald, he gave Donald his gun and told Donald to shoot him. Then Mike took the gun from Donald, pointed it at the family dog and pulled the trigger. The dog survived because the gun was not loaded. HT 605:10–606:16, 638:13–639:16. Darryl, who was two or three at the time, and his brothers were "crying our eyeballs out" and "distraught" over their father's actions. HT 606:18–607:1.

34

US:145367343

108.    After Darryl's parents separated in 1988 and divorced in 1991, their relationship was ugly. They engaged in "constant argument[s]" over everything, including "child support, visitation, [and] dealings with the house they had just bought." HT 608:14–21; *see also* HT 620:11–12 ("mom was always arguing with Mike when it came to child support"); HT 656:22–657:8 (Darryl's mother Pam "brought the worst out in Mike," and he "was mean" when they talked on the phone). Darryl became a pawn in his parents' child support arguments. HT 620:8–20.

109.    In 1989, Darryl's mother began dating Frank Sutton and moved into his home in Barnwell, South Carolina with her sons. In 1991, she married Frank. HT 609:25–610:11. Frank was an alcoholic. He did not want Darryl and his brothers around and was hostile and abusive to them. He often gave Darryl's mother an ultimatum that she had to choose between him and her children: "'[I]f you don't do something about these kids, I'm leaving. It's either them or me.'" HT 619:14–16. As Tony described it:

> It's hard to explain the kind of feeling you have when . . . you're supposed to have a mother who's supposed to protect you and be there for you . . . and you have a man she's married to who despises, I mean, made it adamantly known that he basically despised all of us. It was hard to be there.

HT 629:3–9.

110.    Frank was "nonexistent" as a father. HT 615:2. He "liked to control [Darryl and his brothers] by fear." HT 617:4. Frank "controlled almost everything we did, where we could go, or how we could do it, if we could do it or not. It was just like we were being watched every little thing that we were doing." HT 617:8–13. Frank installed a video surveillance system to monitor Darryl and his brothers. If they violated Frank's code-of-conduct, he would beat them with a belt or paddle. HT 616:7–11.

35

111.    In May 1995, Darryl's mother sent him to live with his father, his stepmother, Terrie Stinski, her daughter Connie from a previous marriage, and Terrie's sister Patti Bray. Darryl arrived in Wisconsin with a single suitcase of summer clothes, expecting that he would be spending the summer in Wisconsin and then returning to live with his mother. HT 661:7–662:7, 1342:12–22. But instead Darryl lived with his father and stepmother in Wisconsin for five years. Darryl's mother never visited him while he was in Wisconsin. She never sent him all his clothes and belongings even though he asked for them.

112.    Darryl's time in Wisconsin was characterized by frequent moves—the family moved five times during the five years he spent in Wisconsin—and rigid discipline. Darryl's friends did not visit his home often because it "wasn't a pleasant place." HT 962:5–9. Darryl's "family tend[ed] to yell a lot at each other." HT 962:10–11. Darryl's father "yelled at [him] for a lot of minor things" and Darryl was punished and grounded frequently, including for breaking his collarbone. HT 962:20–963:20.

113.    In August 2000, Darryl traveled to Florida for his brother Donald's wedding. TT 2672:1–2673:2. He did not return to Wisconsin. Instead, he moved back to South Carolina and lived with his mother and stepfather. A few months later, in October 2000, two young boys were killed and another wounded during a robbery and shooting in a local Sonic restaurant. Although Darryl did not know the victims, he attended their funerals to comfort their families and friends. HT 1038:5–17. Around this time, Darryl stayed overnight with a friend of one victim without telling his mother. TT 2604:10–15. Darryl's stepfather seized on that act of mercy as an excuse to kick Darryl out of the house. TT 2604:16–17.

114.    In March 2001, after living with another family for a short period, Darryl moved to Savannah, Georgia to live with his brother Donald and sister-in-law Amber, who was

36

expecting a child. Donald was in the army and living with his wife in an apartment off base. When Tony learned that Darryl was living with Donald, he told their mother that he "didn't believe Donald at the time could handle the responsibility" of caring for Darryl because "Donald's never been the one to handle responsibility very well." HT 627:24–628:3. In addition, Donald "was having some issues with alcohol at the time. And . . . sending a 17-year old to an irresponsible . . . someone who's not as responsible as a parent would be" was not a good idea. HT 628:5–9. To exacerbate matters, Savannah had a reputation as a "party city" and Tony "didn't think it was the best place for Darryl." HT 628:10–15.

115.    Tony's concerns were prescient. Liz Dostal, a friend of Darryl's testified that Donald "wasn't a very good caretaker." HT 1274:14–16. He lived "a bachelor-style life, even though he had a girlfriend, wife, whatever she was at the time, and a child." HT 1274:18–19. There was little furniture and little food in Donald's apartment "unless it was ramen noodles and beer." HT 1274:18–19. There were no rules in Donald's apartment, which was like a "frat house." HT 1276:17–22.

116.    In the summer of 2001, Tony saw Darryl again at their grandfather's funeral. Darryl "looked stressed" and "beat up" and "like he felt like everybody gave up . . . ." HT 629:13–22

117.    Darryl's sentencing jury did not hear from Tony. Even though Darryl's mother knew Tony's whereabouts, he was never contacted by anyone on Darryl's defense team, but would have testified had he been contacted. HT 597:19–599:25. The defense team could not locate Tony, although Ms. Davis testified that she left a message for him. HT 304:10–14.

118.    Trial counsel rendered ineffective assistance by failing to make greater efforts to contact Mr. Raby and present this first-hand testimony about the abuse and neglect that Darryl

US:145367343

suffered throughout his life. *See Lewis v. Dretke*, 355 F.3d 364, 368 (5th Cir. 2003) (trial

counsel ineffective where they "adduced evidence of child abuse through the testimony of

Lewis's grandmother," but "her conclusional testimony contained none of the details provided

by Lewis's siblings at the habeas hearing . . . ."). Had counsel done so, there is a reasonable

probability that the result of the penalty phase would have been different.

119.    The state habeas court concluded that Tony's testimony "would have been largely

cumulative of testimony counsel presented through numerous witnesses at Petitioner's trial."

But Mr. Sparger's presentation of some mitigation evidence does not foreclose an inquiry into

prejudice.

> We certainly have never held that counsel's effort to present *some* mitigation
> evidence should foreclose an inquiry into whether a facially deficient mitigation
> investigation might have prejudiced the defendant. To the contrary, we have
> consistently explained that the *Strickland* inquiry requires precisely the type of
> probing and fact-specific analysis that the state trial court failed to undertake.

*Sears v. Upton*, 130 S. Ct. 3259, 3266–67 (2010) (emphasis by court). Unlike other witnesses,

Tony was the only witness who could provide a first-hand account of Darryl's abandonment and

mistreatment throughout his young life.

120.    The state court's conclusion resulted in a decision based on an unreasonable

determination of the facts in light of the state court record, and was contrary to, or an

unreasonable application of clearly established federal law. *See* 28 U.S.C. §§ 2254(d)(1), (2).

#### b.    Sean Proctor

121.    Sean Proctor would have been a critical witnesses to explain Darryl's downward

spiral days before the crime after he was kicked out of his brother's house in Savannah.

Mr. Sparger did not call Mr. Proctor even though he was available and prepared to testify at trial.

US:145367343

122.    Darryl met and befriended Sean Proctor after he moved to Savannah to live with his brother Donald. He developed a bond with Sean's mother and a brotherly relationship with Sean's two younger sisters. HT 1293:25–1295:18.

123.    In June 2001, Donald's wife left him and, as a result, the Army stopped paying Donald for off-base housing. In October 2001, Donald vacated the apartment because he could not pay the rent and moved to barracks on the base. When Darryl found out that Donald was moving to the base, Darryl asked where he would live. Donald replied, "'[t]hat's not my problem.'" TT 2810:7–13. Darryl was forced to find other accommodations.

124.    For a few months, Darryl lived with Sean and his family. HT 1297:18–1298:10. After that, he "bounced around with friends," meaning "[h]e stayed somewhere until he wasn't able to stay there and went to the next house." HT 1299:22–1300:6. For a short period, Darryl lived in an apartment with a roommate, Nick Ostreyko-Hart. Sean spent a lot of time with Darryl at that apartment because "the supervision levels were, for lack of a better word, nonexistent there." HT 1300:7–22. But Nick found a new roommate—Darryl's brother Donald—and Donald kicked Darryl out of an apartment for a second time. HT 1301:9–19. Darryl told Sean he felt "betrayed" because his "own flesh and blood [threw] him to the curb." HT 1301:20–1302:1.

125.    About a week before the crime, Darryl knocked on Sean's bedroom window and asked if he could stay over because "[h]e had nowhere else to go." HT 1303:12–1304:4. Darryl looked like he was homeless, "[l]ike somebody that hadn't slept very well, like they've just been moving, like somebody that doesn't have time to stop." HT 1304:18–25. Sean snuck Darryl in through a bedroom window and allowed Darryl to sleep in a crawlspace under his bed that night. HT 1304:10–17.

US:145367343

126.    The jury did not hear Sean Proctor's description of Darryl's condition just days before the crime because trial counsel did not call him as a witness. Despite Mr. Proctor's willingness to testify, during a break in the trial, Mr. Schiavone told Mr. Sparger, "'you're not going to call Mr. Proctor.'" HT 206:25–207:11; *see also* HT 320:14–19. Even though he was responsible for the penalty phase presentation, Mr. Sparger obeyed Mr. Schiavone. Mr. Sparger "sugarcoated some reason" and told Mr. Proctor that "he could go ahead and leave." HT 207:12–18. After the trial, Mr. Sparger wrote a letter to Sean Proctor, which stated that "'[s]ince what you had told me was not consistent with what you had told our investigator Dale Davis, I was very concerned about calling you, because I was] not sure what you would say.'" HT 324:13–22. That did not reflect Mr. Sparger's reason for declining to call Sean Proctor as a witness. HT 324:23–7.

127.    There was no strategic reason for failing to call Mr. Proctor. By the time of trial, he had overcome the drug abuse and other issues that he was experiencing in 2002 when he met and befriended Darryl. He was sober, was working full-time and dating his current wife. HT 1308:13–1310:4.

128.    Mr. Proctor's evidence was essential to provide the jury an understanding of the desperate straits Darryl was in just prior to the crime. Had the jury heard that evidence, there is a reasonable probability that the outcome of the penalty phase would have been different.

129.    Despite the evidence admitted at the state court habeas hearing, the state court concluded that trial counsel made a strategic decision not to call Mr. Proctor as a witness during the penalty phase of Darryl's trial. Order at 77. The state court's conclusion resulted in a decision based on an unreasonable determination of the facts in light of the state court record,

US:145367343

and was contrary to, or an unreasonable application of clearly established federal law. *See* 28 U.S.C. §§ 2254(d)(1), (2).

c.      **Linda Herman**

130.    Linda Herman would have been another critical witness to Darry's predicament and mindset in the days just before the crime. But the jury did not hear from her because trial counsel did not call her to testify during the penalty phase of Mr. Stinski's trial.

131.    Darryl enrolled in high school in Savannah. TT 2674:24–2675:5. Linda Herman, the principal at Forest Windsor High School, required Darryl to sign a behavioral contract in light of truancy issues that he had in his previous high school in South Carolina. Ms. Herman testified that "I remember the principal [of Darryl's previous high school] assuring me that this was not a violent student. . . .The problem was that he had been in and out of schools and not attending classes and not doing the academic work he was supposed to do." HT 1082:20–1084:21. Although Darryl continued to have attendance issues, he was never violent, bullying or disrespectful in school. HT 1085:23–1086:20.

132.    Several weeks before the crime, Darryl was withdrawn from high school for truancy. TT 1086:21–1089:8. Ms. Herman would have described to the jury that just days before the crime, Darryl returned to school and begged her to let him back in school. HT 1089:9–1090:22. He was in a "terrible condition." HT 1089:24–1090:1. He looked "disheveled" and "like he'd slept in his clothes . . . on the streets somewhere." HT 1090:2–22. Darryl "was just desperate, almost pleading to get in school." HT 1099:25–1102:7. He told Ms. Herman that he "'really needed to be back in school.'" HT 1090:10–11. Ms. Herman rejected Darryl's request and told him he would have to return the following school year, "[a]nd the next thing I knew, this crime happened." HT 1090:15–22.

41

133.   Ms. Herman does not recall ever being contacted by the defense team. HT

1072:2–1073:13. Ms. Davis testified that she thought she spoke to Ms. Herman, but conceded

that "if I don't have a memo about speaking to her, then I didn't speak to her." HT 902:18–23.

There is no such memo in Ms. Davis' files. As a result, Darryl's sentencing jury was deprived of

her important evidence, which would have buttressed Mr. Proctor's description of Darryl just

days before the crime. Had the jury heard about Darryl's plea to return to school, there is a

reasonable probability that the result of the penalty phase would have been different.

134.   Despite Ms. Herman's testimony that she was available and would have testified

for Mr. Stinski at his trial, the state habeas court concluded that trial counsel made a strategic

decision not to present her testimony because of hearsay in a document from an investigator for

the District Attorney that reported her reluctance to testify. The state court's conclusion resulted

in a decision based on an unreasonable determination of the facts in light of the state court

record, and was contrary to, or an unreasonable application of clearly established federal law.

*See* 28 U.S.C. §§ 2254(d)(1), (2).

### 2.   Trial Counsel Unreasonably Produced Ms. Davis' Privileged Witness Interview Notes

135.   Mr. Sparger also prejudiced the penalty phase presentation by providing Ms.

Davis' privileged interview memoranda to the prosecution. From the time she was retained

through 2005, Ms. Davis interviewed 40 people, and memorialized the information she obtained

in memoranda that she sent to Mr. Sparger. Ms. Davis marked each memorandum that she

prepared with the designation "CONFIDENTIAL" and "ATTORNEY-CLIENT AND WORK-

PRODUCT PRIVILEGED INFORMATION." *See, e.g.*, PX 28k at DS00041595–733. Those

designations were consistent with Ms. Davis' discussions with Mr. Sparger and her belief "that

US:145367343

all of my information was confidential and would not be turned over to the prosecution." HT
826:17–828:19.

136.   Mr. Sparger inexplicably and unreasonably produced Ms. Davis' privileged
interview memoranda, which prejudiced the penalty phase presentation by giving the prosecution
a window into the defense strategy and impeachment material.  For example, on cross-
examination, the prosecution confronted Mark Correll, a person with whom Mr. Stinski lived
after his stepfather kicked him out of the house, with Ms. Davis' memorandum of her interview
with him.  That memorandum reported incorrectly that Mr. Correll had asked Darryl to leave his
home because Darryl had become verbally abusive to his son.  TT 2621:5–2622:10.  But Mr.
Correll had never seen that memorandum before testifying and was not prepared by Darryl's
lawyers to address information in it at Darryl's trial.  In the state habeas court, Mr. Correll
contradicted the information in Ms. Davis' interview memorandum, denying that Darryl verbally
abused his son: "I do not remember that at all" and "I didn't remember it then." HT 1011:18–
1012:7.

137.   Ms. Davis' notes should not have been produced because, as the Georgia Supreme
Court held on direct appeal, "'notes and summaries' made by a mitigation specialist who is
working at the direction of trial counsel in a death penalty case should be regarded as 'notes or
summaries made by counsel' within the meaning of the criminal discovery procedure." *Stinski v.
State*, 286 Ga. 839, 845, 691 S.E.2d 854, 865 (2010).  As the U.S. Supreme Court has held, "[a]n
attorney's ignorance of a point of law that is fundamental to his case combined with his failure to
perform basic research on that point is a quintessential example of unreasonable performance
under *Strickland.*" *Hinton v. Alabama*, 134 S. Ct. 1081, 1089 (2014) (per curiam); *accord
Lawhorn v. Allen*, 519 F.3d 1272, 1295 (11th Cir. 2008) (decision to waive closing argument

US:145367343

during the penalty phase "based on a complete misunderstanding of a clear rule of law" constituted ineffective assistance because "[t]actical or strategic decisions based on a misunderstanding of the law are unreasonable"); *Hardwick v. Crosby*, 320 F.3d 1127, 1163 (11th Cir. 2003) ("failure to present mitigating evidence because of misunderstanding the state law as to presentation of mitigating evidence is unreasonable as a tactical decision").

138.    The state habeas court concluded that "until the Georgia Supreme Court issued its direct appeal decision in the instant case, trial counsel was not on notice that the materials produced by Ms. Davis in her role as a mitigation specialist were not discoverable." Order at 71. But the Georgia Supreme Court's decision did not change or even clarify the law. The Court merely cited the criminal discovery statute and case law from 1967 to hold that witness interview notes prepared by mitigation investigators for defense counsel are not discoverable.

139.    The state court's conclusion resulted in a decision based on an unreasonable determination of the facts in light of the state court record, and was contrary to, or an unreasonable application of clearly established federal law. *See* 28 U.S.C. §§ 2254(d)(1), (2).

### 3.    Trial Counsel Unreasonably Presented Ms. Davis' Testimony

140.    At death penalty seminars that Ms. Davis attended, "[w]hat they covered about testifying was that the mitigation investigator shouldn't ever be put on the stand . . . because that person has access to all—a whole world of information that you may or may not want to use." HT 863:24–864:8. Consequently, Ms. Davis advised Mr. Sparger to retain a social worker who could present Darryl's social history at trial and recommended a social worker to him "who can take the records, look at the records, look at interviews, look at things, and put that together, and show how that can affect a person." HT 926:9928:8, 283:22–284:23. Mr. Sparger failed to act on Ms. Davis' recommendation. HT 163:5–165:6.

US:145367343

141.    On March 19, 2007, approximately two months before the trial began and five years after Ms. Davis was retained, Mr. Sparger notified Ms. Davis that he wanted her to testify. Ms. Davis "didn't want to testify" because she "wasn't qualified to testify," although she ultimately agreed to do it.

142.    The night before her scheduled testimony, Mr. Sparger gave Ms. Davis a notebook with documents he wanted to get into evidence. HT 845:8–18. Mr. Sparger did not prepare her for questions she might be asked on cross-examination. HT 853:24–855:1. Rather than use Ms. Davis solely to authenticate documents she had collected, Mr. Sparger asked her about the documents even though she was "just not qualified to take that information and say what impact it has on anybody or how a combination of those things would affect a person." HT 920:18–23. Predictably, Ms. Davis' convoluted testimony consisted of her recitation of details from records with no explanation how those details mitigated, if at all, Mr. Stinski's culpability for the crimes.

143.    For example, Ms. Davis told the jury that eighteen minutes after he was born Mr. Stinski "was given oxygen for cyanosis, which would mean he was turning blue (TT 2366:12–17), that he "had chronic ear problems when he was younger and eventually had to have tubes put in his ears" (TT 2368:5–11), and that when he was sixteen years old, he was caught shoplifting candy valued at $2.06. TT 2379:10–19. Mr. Sparger never attempted to explain why that information should be important to a jury assessing Mr. Stinski's culpability.

144.    On cross-examination, Ms. Davis admitted that she was not qualified to opine on whether cyanosis is unusual because "I'm not a medical expert," and that Mr. Stinski's cyanosis was not linked to any permanent mental damage and his chronic ear problems were not linked to any psychological problems. TT 2414:21–2415:13; *see also* TT 2419:8–18 (there was a

45

difference between Darryl's scores on standardized testing in reading and language skills and his scores in math "[b]ut again, I'm not an expert in those things and it was just something I noted"). Practically apologizing for providing the jury with information absent an explanation regarding its usefulness, Ms. Davis further testified that "some of those records, . . . you get them, but they don't really mean a whole lot when you get them." TT 2415:8–13.

145.   Picking up on that theme, the prosecutor characterized Ms. Davis as having only "put together some records" and "some copies of some interviews." TT 2410:17–22. And, in closing, the prosecutor argued: ". . . [A]s I said, sometimes when you get a lot of junk going into reports, that doesn't—that kinda takes away from the reports, the value they have. . . . It sounds like throw a lot up in the air and see what lands . . . ." TT 2876:25–2877:9.

146.   Ms. Davis was upset about her cross examination and felt she did not perform well, which "could hurt Darryl." HT 853:24–855:1. Outside the courtroom, after her testimony concluded, Ms. Davis told Mr. Schiavone that Mr. Sparger "was just in over his head and that the case was not well-prepared." HT 855:5–856:21. Mr. Schiavone "didn't really react at all. He just—it seems like he nodded." *Id.*

147.   "[I]t hardly constitutes a reasonable investigation and mitigation strategy simply to obtain . . . records . . . then dump the whole file in front of the jury without organizing the files, reading them, eliminating irrelevant files or explaining to the jury how or why they are relevant." *Johnson v. Bagley*, 544 F.3d 592, 602 (6th Cir. 2008).

148.   The state habeas court concluded that "[g]iven Ms. Davis's extensive experience as a mitigation specialist and the scope of her testimony, counsel's decision to have her testify in mitigation to introduce Petitioner's social history was reasonable." Order at 70. But Ms. Davis

US:145367343

was not qualified to give a social history or to explain the significance of the documents she had

obtained.

149.    The state court's conclusion resulted in a decision based on an unreasonable

determination of the facts in light of the state court record, and was contrary to, or an

unreasonable application of clearly established federal law.   *See* 28 U.S.C. §§ 2254(d)(1), (2).

### 4.    Trial Counsel Unreasonably Neglected to Present Evidence of Mr. Stinski's Remorse

150.    At trial, a major theme of the State's was Mr. Stinski's supposed lack of remorse

for the brutal murders.  In its penalty phase opening argument, the State emphasized that point:

> Other things you can consider are the reaction of the defendant, let's say, in the
> interview.  Thirty hours after he committed the crime, what's he doing?  It's a
> totally flat affect.  No emotion, except maybe two times.  When Captain
> Merriman came in, does he need something to drink?  Oh, please.  More emotion
> than was ever shown anywhere else in that whole episode about lying about how
> two people were brutally killed. . . . It was important to him thirty hours after the
> death to get a Mountain Dew than it was  that two people were killed at his hands.

TT 2262:2–24.

151.    The State returned to that theme in its closing argument:

> The remorse or lack of remorse shown by the defendant in this case.  You
> remember the police took a photo of the defendant at the scene—you know, right
> afterwards.  He didn't really seem upset in any way. . . . But regardless of how
> much weight you give to the weight of the suffering [of the victims], even more
> so, I would suggest that it's relevant, the attitude of the defendant toward this
> crime as expressed in that statement.  That is a matter of fact rendition of what
> occurred, no emotion for the harm that he had caused.

TT 2874:9–2875:2.  The State played portions of Mr. Stinski's videotaped statement and asked

the jury to "look at his flat affect throughout." TT 2884:14–15.

152.    Mr. Sparger failed to develop and present available evidence to rebut or forestall

the State's arguments concerning Mr. Stinski's supposed lack of remorse.

47

153.    The defense team failed to retain a trauma expert who would have explained to

the jury that "one way that children respond to trauma is by disconnecting emotionally from the

experience." HT 1385:15–17. This process—called "'dissociation'"—arises from

"overwhelming arousal" associated with trauma, which causes children to "emotionally

disconnect in order to maintain some sort of balance within themselves" and "comes across as

this emotional blunting." HT 1386:13–1387:3.

154.    Dissociation explains Mr. Stinski's lack of affect during his videotaped statement

and at trial. HT 1386:4–12. But Mr. Stinski's sentencing jury did not have the benefit of that

evidence because the defense team did not retain a trauma expert to provide that explanation.

155.    There was additional evidence available to Mr. Sparger to rebut the State's

arguments about an alleged lack of remorse. After he was arrested, Mr. Stinski was housed in

the same jail unit as Alton VanBrackle who told investigators that Mr. Stinski "was crying" as he

described the crime to Mr. VanBrackle and "can't sleep at night." Pets. Ex. 29F at DS 0031373–

86. Mr. Sparger planned to call Mr. VanBrackle to testify about Mr. Stinski's remorse without

getting into the details of the jailhouse confession that Mr. Stinski made to Mr. VanBrackle:

> If the State has not called Alton VanBrackle during the guilt-innocence phase (to
> get in the jailhouse confession), I will call him to get in the remorse. He has some
> very strong stuff about how Darryl could not sleep, etc. If the State does call
> VanBrackle during guilt-innocence for the jailhouse confession, I believe we may
> want to hold off on the remorse stuff and recall him for further cross-examination
> during sentencing. If called for further cross, I believe we could prevent the State
> from doing redirect that is about the jailhouse confession.

Pets. Ex. 28k at DS-0041467–70.

156.    The State did not call Alton VanBrackle during the guilt-innocence phase.

Instead, Mr. Schiavone sought to do that, but the trial court ruled that Mr. VanBrackle's

US:145367343

testimony would be inadmissible during the guilt-innocence stage "unless the defendant testifies." TT 2065:2–2079:13.

157.    During the penalty phase, the defense again sought to introduce Mr. VanBrackle's testimony. The State moved in limine to permit it to introduce evidence of a second videotaped statement that Mr. Stinski gave to investigators in violation of his right to counsel if Mr. VanBrackle testified to the details of Mr. Stinski's jailhouse confession. The State expressly represented that the ruling it sought did not pertain to Mr. VanBrackle's anticipated testimony about remorse: "it's fine if [Mr. VanBrackle] gets up and testifies about Stinski being remorseful . . . ." TT 2664:10–11; *see also* TT 2669:11–12 ("if [VanBrackle's] testifying to remorse, that's one thing Your Honor").

158.    The trial court ruled that, if Mr. VanBrackle testified about Mr. Stinski's description of the crime, the State could introduce the second videotaped statement to show any alleged inconsistency between what Mr. Stinski told Mr. VanBrackle and what he told investigators about his participation in the crime. TT 2724:18–22. However, the trial court clarified that *Mr. VanBrackle's testimony concerning Mr. Stinski's remorse would be admissible without risking introduction of Mr. Stinski's second videotaped statement*: "Any evidence regarding the defendant's lack of remorse is certainly admissible, and we wouldn't even think about disallowing that testimony to get in. He's got a right to bring that in, if he wants to." TT 2724:23–2725:1.

159.    Mr. Stinski's lawyers decided not to present Mr. VanBrackle's testimony in light of the trial court's ruling (HT 268:10–12), which the state habeas court accepted as a "strategic decision" (Order at 73) even though Mr. VanBrackle's testimony regarding Mr. Stinski's

US:145367343

remorse would have been admissible without the risk that it would open the door to Mr. Stinski's second videotaped statement.

160.    As a result of trial counsel's conduct, the State introduced unrebutted evidence of Mr. Stinski's supposed lack of remorse and was able to portray him as an unrepentant, cold-blooded killer even though that was not the case, and there was admissible evidence was available to rebut it. Had counsel dissuaded the jury from that impression, there is a reasonable probability that the result of the penalty phase would have been different.

161.    The state court's conclusion that trial counsel made a legitimate strategic decision not to call Mr. VanBrackle resulted in a decision based on an unreasonable determination of the facts in light of the state court record, and was contrary to, or an unreasonable application of clearly established federal law. *See* 28 U.S.C. §§ 2254(d)(1), (2).

### 5.    Trial Counsel Unreasonably Failed to Prepare Mitigation Witnesses for Their Trial Testimony

162.    After the January 2005 strategy meeting, Ms. Davis had no contact with anyone on the defense team for several months until Dr. Weilenman emailed to ask her whether she had heard anything about the case. On May 17, 2005, Ms. Davis contacted Mr. Stinski's lawyers to "reopen communications about the case" and attached a list of potential mitigation witnesses. PX 28kat DS-0041655–58; HT 841:7–17. At that time, Ms. Davis was "doing nothing" on the case and "was not getting any information from the lawyers saying that anything was going on from their perspective." HT 844:11–845:3. Neither Mr. Schiavone nor Mr. Sparger ever responded to her email. HT 841:7–844:10.

163.    Mr. Sparger did not contact the vast majority of the potential mitigation witnesses identified in Ms. Davis' May 2005 summary for almost two years until a few months before the trial began. In March 2007, Mr. Sparger contacted mitigation witnesses for a six minute "meet

and greet" telephone conversation to touch base and introduce himself. He planned to speak with the witnesses again before trial to go over their testimony in more detail and to conduct mock cross-examinations, but he ran out of time. HT 174:11–25, 175:9–180:16. Although he was trying to plan and prepare for the penalty phase, Mr. Sparger remained responsible for supporting Mr. Schiavone during the guilt/innocence phase and taking care of travel arrangements for the witnesses. Mr. Sparger spoke to some witnesses again about logistics and confirming details gathered by Ms. Davis. HT 278:1–20. Consequently, "by the time I was in front of the court and had [the witnesses] on the stand, I was lost." HT 278:9–11.

164.    The penalty phase began one or two hours after the jury returned its verdict in the guilt/innocence phase. Mr. Sparger had no second chair or other assistance in the courtroom. HT 194:25–195:3. Mr. Schiavone was outside the courtroom during the penalty phase other than for Mr. Sparger's closing argument. HT 195:10–19, 208:16–209:5. Mr. Yancey was at the counsel table. While Mr. Yancey took notes critiquing Mr. Sparger's performance, he did not share suggestions with Mr. Sparger, and to the extent he did, Mr. Sparger "didn't want to listen to any suggestions." HT 378:12–388:10. Mr. Sparger did not ask him for help because Mr. Yancey did not have Ms. Davis' memos and had not had any contact with the mitigation witnesses. HT 195:22–196:22. As Mr. Sparger explained, "I was there by myself. I was on my own little island, for lack of better description." HT 199:9–200:2; *see also* HT 195:10–19; *see also* HT 195:10–19 ("I was in there conducting the mitigation phase. Mr. Yancey was present. He was at counsel table. Mr. Schiavone was outside the courtroom most of the time.").

165.    Some of Darryl's friends and acquaintances from Wisconsin, South Carolina and Savannah testified during the penalty phase. Consistent with Mr. Sparger's testimony that he did not conduct mock examinations, the witnesses agreed that Mr. Sparger did not prepare them for

51

the questions he would ask on direct examination or the questions they likely would be asked on cross-examination. Nor did he discuss with them the mitigation strategy and how their testimony would fit in. HT 743:6–746:14, 782:22–786:16, 971:6–972:4.

166.    As a result of trial counsel's ineffectiveness, the witnesses' testimony was disjointed and unpersuasive. Even the witnesses themselves knew it. Jonathan Hassenzahl, Darryl's friend from Wisconsin, "didn't feel like I was listened to at all." HT 751:23–752:6. Similarly, Paul Van Eyck, another of Darryl's friends from Wisconsin, was "confused" after his trial testimony because "I had no idea whether my—my testimony had affected the trial in any kind of manner, positive or negative." HT 786:19–24. Likewise, Logan Miller testified that he was not prepared for his testimony and afterwards felt "[l]ike I didn't help." HT 973:7–21.

167.    So too was Mr. Sparger's closing argument rambling and incoherent. Mr. Sparger variously talked about his son and granddaughter, and something he called a "presumption of life, even if it's not said that way in an instruction to you by the Court." TT 2905:15-2907:19. In addition, Mr. Sparger quoted from Clarence Darrow during the Leopold and Loeb trial in the 1920s even though "if any of you were to ask me what the case was about, I have no idea right now" because "my mind[ is] fried right now." TT 2914:15-2915:23. He also quoted from a letter to the editor written during the Susan Smith trial even though he could not "remember who wrote it" and suggested that "[m]aybe some of you all may" and he did not "know if I have the entire letter; I may not." TT 2921:11-2922:18.

168.    And he explained that he provided the jury with seemingly irrelevant details such as that Darryl had "[t]ubes in the ear or whatever you call it" because "we're trying to give you everything we can find," although "maybe I should have done that differently. I'm learning." TT 2908:10-22.

US:145367343

169.    Mr. Sparger told the jury that "I'm not going to go into the evidence in any great detail" and he kept his word. TT 2911:17-18. In fact, Mr. Sparger's discussion of the record comprises only four pages of the transcript. TT 2925:23-2929:16. Even then, Mr. Sparger's discussion was without any specificity. He told the jury that "all of us are helped somewhere along the line" and, although Darryl "has some of that," he did not get help from his mother and father. TT 2925:16-2926:4. Then Mr. Sparger discussed the rule book that governed Darryl's conduct for some period while he lived with his stepmother and father in Wisconsin. Mr. Sparger described the rule book as a "very rigid regimen" and explained that "[m]y concern with the book" is that Darryl "never had a chance to think." TT 2926:5-2927:15.

170.    Even though Mr. Sparger's stated strategy was to show that Darryl "was much less culpable than Mr. O'Kelley" (Tr. 171:6-17), Mr. Sparger's discussion of Mr. O'Kelley comprises only two paragraphs of his closing argument. In that regard, Mr. Sparger told the jury that "you all heard a lot about Dorian in the first phase" and "you heard at the start of this phase" from two teachers, one of whom "likened [Dorian] to Charles Manson" and another of whom "explained how Dorian could be very manipulative." TT 2929:3-13. Then Mr. Sparger asked the jury "[d]oesn't all the evidence show that" Darryl could be manipulated? TT 2929:13. But Mr. Sparger did not describe any record evidence to answer that question affirmatively.

171.    Similarly, Mr. Sparger told the jury that Darryl "wasn't yet a young man, in my opinion" and asked the jury whether Darryl "had . . . developed as much as most eighteen year olds." TT 2903:9-14. But he did not answer that question for the jury with reference to the record because he had not developed the evidence to answer that question.

US:145367343

172.   In sum, although Mr. Sparger told the jurors they were not required to impose a death sentence and begged them for mercy (TT 2930:12), he gave them no basis with reference to the record to exercise mercy.

173.   The state habeas court concluded that "Mr. Sparger's presentation of mitigation evidence was substantively sound and any stylistic deficiency was not substantial or prejudicial." Order at 78.

174.   The state court's conclusion resulted in a decision based on an unreasonable determination of the facts in light of the state court record, and was contrary to, or an unreasonable application of clearly established federal law.  *See* 28 U.S.C. §§ 2254(d)(1), (2)

C.   **Trial Counsel Unreasonably Failed to Question Potential Jurors Regarding Their Views About the Death Penalty in Cases Involving Child Victims**

175.   The Sixth and Fourteenth Amendments to the United States Constitution guaranteed Mr. Stinski "the right to a . . . trial [] by an impartial jury . . . ." *Parker v. Gladden*, 385 U.S. 363, 364 (1966); *accord Irvin v. Dowd*, 366 U.S. 717, 721–22 (1961) ("[T]he right to jury trial guarantees to the criminally accused a fair trial by a panel of impartial, 'indifferent' jurors.  The failure to accord an accused a fair hearing violates even the minimal standards of due process.").  "'*Voir dire* plays a critical function in assuring the criminal defendant that his [constitutional] right to an impartial jury will be honored.'" *Morgan v. Illinois*, 504 U.S. 719, 729 (1992) (quoting *Rosales-Lopez v. United States*, 451 U.S. 182, 188 (1981)).  "'Without an adequate *voir dire*, the trial judge's responsibility to remove prospective jurors who will not be able impartially to follow the court's instructions and evaluate the evidence cannot be fulfilled.'" *Morgan*, 504 U.S. at 729–30 (quoting *Rosales-Lopez*, 451 U.S. at 188).

176.   Consistent with these constitutional principles, the Georgia Supreme Court has held that "the 'subject matter of the action' as to which voir dire is permitted under OCGA § 15-

54

12-133 extends beyond the crimes charged in the indictment and the sentences the charges carry to other 'critical facts' of the case that experience, reason, and common sense indicate will be so influential for at least some prospective jurors that they will be unable to consider all of the evidence in the case in light of the court's instructions on the law and render a fair and impartial verdict." *Ellington v. State*, 292 Ga. 109, 135–26, 735 S.E.2d 736, 760 (2012). In particular, the Court held that it was reversible error in a capital case for the trial court to prohibit the defendant from inquiring whether prospective jurors could fairly consider a life sentence in a case involving child victims. *Id.* at 127–28, 735 S.E.2d at 755.

177.    One of the victims in Mr. Stinski's case was a twelve-year old child. Her age was a critical factor that the jury would have to consider in imposing the death penalty. Relying on *Morgan v. Illinois*, during voir dire, trial counsel stated that all the prospective jurors should be questioned about whether they could fairly consider a life sentence in a case involving a child victim:

> I would intend to ask each and every juror in the situation where there's multiple charges, including more than one count of murder, as to their feelings concerning the death penalty and the automatic imposition of the death penalty.
>
> And I also would ask where a child is the victim in a case in which the person is accused of the murder of a child, I would also ask that question. I'm not going to frame it in the facts of this case. That is exactly what I'm dealing with in this case.
>
> And do I think that that's a relevant question that has to be asked, because some people will impose the death penalty in every case in those instances, and they are not qualified if they will, so I intend, and I would ask that of each and every juror from this point forward and I'd like a continuing objection that I'm not allowed to ask those questions of each juror.

TT 450:23–451:14.

178.    Although the trial court ultimately permitted trial counsel to make that inquiry, Mr. Stinski's counsel failed to do so during voir dire of many of the prospective jurors, including

55

nine (9) of the jurors who ultimately served on Mr. Stinski's jury. *See* TT 376:6–379:19

(Charline Lee); 545:21–549:25 (Cheryl Reid); 603:20–606:21 (Josie Wimberly); 645:16–647:6

(Patricia Bradley); 649:16–698:2 (Diane Chaffin); 893:20 (Sarah Roberts); 960:10–963:6

(Deborah Scarbary); 1031:15–1033:2 (Martin Kanode); 1204:19–1209:20 (Charles Baker).

179.    The state habeas court found "that other potential jurors provided responses so

favorable to the defense that Petitioner's counsel could reasonably have believed any further

questions would lead to a challenge for cause by the state." Order at 28. But if a potential juror

responded that she could not consider a life sentence in a case involving the murder of a child,

the defense should have sought to exclude that jurors regardless of how the juror answered other

questions. And if the juror responded that she could consider a life sentence, then that would not

provide any basis for the State to seek to excuse her.

180.    The state court's conclusion resulted in a decision based on an unreasonable

determination of the facts in light of the state court record, and was contrary to, or an

unreasonable application of clearly established federal law. *See* 28 U.S.C. §§ 2254(d)(1), (2).

**D.    Mr. Stinski was Prejudiced by Trial Counsels' Deficient Performance Both Individually and Cumulatively**

181.    The Court should evaluate whether the "cumulative effect of trial counsel's errors

sufficiently undermine[d] confidence in the outcome of the proceeding," rather "than evaluat[e]

each error in isolation." *Goodman v. Bertrand*, 476 F.3d 1022, 1030 (7th Cir. 2006); *accord*

*Cargle v. Mullin*, 317 F.3d 1196, 1212 (10th Cir. 2003) ("[O]ur decision to grant relief on

ineffective assistance grounds is a function of the prejudice flowing from all of counsel's

deficient performance—as *Strickland* directs it to be."); *Stouffer v. Reynolds*, 168 F.3d 1155,

1163–64 (10th Cir. 1999) ("Taken alone, no one instance establishes deficient representation.

However, cumulatively, each failure underscores a fundamental lack of formulation and

US:145367343

direction in presenting a coherent defense."); *Turner v. Duncan*, 158 F.3d 449, 457 (9th Cir. 1998) ("it is appropriate to consider the cumulative impact of [counsel's] errors in assessing prejudice").

182.    As demonstrated above, Mr. Stinski was prejudiced by each of trial counsel's errors. But even if, contrary to law and fact, he had not been, the Court should consider the cumulative effect of trial counsel's errors. The cumulative effect of trial counsels' numerous errors was that the jury learned precious little about the facts that mattered to mitigate Mr. Stinski's conduct—and much that did not matter. Had counsel not engaged in all those errors, there is a reasonable probability that the outcome of the trial would have been different.

## II.    MR. STINSKI'S TRIAL COUNSEL RENDERED INEFFECTIVE ASSISTANCE AT THE GUILT/INNOCENCE PHASE OF HIS CAPITAL TRIAL IN VIOLATION OF HIS SIXTH AND FOURTEENTH AMENDMENT RIGHTS

183.    Mr. Stinski was charged with both malice murder (Ga. Code Ann. § 16-5-1(a)) and felony murder (Ga. Code Ann. § 16-5-1(c)). Although a conviction on either charge would subject Mr. Stinski to a potential sentence of death, life without parole or life imprisonment, there is a significant difference between the two charges in terms of the prospect that a death sentence might be imposed. *See, e.g., Cooper v. State*, 286 Ga. 66, 66–67, 685 S.E.2d 285, 287 (2009) (defendant who was acquitted of malice murder, but convicted of felony murder sentenced to life imprisonment where defendant participated in burglary and codefendant choked victim and set fire to victim's house).

184.    The Eighth Amendment imposes certain restraints on the application of the death penalty to defendants convicted of felony murder because "the focus must be on [the defendant's] culpability, not on that of those who committed [the underlying felony] and shot the victims, for we insist on 'individualized consideration as a constitutional requirement in imposing the death sentence,' which means that we must focus on 'relevant facets of the

US:145367343

character and record of the individual offender.'" *Enmund v. Florida*, 458 U.S. 782, 798 (1982) (citation omitted).

185.    To support the charge of malice murder, the State had to prove beyond a reasonable doubt that Mr. Stinski had the specific intent to kill or acted with an abandoned and malignant heart. *See Hicks v. State*, 285 Ga. 386, 388, 677 S.E.2d 111, 113 (2009). "The main difference between . . . felony murder and malice murder is that felony murder does not require proof of malice or intent to kill." *Guyse v. State*, 286 Ga. 574, 576, 690 S.E.2d 406, 408 (2010) (citing *Holliman v. State*, 257 Ga. 209, 209, 356 S.E.2d 886, 887 (1987)).

186.    Trial counsel's stated strategy during the guilt/innocence phase was to establish that Mr. Stinski had no intent to kill and that his actions constituted felony murder, not malice murder. HT 236:10–20. But trial counsel unreasonably failed to implement that strategy in key respects.

187.    Mr. O'Kelley had admitted to a friend that he had "slit Ms. Pittman's throat and . . . raped Kimberly," and "'busted [ tooth] out of the little girl's mouth.'" *O'Kelley v. State*, 284 Ga. 758, 759, 670 S.E.2d 388, 392 (2008). Consistent with Mr. O'Kelley's admission, much of the State's evidence concerned Mr. O'Kelley's involvement in the acts charged and was probative of his specific intent to kill, but not Mr. Stinski's.

188.    In particular, the forensic and other evidence implicated Mr. O'Kelley—not Mr. Stinski—as the person directly responsible for the beating, stabbing and ultimately deaths of the victims and indicated that Mr. O'Kelley was the only person acting with the requisite or specific intent to kill necessary to support a conviction for malice murder. There was no forensic evidence suggesting that Mr. Stinski (as opposed to Mr. O'Kelley) ever developed the specific

US:145367343

intent to kill. But Mr. Stinski's counsel failed to highlight for the jury the difference between the Mr. Stinski's conduct and that of Mr. O'Kelley and the relative culpability of each.

189.    Although on cross-examination Mr. Schiavone brought out evidence concerning Mr. O'Kelley's "insane party" where he announced that he would be declared legally insane and not culpable for his actions and that Mr. O'Kelley had raped Amy Norman (TT 255:2–259:12), he failed to demonstrate that Mr. O'Kelley—and not Mr. Stinski—was the perpetrator of the violence that occurred in the Pittman home.

190.    For example, the State introduced evidence that Mr. O'Kelley was carrying a tooth from one of the victims when he was arrested. There was no evidence to suggest that Mr. Stinski ever possessed the tooth or had anything to do with removing the tooth from the victim. Trial counsel failed to highlight during the cross-examination of Lieutenant Noel Daniel, the witness who testified that he found a tooth—later identified as the victim's in a plastic bag in Mr. O'Kelley's wallet, that this evidence had nothing to do with Mr. Stinski or his relative culpability.

191.    Similarly, Lieutenant Daniel testified that he also recovered blood-stained clothes and sneakers belonging to Mr. O'Kelley in a search after Mr. O'Kelley's arrest  The blood later was identified as one of the victim's. But trial counsel did not cross-examine Lieutenant Daniel or otherwise argue to the jury that nothing associated with Mr. Stinski contained either of the victim's blood.

192.    Likewise, the State elicited testimony concerning statements made by Mr. O'Kelley that bore on his state of mind—but not Mr. Stinski's. Trial counsel failed to highlight the lack of nexus to Mr. Stinski and the insufficient evidence of Mr. Stinski's intent.

US:145367343

193.    In failing to distinguish between Mr. Stinski's and Mr. O'Kelley's relative culpability during the guilt/innocence phase of the trial, trial counsel neglected their duty to coordinate guilt/innocence phase strategy with penalty phase strategy. "During the investigation of the case, counsel should begin to develop a theme that can be presented consistently through both the first and second phases of the trial. Ideally, 'the theory of the trial must complement, support and lay the groundwork for the theory of mitigation.'" American Bar Association, Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases, Revised Edition, 31 Hofstra L. Rev. 913, 1059 (2003) (Commentary to ABA Guidelines § 10.11) (citation omitted).

194.    According to Mr. Sparger, the defense team's mitigation theory was that "Mr. Stinski was much less culpable than Mr. O'Kelley . . . ." HT 171:1–17; *see also* HT 157:12–14 (mitigation theory was that "Dorian was much more culpable. Darryl certainly wasn't Dorian and . . . Darryl was a follower."). It was critical for trial counsel to make those points to the jury during the guilt/innocence phase at every opportunity to buttress their mitigation theory. But they failed to do so at critical times.

195.    Mr. Stinski was prejudiced by trial counsel's failure to distinguish his culpability from that of Mr. O'Kelley. Had trial counsel done so, there is a reasonable probability that Mr. Stinski would not have been convicted of malice murder and would not have been sentenced to death.

196.    The state court's contrary conclusion resulted in a decision based on an unreasonable determination of the facts in light of the state court record, and was contrary to, or an unreasonable application of clearly established federal law. *See* 28 U.S.C. §§ 2254(d)(1), (2)

60

III.    **MR. STINSKI'S EXECUTION WOULD CONSTITUTE CRUEL AND UNUSUAL PUNISHMENT UNDER THE EIGHTH AND FOURTEENTH AMENDMENTS TO THE U.S. CONSTITUTION BECAUSE HE WAS THE FUNCTIONAL EQUIVALENT OF AN ADOLESCENT AT THE TIME OF THE CRIME**

197.    In *Roper v. Simmons*, 543 U.S. 551 (2005), the Supreme Court held that the Eighth and Fourteenth Amendments to the U.S. Constitution bar the execution of defendants under 18 at the time that they committed a crime.  The Court identified "[t]hree general differences between juveniles . . . and adults [that] demonstrate that juvenile offenders cannot with reliability be classified among the worst offenders." *Id.* at 569.  First, "[a] lack of maturity and an underdeveloped sense of responsibility are found in youth more often than in adults and are more understandable among the young.  These qualities often result in impetuous and ill-considered actions and decisions." *Id.*  Second, "juveniles are more vulnerable or susceptible to negative influences and outside pressures, including peer pressure." *Id.*  Third, "the character of a juvenile is not well formed as that of an adult." *Id.* at 570; *see Miller v. Alabama*, 567 U.S. 460, 471 (2012) (same).  Moreover, "[t]he relevance of each individual factor derives from the fact that the signature qualities of youth are transient; as individuals mature, the impetuousness and recklessness that may dominate in younger years can subside." *Roper* 534 U.S. at 570 (citation omitted).  For those reasons, the Court held that neither of the penological justifications for the death penalty—retribution and deterrence—provides adequate justification for imposing the death penalty on juveniles.

198.    At the same time, the Court recognized that the "qualities that distinguish juveniles from adults to not disappear when an individual turns 18." *Id.* at 574; *see also Eddings v. Oklahoma*, 455 U.S. 104, 115 (1982) ("[Y]outh is more than a chronological fact.  It is a time and condition of life when a person may be most susceptible to influence and to psychological damage.").

61

199.    More recently, the Supreme Court has held that imposing bright line rules that defy current medical standards violate a defendant's constitutional rights because "persons facing that most severe sanction [of the death penalty] must have a fair opportunity to show that the Constitution prohibits their execution." *Hall v. Florida*, 134 S. Ct. 1986, 2001 (2013). In *Hall*, the Court held that a Florida statute, which foreclosed inquiry into a person's potential intellectual disability if that person had an IQ over 70, created an "unacceptable risk that persons with intellectual disability will be executed." *Id.* at 1990. As the Court explained,

> Florida's rule disregards established medical practice in two interrelated ways. It takes an IQ score as final and conclusive evidence of a defendant's intellectual capacity, when experts in the field would consider other evidence. It also relies on a purportedly scientific measurement of the defendant's abilities, his IQ score, while refusing to recognize that the score is, on its own terms, imprecise.

*Id.* at 1995.

200.    Similarly, in *Moore v. Texas*, 137 S. Ct. 1039 (2017), the Supreme Court held that a state's determination whether a defendant is ineligible for the death penalty due to intellectual disability "must be 'informed by the medical community's diagnostic framework.'" *Id.* at 1048. A standard that deviates from that framework "'creat[es] an unacceptable risk that persons with intellectual disabilities will be executed.'" *Id.* at 1044 (quoting *Hall*, 134 S. Ct. at 1990)

201.    Here too a bright line rule prohibiting the execution of juveniles creates the risk that persons who mental health professionals have concluded have the same attributes as juveniles will be executed. At the time of *Roper*, "the research [had] not yet produced a robust understanding of maturation in young adults age eighteen to twenty-one." Elizabeth S. Scott, Richard J. Bonnie & Laurence Steinberg, *Young Adulthood as a Transnational Legal Authority: Science, Social Change and Justice Policy*, 85 Fordham L. Rev. 641, 653 (2016) (hereinafter

US:145367343

"*Young Adulthood*"). More recent "research supports a regime that recognizes young adults as a transitional category between juveniles and older adult offenders." *Young Adulthood*, at 644.

202.    The primary reason late adolescents resemble juveniles when it comes to decision-making and behavior is that the frontal lobes, "home to key components of the neural circuitry underlying "executive functions" such as planning, working memory, and impulse control, are among the last areas of the brain to mature; they may not be fully developed until halfway through the third decade of life." Sara Johnson, *Adolescent Maturity and the Brain, The Promise and Pitfalls of Neuroscience Research in Adolescent Health Policy*, 45 J. Adolesc. Health 216, 216 (2009). The prefrontal lobe and the cerebellum, the regions "involved in emotional control and higher-order cognitive function," are still developing during late adolescence. Robin Martantz Henig, *Why Are So Many People in their 20s Taking So Long To Grow Up?*, N.Y. Times (Aug. 18, 2010).

203.    As a result, late adolescents share the same characteristics with juveniles that render them less culpable than adults and ineligible for the death penalty. First, late adolescents are still immature and impulsive. This is because the prefrontal cortex, "responsible for the complex processing of information, ranging from making judgments to controlling impulses, [and] foreseeing consequences, is one of the last area of the brain to mature." Ken C. Winter, *Adolescents Brain Development and Drug Use*, Treatment Research Inst., at 2 (2004). As a consequence, late adolescents engage in more risk-seeking behavior, show poor judgement and tend to act before they think. *Id.*, at 2. Second, adolescents are still motivated by what their peers think of them. Studies have found that "peer effects on risk taking and risky decision making [are] stronger among adolescents and youth [up to age twenty-two] than adults." Margo Gardner & Laurence Steinberg, *Peer Influence on Risk Taking, Risk Preference, and Risky*

63

*Decision Making in Adolescence and Adulthood: An Experimental Study*, 41 Developmental

Psych. 589, 625 (2005). Finally, personality traits are just as transient in late adolescents as they

are in juveniles. Researchers explain that "the process for becoming an adult is an extended

one...." Laurence Steinberg, *Risk Taking in Adolescence: New Perspectives from Brain and*

*Behavioral Science*, 16 Current Directions in Psych. Sci. 55, 57 (2007).

204.    Mr. Stinski was approximately eighteen years and nine months old at the time of

the crime for which he was convicted. However, he possessed all the characteristics of a juvenile

identified in *Roper* that show that he "cannot be classified among the worst offenders" for whom

the death penalty is reserved. *Roper*, 543 U.S. at 569.

205.    All the witnesses who knew Darryl prior to the crime testified that he was

immature even for his age, impulsive and prone to not think about the consequences of his

actions. HT 672:16–673:11, 742:3–11, 734:5–11, 773:15–776:22, 959:6–960:22. As Dr. James

and Dr. Ash established, these characteristics were exacerbated in Darryl's case by deficits in his

prefrontal cortex, rendering him even less able to control his impulses than his age peers. HT

473:2–22, 1189:14–1190:20, 1197:18–24. As Dr. Ash testified based on his review and analysis,

Darryl's "susceptibility to peer pressure is really off the charts" so much that it "far exceeds what

you see in any normal child of any age, really." HT 478:8–16.

206.    In addition, "the violence [associated with the crime] was so out of character" for

Darryl. As Dr. Ash explained and the Supreme Court held in *Roper*, one reason that adolescents

are less culpable than adults for crimes they commit is that the "adolescent personality is not

fixed" and, as a result, one cannot conclude that adolescent conduct represents a "depraved

character." HT 486:18–488:22, 489:13–490:11; *see Roper*, 543 U.S. at 570.

64

207.    Darryl's participation in the crime had all the "hallmarks of adolescent crime." HT 460:5–461:6. Dr. Ash concluded that Darryl was functioning like a thirteen to fifteen-year-old in the Pittman home. HT 492:7–493:1. Under *Roper*, he should be ineligible for the death penalty. *See, e.g., Commonwealth of Kentucky v. Bredhold*, No. 14-CR-161, slip op. at 12 (Ky. Cir. Ct. Aug. 1, 2017) ("Given Mr. Bredhold's young age and development, it is difficult to see how he and others his age could be classified as 'the most deserving of execution;'" holding the death penalty unconstitutional for defendant who was 18 years and five months old at the time of his crime).

208.    The state court's contrary conclusion resulted in a decision that was an unreasonable application of clearly established federal law. *See* 28 U.S.C. §§ 2254(d)(1), (2).

## PRAYER FOR RELIEF

For all of the foregoing reasons and other such reasons as may be made upon amendment of this petition and a full evidentiary hearing, Mr. Smith respectfully requests that this Court grant him the following relief:

(a)    Grant petitioner's motion to proceed *in forma pauperis*;

(b)    Afford petitioner an opportunity to respond to any responsive pleading filed by respondent;

(c)    Grant petitioner discovery under Rule 6 of the Rules Governing Habeas Corpus Cases and a sufficient period of time to conduct discovery, and grant petitioner authority to obtain subpoenas to further document and prove the facts set forth in this petition;

(d)    Grant petitioner an evidentiary hearing at which additional proof may be offered supporting the allegations in this petition;

65

(e)    Permit petitioner after additional factual development an opportunity to brief and argue the issues presented in this petition;

(f)    Issue a writ of habeas corpus granting Mr. Stinski relief from his unconstitutionally obtained conviction and death sentence;

(g)    Grant such further and other relief as may be appropriate.

Dated this 26th day of March, 2018.

Respectfully submitted,

/s/ Stephen M. Brooks
Stephen M. Brooks
Georgia Bar No. 085151
NELSON MULLINS RILEY & SCARBOROUGH LLP
Atlantic Station
201 17th Street NW, Suite 1700
Atlanta, GA 30363
Tel: 404.322.6272
Fax: 404.322.6050
stephen.brooks@nelsonmullins.com

*Attorney for Petitioner Darryl Scott Stinski*

US:145367343

## ATTORNEY VERIFICATION

Pursuant to 28 U.S.C. §§ 1746 and 2242, I verify that the foregoing is true and correct under penalty of perjury, based on the best of my knowledge, information and belief, as attorney acting for Petitioner.

*/s/ Stephen M. Brooks*
Stephen M. Brooks
Georgia Bar No. 085151