## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF GEORGIA
## SAVANNAH DIVISION

DARRYL SCOTT STINSKI,

        Petitioner,

    v.

WARDEN BENJAMIN FORD,

        Respondent.

CIVIL ACTION NO.: 4:18-cv-66

### O R D E R

In 2007, following a trial in the Superior Court of Chatham County, a jury convicted Petitioner Darryl Stinski of two counts of malice murder, two counts of felony murder, and other related crimes for the murders of Susan Pittman and her thirteen-year-old daughter, Kimberly Pittman. (Doc. 7-11, pp. 34–37.) Petitioner was eighteen years and nine months old when he committed these crimes on April 10, 2002. (Doc. 27-20, p. 88.) Petitioner was sentenced to death on June 13, 2007. (Doc. 8-1, pp. 210–15.) After the completion of his direct appeal and state habeas corpus proceedings, Petitioner filed his Petition for Writ of Habeas Corpus in this Court, pursuant to 28 U.S.C. § 2254, challenging his conviction and death sentence. (Doc. 1.) After careful consideration of the parties' briefings, (docs. 65, 69, 71), the Court **DENIES** Petitioner's Petition for Writ of Habeas Corpus. (Doc. 1.)[1]

### BACKGROUND

#### I.    Factual Background

The Supreme Court of Georgia set forth the facts of this case as follows:

---

[1]  The Court **GRANTS** Respondent's Motion for Page Extension, (doc. 68), and **GRANTS** Petitioner's Motion to Extend Time and to Exceed Page Limitation, (doc. 70). The Court deems the parties' briefs to be filed timely and in compliance with the Court's page limit.

Darryl Stinski and Dorian O'Kelley engaged in a crime spree that spanned April 10–12, 2002.  On the night of April 10, two police officers observed two men dressed in black clothing in a convenience store.  Later, the officers responded to two separate calls regarding the sounding of a burglar alarm at a nearby home and the officers returned to the store after responding to each call.  Then, at approximately 5:00 a.m. on April 11, the officers noticed while leaving the store that "the sky was lit up."  The officers discovered the victims' house fully engulfed in flames.  As one of the officers moved the patrol vehicle to block traffic in preparation for the arrival of emergency vehicles, his headlights illuminated a wooded area where he observed the same two men that he and his partner had observed earlier in the convenience store.  O'Kelley, as the neighbor living across the street from the burned house, gave an interview to a local television station.  The officer saw the interview on television and identified O'Kelley as being one of the men he had seen in the convenience store and near the fire.  The officer later identified both Stinski and O'Kelley in court.

Stinski and O'Kelley left items they had stolen with friends who lived nearby.  The friends handed those items over to the police.  Testimony showed that, before their arrest, O'Kelley had bragged about raping a girl and keeping one of her teeth as a memento and Stinski had laughed when he saw O'Kelley being interviewed on the news in front of the victims' house.

Stinski gave two videotaped interviews with investigators after his arrest, the second of which was suppressed on his motion.  In the interview the jury heard, Stinski confessed to participating in the crime spree described below, which began with burglarizing a home and leaving when a motion detector in this first home set off an alarm.  After their botched burglary of the first home, Stinski and O'Kelley turned off the electricity to the home of Susan Pittman and her 13–year–old daughter, Kimberly Pittman, and entered as both victims slept.  O'Kelley took a walking cane and began beating Susan Pittman, while Stinski held a large flashlight.  Stinski beat Susan Pittman with the flashlight and then left the room to subdue Kimberly Pittman, who had awakened to her mother's screams.  O'Kelley then beat Susan Pittman with a lamp and kicked her.  At some point, Susan Pittman was also stabbed three to four times in the chest and abdomen.  Stinski took Kimberly Pittman upstairs so she would not continue to hear her mother's screams.  Susan Pittman eventually died from her attack.  Stinski and O'Kelley then brought Kimberly Pittman back downstairs, drank beverages, and discussed "tak[ing] care of" her.  Stinski took Kimberly Pittman back upstairs and bound and gagged her.  As Stinski rummaged through the house downstairs, O'Kelley raped Kimberly Pittman.  Stinski and O'Kelley then agreed that Stinski would begin beating Kimberly Pittman with a baseball bat when O'Kelley said a particular word.  On cue, Stinski hit Kimberly Pittman in the head with the bat as she knelt on the floor, bloody from the rape and with her hands bound.  O'Kelley then slit Kimberly Pittman's throat with a knife but she remained alive.  Stinski went downstairs and came back upstairs when O'Kelley called him.  Stinski then hit Kimberly Pittman in her knee with the bat as O'Kelley tried to suffocate her.  O'Kelley then took

another knife and stabbed her in the torso and legs.  O'Kelley kicked her and threw objects at her head, but her groans indicated that she was still alive.  Stinski and O'Kelley then set fires throughout the house and went to O'Kelley's house across the street to watch the fire.  Kimberly Pittman died of smoke inhalation before the fire fully consumed the house.  Later, in the early morning hours of April 12, Stinski and O'Kelley broke into numerous vehicles in the neighborhood.

Stinski v. State, 691 S.E.2d 854, 862–63 (Ga. 2010).

## II.      Procedural History

### A.      Trial and Appeal

On June 5, 2002, a Chatham County grand jury indicted Petitioner on two counts of malice murder, two counts of burglary, two counts of arson in the first degree, five counts of entering an automobile, one count of cruelty to children in the first degree, and one count of possession of a controlled substance with intent to distribute.  (Doc. 6-1, pp. 50–54); see also Stinski v. State, 691 S.E.2d at 862 n.1.  Shortly thereafter, the prosecution filed a notice of intent to seek the death penalty.  Stinski v. State, 691 S.E.2d at 862 n.1.  Attorneys Michael Schiavone, Steven Sparger, and Willie Yancy were appointed to represent Petitioner with Schiavone serving as lead counsel and Sparger in charge of mitigation.  (Doc. 27-20, pp. 8–9.)

Petitioner's trial began with jury selection on May 24, 2007.  Stinski v. State, 691 S.E.2d at 862 n.1.  On June 8, 2007, after the conclusion of the guilt phase of trial, a jury found Petitioner guilty on all counts and on two lesser-included counts of felony murder.  (Doc. 7-11, pp. 34–37.)  Shortly after the guilt phase of trial concluded, the sentencing phase of trial began.  (Doc. 10-8, pp. 145, 167–68.)  Petitioner's trial counsel called twenty-six witnesses to testify during the sentencing phase of trial, including Petitioner's maternal grandmother, mitigation specialist Dale Davis, and Dr. Jane Weilenman, a psychologist.[2]  (Doc. 27-20, pp. 43–47, 61–68.)

---

[2] Petitioner's trial counsel also called, among others, Petitioner's biological mother and father, stepmother, step-aunt, and stepsister, as well as Petitioner's former pastor, a social worker who had monitored Petitioner following a shoplifting conviction, a psychiatric nurse who treated Petitioner from the ages of twelve to

Petitioner's maternal grandmother, Sharlene Riley, generally testified about Petitioner's childhood and family history.  (Id. at pp. 43–44; doc. 10-9, pp. 28–64.)  Concerning Petitioner's childhood, Riley testified about Petitioner's frequent moves as a child.  (See doc. 27-20, pp. 43–44.)  Riley testified that, at a young age, Petitioner lived with his biological parents, his older stepbrother Tony Raby, and his other older brother Donald Stinski.  (Doc. 10-9, pp. 37–38.)  Riley stated that the family moved frequently before moving to South Carolina when Petitioner was three.  (Id.; doc. 27-20, pp. 43–44.)  While in South Carolina, Petitioner's parents filed for divorce.  (Doc. 27-20, p. 43.)  Riley further testified that Petitioner's mother remarried Frank Sutton, a police officer in South Carolina, in August 1991.  (Id.; doc. 10-9, p. 42.)  At the request of Petitioner's mother, Riley cared for Petitioner and his siblings for a few months in 1994 before Petitioner, his mother, and his siblings moved to New Mexico following Petitioner's mother and stepfather splitting up.  (Doc. 27-20, p. 44; doc. 10-9, pp. 41, 45–46.)  Petitioner's mother then moved the family back to South Carolina after reconciling with the stepfather.  (Doc. 27-20, p. 44; doc. 10-9, pp. 52–53.)  In August 1995, Petitioner's mother sent Petitioner to live with his biological father, stepmother, and stepsister in Wisconsin, where Petitioner remained until he was seventeen.  (Doc. 27-20, p. 44; doc. 10-9, pp. 54–57, 236.)  After living in Wisconsin, Petitioner moved back to South Carolina and stayed with his mother and stepfather.  (Doc. 27-20, p. 44; doc. 10-9, p. 58.)  However, Petitioner's stepfather kicked him out of the house, and Petitioner moved to Savannah to live with his older brother Donald, who also subsequently kicked Petitioner out of his home. (Doc. 27-20, p. 44; doc. 10-9, p. 58.)  Petitioner then lived with whoever would take him in.  (Doc. 27-20, p. 44; doc. 10-9, pp. 58–59.)

---

fourteen, two of Petitioner's grade-school teachers, and several of Petitioner's former schoolmates and friends.  (Doc. 27-20, pp. 43–68.)

Regarding Petitioner's family history, Riley testified that Petitioner's family struggled with alcoholism and abuse dating back to his great-grandfather. (See doc. 10-9, pp. 30–38, 44, 62–63.) Riley testified that Petitioner's father "drank heavily" and was "very abusive" and neglectful. (Id. at p. 34.) Riley specifically recalled multiple instances of Petitioner's father's neglect, including an instance in which a car struck Petitioner in the street when Petitioner's father was supposed to be watching Petitioner but was instead away from the home drinking alcohol with a friend. (Id. at pp. 34–36.) Moreover, Riley stated that Petitioner's mother divorced his father because "[s]he got tired of hi[m] being drunk and passing out on the floor with a gun or knife in his hand." (Id. at p. 38.) Concerning Petitioner's stepfather, Riley testified that he was a "heavy drinker[]" and "control freak." (Id. at pp. 44, 63.)

Dale Davis also testified during the sentencing phase of trial "for the purpose of introducing several volumes of records relating to Petitioner." (Doc. 27-20, p. 45.) Petitioner's trial counsel retained Davis as a mitigation specialist for Petitioner's trial. (Id.) According to Davis, her role in the case was to "take [Petitioner] and find out every single thing [she could] find out about [him] from [his] birth, even pre-birth, up until [the crime]." (Doc. 10-9, p. 78.) To fulfill this role, Davis interviewed "forty or more" people, prepared an extensive social history on Petitioner, and worked approximately 432 hours on Petitioner's case. (Id. at pp. 78–80, 83–89, 95–96, 101–02, 105–10, 112–13, 125; doc. 27-20, pp. 31, 45–47.) At the time of Petitioner's trial, Davis had worked on "approximately thirty death penalty cases [and] [h]undreds of other . . . cases" as a mitigation expert. (Doc. 10-9, pp. 76–77.) Through Davis, Petitioner's trial counsel introduced many records and documents relating to Petitioner's family, history, and childhood, including birth records, prenatal and delivery records, hospital records, school records, social services and family court records, counseling records, medical and mental health records from Chatham County Detention

5

Center, divorce records from Petitioner's parents, mental health records regarding Petitioner's brother, marriage records for Petitioner's mother and stepfather, and a police report regarding Petitioner's stepfather. (Doc. 10-9, pp. 78–80, 83–89, 95–96, 101–02, 105–10, 112–13; see also doc. 27-20, p. 45.)

Trial counsel also elicited testimony from Davis regarding information contained in the records she gathered as part of her investigation. (See doc. 27-20, p. 45.) Regarding Petitioner's childhood, Davis testified extensively about the abuse, neglect, and alcoholism in Petitioner's family. (Id. at p. 46.) Davis testified that the divorce records indicated that Petitioner's mother filed for divorce from his biological father because of a "pattern and practice of alcohol and/or substance abuse." (Doc. 10-9, p. 109.) Davis further testified that Petitioner's father suffered from a "real serious drinking problem." (Id.) Concerning Petitioner's stepfather, Davis testified about the information contained in a police report about an incident involving the stepfather. (Id. at pp. 111–12.) According to Davis, the police report concerned a domestic violence and simple assault incident in which Petitioner's stepfather shoved Petitioner's older brother Donald while under the influence of alcohol. (Id.) The police report also noted that Petitioner's mother declined to press charges. (Id. at p. 111.)

Furthermore, Davis testified about Petitioner's life in Wisconsin after he moved there to live with his father, stepmother, and stepsister. Petitioner's father and stepmother were strict parents who harshly punished him for not meeting their expectations. (Id. at pp. 98–100.) Davis also testified about Petitioner's father and stepmother's favoritism towards his stepsister. (Id. at p. 172; see also doc. 27-20, p. 46.) School records showed that Petitioner took an anti-depressant medication and Ritalin to treat ADHD but that he shared the Ritalin with other students to make

friends.  (Doc. 10-9, pp. 89, 100–01.)  During his time in Wisconsin, Petitioner had minimal contact with his mother, who still lived in South Carolina.  (Id. at p. 105.)

Regarding Petitioner's mental health, Davis testified that Petitioner suffered from ADHD, depression, post-traumatic stress disorder, and a psychotic disorder, for which Petitioner received medication.  (Id. at pp. 106–08, 170.)  Davis also testified as to the mental health records of Petitioner's brother.  (Id. at p. 113.)  Davis stated that these records showed a "history of alcohol abuse and mental illness in [Petitioner's] family."  (Id.)  Indeed, Davis testified that "depression ran through [Petitioner's family]" and that "[t]here were a number of suicides and suicide attempts" within Petitioner's family.  (Id. at p. 124; see also doc. 27-20, p. 47.)

Dr. Weilenman was the final witness Petitioner's trial counsel called at the sentencing phase of trial.[3]  (Doc. 27-20, p. 61.)  Trial counsel retained Dr. Weilenman to conduct a psychological evaluation of Petitioner.  (Doc. 26-19, p. 150.)  To this end, Dr. Weilenman "was part of the team that got some of the . . . mitigation information from . . . Davis," and "through that, was able to do interviews, back-up interviews, [and] talk to the family members in preparation for . . . trial."  (Doc. 10-11, p. 6.)  As part of her role in Petitioner's case, Dr. Weilenman met with Petitioner five times, interviewed him for approximately ten to fifteen hours, and reviewed the documents Davis gathered as part of the mitigation investigation.  (Id. at pp. 6–7; see also doc. 27-20, p. 61.)  In creating a social history for Petitioner, Dr. Weilenman "focus[ed] on [Petitioner's]

---

[3]  Dr. Jane Weilenman is a clinical psychologist with a master's degree in school psychology from City College in New York and a Doctor of Philosophy degree from the California School of Professional Psychology.  (Doc. 10-11, p. 3.)  At the time Dr. Weilenman testified at the sentencing phase of trial, Weilenman served as the clinical director of Coastal State Prison's mental health unit and maintained a private practice as a clinical psychologist.  (Id. at pp. 4–5.)

entire life," including "filling in all the blanks of the family history" and "focus[ing] on each family member . . . to find out . . . their impact . . . on [Petitioner's] life."[4]  (Doc. 10-11, pp. 7–8.)

As the state habeas court found, Dr. Weilenman testified about, among other things, Petitioner's background, including issues of neglect, abandonment, and abuse.  (Doc. 27-20, p. 61.)  Specific to Petitioner's family, Dr. Weilenman testified that they suffered from "global drug and alcohol abuse" as well as "mental health issues."  (Doc. 10-11, p. 8.)  Dr. Weilenman specifically noted that Petitioner's extended family suffered multiple suicides, that there was significant "alcohol abuse" during Petitioner's early childhood, and that there was an "intense conflict in [Petitioner's] home" between his parents.  (Id. at pp. 8, 11.)  Dr. Weilenman further testified that Petitioner's stepfather was a "heavy drinker," abused alcohol, and physically abused Petitioner.  (Id. at pp. 13, 17.)  For example, Petitioner's stepfather frequently paddled Petitioner with a homemade paddle into which he had drilled holes so there was less resistance.  (Id. at p. 19.)  Dr. Weilenman further testified about Petitioner's frequent moves.  For example, Dr. Weilenman highlighted that Petitioner's stepfather and older brother both kicked him out of their homes and that Petitioner lived in twelve different places in the three months leading up to his crimes.  (Id. at pp. 40, 46.)

Based on her evaluation of Petitioner, Dr. Weilenman reached several conclusions.  Dr. Weilenman stated that Petitioner suffered from a "history of instability" due to moving twenty-five times in eighteen years.  (Id. at p. 48.)  The other "main theme" Dr. Weilenman emphasized in her testimony was Petitioner's "history of abandonment by his biological family."  (Id.)  Indeed, Dr. Weilenman stated that the two patterns in Petitioner's life were "instability" and "abandonment."  (Id. at p. 50.)  Due to these patterns, Dr. Weilenman testified that Petitioner

---

[4]  Notably, Dr. Weilenman did not perform a "psychological test" on Petitioner.  (Doc. 10-11, p. 67.)

"wants to be accepted." (<u>Id.</u> at p. 52.) According to Dr. Weilenman, people like Petitioner will "sometime[s] exhibit . . . inappropriate conduct" and "don't really think." (<u>Id.</u>) Furthermore, based, in part, on her own interactions with Petitioner, Dr. Weilenman concluded that Petitioner "was a follower . . . [that] did what he felt to please others." (<u>Id.</u> at pp. 52–53.)

Dr. Weilenman also testified about Petitioner's mental health, development, and juvenile conduct. Specifically, Petitioner suffered from post-traumatic stress disorder, ADHD, and an "adjustment disorder with depressed features." (<u>Id.</u> at p. 54.) According to Dr. Weilenman, "one of the major issues" with ADHD is that it effects one's "executive functioning" (i.e., "how you think, how you process information, impulse control, [and] all of those things"). (<u>Id.</u> at p. 55.) Dr. Weilenman further testified that the development of one's frontal lobe also impact's one's executive functioning. (<u>Id.</u>) According to Dr. Weilenman, the brain's frontal lobe, which she described as the "thinking center," does not fully develop until the age of twenty-five. (<u>Id.</u>) Thus, as one gets older, the frontal lobe develops, and therefore, a person "may have better control over their behaviors [during their] mid-twenties than they did when they were fourteen." (<u>Id.</u>) When asked to compare Petitioner's executive functioning to that of a typical eighteen or nineteen-year-old, Dr. Weilenman stated that a typical eighteen to nineteen-year-old "is developing . . . some sense of internalizing external values." (<u>Id.</u> at p. 59.) Dr. Weilenman testified that a typical late adolescent "[is] forming some sense of identity, who they are, . . . know[s] what their belief systems are . . . [and] what they stand for, [and possesses] some sense of right and wrong." (<u>Id.</u>) However, according to Dr. Weilenman, Petitioner's instability and abandonment issues delayed his development of "that internal sense." (<u>Id.</u> at pp. 59–60.) Dr. Weilenman testified that Petitioner "was still more into peer pressure than you would have expected at that age" and, considering Petitioner's unstable life in the weeks leading up to his crimes, "needed to fit in." (<u>Id.</u> at pp. 60–

9

61.)  Indeed, Dr. Weilenman described Petitioner as someone who interacted like a "twelve-year-old," was "highly vulnerable," and did not "[know] who he was." (Id. at p. 56–58.)  Furthermore, Dr. Weilenman stated that Petitioner exhibited "learned helplessness," whereby he would "do whatever it took to please [others] . . . to get [them] to like him." (Id. at p. 57.)

Notably, trial counsel asked Dr. Weilenman, "What happens when you have someone like that, that meets someone who's been described as manipulative and even compared to Charles Manson? What would happen in that sort of situation?" (Id. at pp. 60–61.)  Dr. Weilenman responded:

> You have to understand the state of the person at that time.  As I said before, he was trying to find a place to sleep, food to eat.  At the time he entered the jail, he was roughly 140 pounds . . . I asked him why, and it was mainly because he was eating one meal a day and he was hopping from house to house . . . .
>
> And he'd stay at a house for three days, a house for five days, a house for a week, but as far as knowing where you were going to be at the time, he had no clue.  . . . [I]t had to be how much his friends would tolerate him staying there, how much maybe the adults in the home would tolerate him staying here.
>
> So the basic need that all of us have, food, shelter, he was lacking that, so . . ., in order to survive, he was in a situation and, based on his personality as well, the follower, that he did what he at that time [sic], listening to this guy, as a follower . . . and not questioning it.  He needed to fit in with that group.

(Id. at pp. 60–61.)

After the sentencing phase, the jury recommended the death sentence for the murders of Susan and Kimberly Pittman, finding that the existence of nine aggravating circumstances across the two murders warranted such a sentence:

    (1) Petitioner was "engaged in the commission of a burglary" when murdering Susan
        Pittman;

    (2) the murder of Susan Pittman "was outrageously or wantonly vile, horrible, or inhuman
        in that it involved the depravity of mind of" Petitioner;

10

(3) the murder of Susan Pittman "was outrageously or wantonly vile, horrible, or inhuman in that it involved an aggravated battery to the victim before death;"

(4) Petitioner was committing "another capital felony" while murdering Kimberly Pittman;

(5) Petitioner "was engaged in the commission of a burglary" when murdering Kimberly Pittman;

(6) Petitioner "was engaged in the commission of arson in the first degree" when murdering Kimberly Pittman;

(7) the murder of Kimberly Pittman "was outrageously or wantonly vile, horrible, or inhuman in that it involved tortur[ing] . . . the victim before death;"

(8) the murder of Kimberly Pittman "was outrageously or wantonly vile, horrible, or inhuman in that it involved the depravity of mind of" Petitioner; and

(9) the murder of Kimberly Pittman "was outrageously or wantonly vile, horrible, or inhuman in that it involved an aggravated battery to the victim before death."

(Doc. 8-1, pp. 210–13.)  In addition to the death sentence, Petitioner was sentenced to a total of 140 years of confinement for his other crimes.  (Id. at pp. 214–15.)  Petitioner subsequently filed a motion for a new trial, which was denied.  (Doc. 27-20, p. 2.)  The Georgia Supreme Court then affirmed Petitioner's convictions and death sentence.  See Stinski v. State, 691 S.E.2d at 874-75.

**B.      State Habeas Petition**

On September 12, 2011, Petitioner filed a petition for writ of habeas corpus in the Superior Court of Butts County, (doc. 11-19), and later amended the petition, (doc. 12-24).  In the petition, Petitioner argued, among other things, that his trial counsel rendered ineffective assistance of counsel during the sentencing phase of trial and that he is ineligible for the death penalty under Roper v. Simmons, 543 U.S. 551 (2005), because he was the functional equivalent of an adolescent

11

at the time of his crimes. (Doc. 12-24, pp. 9–24, 29–30.) The state habeas court held an evidentiary hearing in which twenty witnesses testified, including family members, friends, acquaintances, and medical professionals. (See doc. 27-20, p. 2.) Among friends, family, and acquaintances, Petitioner called his stepbrother, his former high school principal, and one of his high school friends as witnesses at the evidentiary hearing. (Doc. 13-18, pp. 15–69; doc. 13-20, pp. 5–40; doc. 13-21, pp. 23–54.) Petitioner's stepbrother, Tony Raby, testified about growing up with Petitioner and Petitioner's biological parents. (Doc. 13-18, pp. 15–69.) Raby generally testified about Petitioner's biological father's alcoholism and their abusive households. (Id. at pp. 22–23, 29–38.) Petitioner's former high school principal, Linda Herman, generally testified that Petitioner left high school several times but "begged" her to let him return to school in the weeks leading up to the crime. (Doc. 31-20, pp. 14, 19–24.) Petitioner's high school friend, Sean Proctor, testified about Petitioner's struggle to find a place to sleep at night in the weeks leading up to the crimes. (Doc. 13-21, pp. 31, 33–35, 37–38.) Petitioner's trial counsel did not call Raby, Herman, or Proctor as witnesses at the sentencing phase of trial. (See doc. 27-20, pp. 75–77.)

Among medical professionals, Petitioner called a clinical neuropsychologist, a forensic psychiatrist, and a developmental psychologist. (Doc. 13-20, pp. 84–197; doc. 13-17, pp. 5–169; doc. 13-21, pp. 56–179.) The clinical neuropsychologist, Dr. Joette James, evaluated Petitioner's neurocognitive strengths and weaknesses by conducting a neuropsychological examination of Petitioner during a six-hour meeting. (Doc. 13-20, p. 93.) As part of this evaluation, Dr. James conducted ten different tests and evaluated Petitioner's records.[5] (Id. at pp. 99, 133.) Dr. James testified that the results of her evaluation indicated that Petitioner suffered from weaknesses in

---

[5] The tests Dr. James conducted on Petitioner include: the Wechsler Adult Intelligence Scale; the Wide Range Achievement Test; the Grooved Pegboard; the Wechsler Memory Scale, the Rey-Osterrieth Complex Figure, the Boston Naming Test, the Deli Kaplan Executive Functioning System, the Wisconsin Card Sorting Test, the Test of Memory Maligning, and a word choice/effort test. (Doc. 13-20, p. 99.)

particular areas of executive functioning, including working memory, short-term memory, auditory attention, planning, and organization.  (Id. at p. 123.)  Dr. James then explained how those deficits in executive functioning contributed to Petitioner's actions the night of the crime spree. (Id. at pp. 154–56.)

The forensic psychiatrist, Dr. Peter Ash, conducted a psychiatric interview with Petitioner that lasted two and a half hours.  (Doc. 13-17, p. 23.)  Dr. Ash also relied on Petitioner's history, reading documents such as the trial transcript, school records, prison records, mental health records, Dr. Weilenman's notes, affidavits of other witnesses, and reports by Dr. James and Dr. James Garbarino, who also testified at the evidentiary hearing.  (Id. at pp. 25–26, 30–41.)   Dr. Ash's goal in evaluating Petitioner was to "get a sense of who [Petitioner] was [and] how he thought" and to perform a "general mental status exam to get a sense of how [Petitioner] was functioning, particularly cognitively and emotionally."  (Id. at p. 23.)  Based on his evaluation of Petitioner, "a couple things" from Petitioner's history "jumped out" to Dr. Ash, including Petitioner's lack of a violent past, his history of "psychological maltreatment," his constant moves throughout his childhood, and the "ongoing pattern of rejection."  (Id. at p. 30.)  Furthermore, Dr. Ash determined that Petitioner suffered from various deficiencies in his executive functioning. (Id. at p. 62.)  Ultimately, the heart of Dr. Ash's testimony at the evidentiary hearing was that Petitioner was functioning at an "adolescent level" the night of the crime.  (Doc. 13-17, pp. 51, 79–82, 86.)

The developmental psychologist, Dr. James Garbarino, read through "all the records available and the affidavits and all the reports" and conducted a psychological and developmental interview of Petitioner that lasted two and a half hours.  (Doc. 13-21, pp. 69–70.)  According to Dr. Garbarino, the purpose of his interview and testimony was to "help a judge and jury understand

[Petitioner's] life." (Id. at pp. 70–71.) Dr. Garbarino relied heavily on Petitioner's social history. (Id. at pp. 72–78, 82–84.) Dr. Garbarino generally testified that Petitioner suffered from "severe psychological maltreatment." (Id. at pp. 97–113.) Dr. Garbarino further testified that the psychological maltreatment "undermined" Petitioner's development as a child and adolescent. (Id. at p. 114.) Dr. Garbarino also testified that his "ultimate conclusion" from his analysis was that Petitioner was, "at the time of the crime, . . . an untreated, traumatized child who inhabited the body of an 18-year-old boy." (Id. at p. 145.) Dr. Garbarino further stated that this conclusion "makes [Petitioner's] behavior before, and during, much more comprehensible" and "gives a basis for saying that as a victim of pervasive, chronic psychological treatment," Petitioner's ability "to resist the influence of Dorian O'Kelley was significantly impaired." (Id.)

After conducting the evidentiary hearing, the Superior Court denied the petition on January 15, 2017. (Doc. 27-20.) Petitioner then filed an Application for Certificate of Probable Cause to Appeal ("CPC Application") in the Georgia Supreme Court, (doc. 27-22), which the Georgia Supreme Court denied, (doc. 27-24).

**C.     Federal Habeas Petition**

On March 26, 2018, Petitioner filed his Petition for Writ of Habeas Corpus in this Court pursuant to 28 U.S.C. § 2254. (Doc. 1.) The parties then filed their briefs regarding the issues of procedural default, cause and prejudice, and the fundamental miscarriage of justice. (Docs. 57, 58, 59.) The Court determined that Petitioner could not brief his ineffective assistance of counsel claim regarding his trial counsel's performance during the guilt phase of his trial but that he could brief the entirety of his claim that he received ineffective assistance of counsel during the sentencing phase of his trial and his Eighth Amendment claim. (Doc. 60.) Petitioner then filed

14

the Brief on the Merits in support of his Petition for Writ of Habeas Corpus. (Doc. 65.) Respondent filed a Response, (doc. 69), and Petitioner filed a Reply, (doc. 71).

In his Brief, Petitioner asserts two general claims. (Doc. 65.) First, he asserts that his trial counsel rendered ineffective assistance of counsel at the sentencing phase of his trial in violation of his Sixth and Fourteenth Amendment rights. (Id. at pp. 87–133.) Specifically, Petitioner asserts that his trial counsel (1) unreasonably neglected to present available expert mental health mitigation evidence, including testimonies from experts such as Dr. James, Dr. Ash, and Dr. Garbarino; (2) unreasonably neglected to obtain testimony from Tony Raby, Linda Herman, and Sean Proctor; (3) unreasonably presented Dale Davis as a witness and produced her memoranda and notes of the case to the prosecution; (4) unreasonably failed to rebut the prosecution's evidence that Petitioner lacked remorse for his crimes; and (5) unreasonably failed to question jurors during voir dire about their opinions on the death penalty in cases involving juvenile victims. (Id.) Petitioner further asserts that his trial counsel's ineffectiveness prejudiced his defense. (Id. at pp. 121–33.) Next, Petitioner claims that his execution would constitute cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments and the United States Supreme Court's decision in Roper v. Simmons, 543 U.S. 551 (2005), because he was the equivalent of a juvenile when he committed his crimes. (Doc. 65, pp. 133–150.)

## STANDARD OF REVIEW

Generally, the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) "bars federal courts from granting habeas relief to a state habeas petitioner on a claim that was adjudicated on the merits in state court." Daniel v. Comm'r, Ala. Dep't of Corr., 822 F.3d 1248, 1258 (11th Cir. 2016) (citing 28 U.S.C. § 2554(d)). However, 28 U.S.C. § 2254(d) provides two exceptions to that general rule. Under Section 2254(d), a federal court may grant habeas relief to

a state habeas petitioner on a claim that was adjudicated on the merits if the state court's adjudication (1) "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1); or (2) "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding," 28 U.S.C. § 2254(d)(2).

The "clearly established" prong under Section 2554(d)(1) "refers to holdings, as opposed to the dicta," of the United States Supreme Court's decisions at the "time of the relevant state court decision." Williams v. Taylor, 529 U.S. 362, 412 (2000)). "'Contrary to' means the state court applied 'a rule different from the governing law set forth in [Supreme Court] cases, or [] it decide[d] a case differently than [the Supreme Court] ha[s] done on a set of materially indistinguishable facts.'" Daniel, at 1258–59 (quoting Bell v. Cone, 535 U.S. 685, 694 (2002)). The "unreasonable application" inquiry asks "whether the state court's application of clearly established federal law was objectively unreasonable," Williams v. Taylor, 529 U.S. at 407, which means more than "just incorrect or erroneous," Lockyer v. Andrade, 538 U.S. 63, 75 (2003). However, the AEDPA does not "prohibit a federal court from finding an application of a principle unreasonable when it involves a set of facts different from those of the case in which the principle was announced. The statute recognizes, to the contrary, that even a general standard may be applied in an unreasonable manner." Panetti v. Quarterman, 551 U.S. 930, 953 (2007) (internal citations and quotations omitted). Furthermore, review under Section 2254(d)(1) is "limited to the record that was before the state court that adjudicated the claim on the merits." Cullen v. Pinholster, 563 U.S. 170, 181 (2011).

16

Regarding Section 2254(d)(2), the Court must "evaluat[e] whether a state court's decision 'was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." <u>Daniel</u>, 822 F.3d at 1259 (quoting 28 U.S.C. § 2254(d)(2)). When doing so, the Court "may not characterize . . . state-court factual determinations as unreasonable merely because [the Court] would have reached a different conclusion in the first instance." <u>Brumfield v. Cain</u>, 576 U.S. 305, 313–14 (2015) (quotations omitted). "Section 2254(d)(2) . . . requires that federal courts afford state court factual determinations 'substantial deference.'" <u>Daniel</u>, 822 F.3d at 1259 (quoting <u>Brumfield</u>, 576 U.S. at 314). "If '[r]easonable minds reviewing the record might disagree about' the state court factfinding in question, 'on habeas review that does not suffice to supersede' the state court's factual determination." <u>Id.</u> (quoting <u>Rice v. Collins</u>, 546 U.S. 333, 341–42 (2006)). The Court "presume[s] findings of fact made by state courts are correct, unless a petitioner rebuts that presumption by clear and convincing evidence." <u>Id.</u> (citing 28 U.S.C. § 2254(e)(1)). "When considering a determination of a mixed question of law and fact, such as a claim of ineffective assistance of counsel, the statutory presumption of correctness applies to only the underlying factual determinations." <u>Tanzi v. Sec'y, Fla. Dep't of Corr.</u>, 772 F.3d 644, 651 (11th Cir. 2014).

This is a "difficult to meet and highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt." <u>Cullen</u>, 563 U.S. at 181 (internal quotations and citations omitted). Indeed, the AEDPA "erects a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court." <u>White v. Wheeler</u>, 577 U.S. 73, 77 (2015) (per curiam). However, "[e]ven in the context of federal habeas, deference does not imply abandonment or abdication of judicial review." <u>Miller-El v. Cockrell</u>, 537 U.S. 322, 340 (2003). "Deference does not by definition preclude relief." <u>Id.</u> "[I]f a convicted

state criminal defendant can show a federal habeas court that his conviction rests upon a violation of the Federal Constitution, he may well obtain a writ of habeas corpus that requires a new trial, a new sentence, or release." Trevino v. Thaler, 569 U.S. 413, 421 (2013).

## DISCUSSION

Petitioner brings two general claims. (Docs 1, 65.) First, he asserts that his trial counsel rendered ineffective assistance of counsel at the sentencing phase of his trial in violation of his Sixth and Fourteenth Amendment rights. (Doc. 65, pp. 87–133.) Next, Petitioner claims that his execution would constitute cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments. (Id. at pp. 133–150.) The Courts addresses each claim in turn.

## I.     Ineffective Assistance of Counsel at the Sentencing Phase of Trial

The United States Supreme Court explained the standard for analyzing ineffective assistance of counsel claims in Strickland v. Washington, 466 U.S. 668 (1984). To prevail on a claim of ineffective assistance of counsel under Strickland, a petitioner must demonstrate (1) his counsel's performance was deficient, i.e., the performance fell below an objective standard of reasonableness, and (2) he suffered prejudice as a result of that deficient performance. Id. at 687–88. "Unless a defendant makes both showings [of the two-part test], it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable." Id. at 687. Indeed, "[i]f a petitioner cannot satisfy one prong, we need not review the other prong." Duhart v. United States, 556 F. App'x 897, 898 (11th Cir. 2014) (citing Strickland, 466 U.S. at 697).

The deficient performance requirement concerns "whether counsel's advice was within the range of competence demanded of attorneys in criminal cases." Hill v. Lockhart, 474 U.S. 52, 58 (1985) (internal quotations omitted). "There is a strong presumption that counsel's conduct fell

within the range of reasonable professional assistance." <u>Davis v. United States</u>, 404 F. App'x 336, 337 (11th Cir. 2010) (per curiam) (citing <u>Strickland</u>, 466 U.S. at 689); <u>see also</u> <u>Jenkins v. Comm'r, Ala. Dep't of Corr.</u>, 963 F.3d 1248, 1264 (11th Cir. 2020) ("[R]eview of counsel's actions is 'highly deferential' and 'a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'") (quoting <u>Strickland</u>, 466 U.S. at 689). "It is petitioner's burden to establish that counsel performed outside the wide range of reasonable professional assistance by making errors so serious that [counsel] failed to function as the kind of counsel guaranteed by the Sixth Amendment." <u>LeCroy v. United States</u>, 739 F.3d 1297, 1312 (11th Cir. 2014) (alteration in original) (internal quotations omitted). "[A] court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." <u>Strickland</u>, 466 U.S. at 690. Furthermore, retrospective judicial scrutiny of counsel's performance "must be highly deferential" and must "eliminate the distorting effects of hindsight." <u>Id.</u> at 689. "In evaluating performance, 'counsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment.'" <u>LeCroy</u>, 739 F.3d at 1312 (quoting <u>Strickland</u>, 466 U.S. at 690).

To show prejudice, a petitioner must "establish a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." <u>Id.</u> (internal quotations omitted); <u>see id.</u> at pp. 1312-13 ("The prejudice prong requires a petitioner to demonstrate that seriously deficient performance of his attorney prejudiced the defense."). A reasonable probability of a different result "is a probability sufficient to undermine confidence in the outcome." <u>Strickland</u>, 466 U.S. at 694. Furthermore, "[t]he likelihood of a different result must be substantial, not just conceivable." <u>Harrington v. Richter</u>, 562 U.S. 86, 112 (2011).

Strickland created a "high bar" for petitioners to satisfy.  Padilla v. Kentucky, 559 U.S. 356, 371 (2010).  This is especially true where, as here, the petitioner must satisfy both Strickland and Section 2254(d)'s "highly deferential" standards of review.  Harrington, 562 U.S. at 105. Indeed, "[t]he standards created by Strickland and [Section] 2554(d) are both highly deferential and when the two apply in tandem, review is doubly so." Id.  Furthermore, where both Strickland and Section 2254(d) apply, "the question is not whether counsel's actions were reasonable.  The question is whether there is any reasonable argument that counsel satisfied Strickland's deferential standard." Id.  As the Eleventh Circuit Court of Appeals clarified,

> It is important to keep in mind that in addition to the deference to counsel's performance mandated by Strickland, the AEDPA adds another layer of deference—this one to a State court's decision—when we are considering whether to grant federal habeas relief from a State court's decision.  Thus, [a petitioner] not only has to satisfy the elements of the Strickland standard, but he must also show that the State court applied Strickland to the facts of his case in an objectively unreasonable manner.

Williams v. Allen, 598 F.3d 778, 789 (11th Cir. 2010) (internal quotations, alterations, and citations omitted).

Petitioner asserts that his trial counsel's performance during the sentencing phase of his trial was deficient because counsel (1) unreasonably neglected to present available expert mental health mitigation evidence, including testimonies from experts such as Dr. James, Dr. Ash, and Dr. Garbarino; (2) unreasonably neglected to obtain testimony from Tony Raby, Linda Herman, and Sean Proctor; (3) unreasonably presented Dale Davis as a witness and produced her memoranda and notes of the case to the prosecution; (4) unreasonably failed to rebut the prosecution's evidence that Petitioner lacked remorse for his crimes; and (5) unreasonably failed to question jurors during voir dire about their opinions on the death penalty in cases involving

20

juvenile victims.  (Doc. 65, pp. 87–121.)  The Court addresses each of Petitioner's arguments in turn.

### A.      Failure to Present Additional Expert Testimony

#### 1.      Ineffectiveness

Petitioner first argues that his trial counsel's performance was ineffective because they failed to present testimony from experts like Dr. James, Dr. Ash, and Dr. Garbarino.  (Id. at pp. 96–97.)  Specifically, Petitioner asserts that trial counsel should have: (1) provided testimony based on neuropsychological testing that explained that Petitioner's executive functioning deficiencies were more pronounced than a typical eighteen-year old's and compromised his ability "to extricate himself from and adapt to the situation as it developed in the Pittman home;" (2) provided testimony from a clinical psychiatrist explaining that Petitioner was functioning as an adolescent and was, therefore, less culpable for his crimes than an adult because of his "impulsivity, susceptibility to peer pressure and his otherwise nonviolent nature;" and (3) provided testimony from a developmental psychologist explaining "how the severe psychological maltreatment [Petitioner] suffered impaired his development and his ability to resist Dorian O'Kelley."  (Id. at p. 97.)

The state habeas court rejected Petitioner's claim, stating:

It is true trial counsel did not present the type of scientific evidence offered by Petitioner in this proceeding to "connect the dots" between Petitioner's conduct and his adolescence . . . .  Nonetheless, Petitioner's trial attorneys effectively presented much of the same factual evidence urged by Petitioner pertaining to Petitioner's life circumstances, immaturity, susceptibility to influence, and developmental deficiency.  While Petitioner's scientific evidence was persuasive, much of the subject matter raised by Petitioner's habeas witnesses was cumulative of the testimony actually presented at Petitioner's trial.  The court finds that the extensive evidenced presented by trial counsel in mitigation more than adequately addressed the subject matter raised by Petitioner's witnesses in this action. . . .  Petitioner has not demonstrated prejudice by proving that the outcome would have been different

had counsel approached the case as now urged by Petitioner, especially considering the aggravating circumstances presented in this case.

(Doc. 27-20, p. 5; see also id. at pp. 35–39.)

Petitioner asserts that the state habeas court's ruling is unreasonable because (1) "it overlooks the testimony confirmed by contemporaneous writings that, at least by December 2004, it was clear to [Petitioner's] defense team . . . that the mitigation case required expertise that Dr. Weilenman did not possess," and (2) "the implicit underlying assumption—that the testimony provided by Dr. Weilenman at trial served the same or a similar purpose to the testimony provided by Drs. James, Ash and Garbarino at the state court hearing—is irreconcilable with the state court's finding that 'trial counsel did not present the type of scientific evidence offered by Petitioner in this proceeding to "connect the dots" between Petitioner's conduct and his adolescence.'"  (Doc. 65, pp. 98–99 (quoting doc. 27-20, p. 5).)

The Court concludes that the state habeas court reasonably determined that trial counsel was not deficient for failing to provide testimony from experts such as Dr. James, Dr. Ash, and Dr. Garbarino during the sentencing phase of trial.  "Counsel representing a capital defendant must conduct an adequate background investigation, but it need not be exhaustive."  Raulerson v. Warden, 928 F.3d 987, 997 (11th Cir. 2019).  Indeed, "[t]he scope of counsel's investigation, like all other actions undertaken by counsel, need only be objectively reasonable under the circumstances to satisfy constitutional demands."  Gissendaner v. Seaboldt, 735 F.3d 1311, 1322 (11th Cir. 2013).  Moreover, the Supreme Court of the United States has held that trial counsel's investigation is not deficient "when counsel gather[s] a substantial amount of information and then ma[kes] a reasonable decision not to pursue additional sources."  Porter v. McCollum, 558 U.S. 30, 40 (2009) (summarizing the holding in Bobby v. Van Hook, 558 U.S. 4, 9–12 (2009)).

"To determine whether trial counsel should have done something more in their investigation," the Court must first "look at what the lawyer[] did in fact." Raulerson, 928 F.3d at 997 (internal quotations omitted).  Here, trial counsel appears to have conducted an extensive mitigation investigation and hired two experts for the sentencing phase in this case: Davis, as the mitigation expert, and Dr. Weilenman, as a clinical psychologist.  (See doc. 27-20, pp. 30, 35.)  In her role as the mitigation expert, Davis worked approximately 432 hours to "find out every single thing" she could about Petitioner, from "pre-birth[] up until [the crime]."  (Doc. 10-9, p. 78.)  Davis interviewed more than forty people, including Petitioner's family, friends, pastor, psychiatrist, teachers, and acquaintances, traveled to Wisconsin, and consulted with trial counsel numerous times.  (Id. at pp. 78–80, 83–89, 95–96, 101–02, 105–10, 112–13, 125; doc. 27-20, pp. 45–47.)  Davis also investigated and procured many records and documents pertaining to Petitioner's childhood, education, and health, including birth records, prenatal and delivery records, hospital records, school records, social services and family court records, counseling records, medical and mental health records from Chatham County Detention Center, divorce records from Petitioner's parents, mental health records regarding Petitioner's brother, marriage records for Petitioner's mother and stepfather, and a police report regarding Petitioner's stepfather.  (Doc. 10-9, pp. 78–80, 83–89, 95–96, 101–02, 105–10, 112–13; see also doc. 27-20, p. 45.)

Dr. Weilenman, in her role as clinical psychologist, performed a psychological evaluation on Petitioner.  (Doc. 26-19, p. 150.)  To perform this evaluation, Dr. Weilenman met with Petitioner five times for approximately ten to fifteen hours total.  (Doc. 10-11, pp. 6–7; see also doc. 27-20, p. 61.)  Dr. Weilenman also reviewed the documents, records, and interview notes procured by Davis during her investigation and re-interviewed other witnesses.  (See doc. 10-11, pp. 6–7; doc. 27-20, p. 61; doc. 26-19, p. 150.)  To form Petitioner's social history, Dr. Weilenman

"focus[ed] on [Petitioner's] entire life," including "filling in all the blanks of [his] family history" and "focus[ing] on each family member . . . to find out . . . their impact . . . on his life." (Doc. 10-11, pp. 7–8.) Like Davis, Dr. Weilenman had experience with death penalty cases, having worked on two Georgia death penalty cases, performed work for the Department of Juvenile Justice, and attended annual death penalty seminars. (Doc. 27-20, p. 35; see also doc. 24-12, p. 72.) Dr. Weilenman crafted a report that highlighted much of the neglect, abuse, and trauma Petitioner suffered during his childhood and adolescent years. (Doc. 26-19, pp. 150–52.) Dr. Weilenman specifically described Petitioner's lack of "moral reasoning and risk assessment" and noted that "[a]t the time of the crimes, due to his age and developmental stage, [Petitioner] demonstrated a pattern of poor insight, and decision-making skills." (Id. at pp. 151–52.) Dr. Weilenman also noted Petitioner's "limited ability to restrain impulses" and failure to "consider an alternative course of action." (Id. at p. 151.) Dr. Weilenman's psychological evaluation also reveals that she consulted with trial counsel and Davis on at least five occasions. (Id. at p. 150.)

Given the extensive work by Davis as a mitigation specialist and Dr. Weilenman as the retained clinical psychologist, this case is distinguishable from other cases in which trial counsel was deemed to have inadequately investigated a petitioner's background for mitigation purposes. See, e.g., Williams v. Taylor, 529 U.S. at 369–70, 395 (finding an unreasonable mitigation investigation where trial counsel "did not begin to prepare for [the sentencing] phase . . . until a week before the trial," called witnesses who testified only generally that petitioner was a "nice boy," and failed to seek prison records or the "extensive records" that described petitioner's "nightmarish childhood"); Porter, 558 U.S. at 40 (finding an unreasonable mitigation investigation where trial counsel had "one short meeting" with petitioner regarding the sentencing phase and failed to obtain "any of [petitioner's] school, medical, or military service records or interview any

24

members of [petitioner's] family"); <u>Hardwick v. Sec'y, Fla. Dep't of Corr.</u>, 803 F.3d 541, 553 (11th Cir. 2015) (finding an unreasonable mitigation investigation where counsel (1) "failed to obtain any of [petitioner's] readily available life-history records, such as his school, medical, psychiatric, foster care, juvenile justice, or social-services records," and (2) "failed to ask any of [petitioner's] family members about [petitioner's] dysfunctional upbringing or extended history of substance abuse").

Petitioner attempts to discredit trial counsel's mitigation investigation by asserting that "[s]everal red flags" should have alerted trial counsel that it was necessary to retain additional experts. (Doc. 65, pp. 94–96.) Specifically, Petitioner argues (1) that a "clinical mental status exam" would have revealed neuropsychological problems and (2) that Petitioner's history of psychological trauma, his youth, and Davis's advice should have placed trial counsel on notice of the need for additional experts to explain how these factors impacted Petitioner's actions and inactions at the time of his crimes. (<u>Id.</u> at pp. 94–95.) However, Petitioner's argument overlooks the fact that the state habeas court found that Dr. Weilenman, the expert responsible for performing the psychological evaluation of Petitioner, did not recommend further testing by additional experts. (Doc. 27-20, p. 38.) Indeed, Sparger testified that:

> If I had been told that testing was needed and it wasn't testing that [Dr. Weilenman] was going to perform, I would have said, "Well, who do we need?" and then it would have been getting the motion, getting the funds to go to the next person. And that never happened because I was never told . . . by Dr. Weilenman, by Ms. Davis, or anyone that there was testing [that needed to be done].

(Doc. 13-16, p. 89.) Furthermore, Schiavone testified that he could not recall whether Mr. Weilenman informed him that Petitioner "needed to have testing done." (Doc. 13-15, pp. 100–01.) Given trial counsel's extensive mitigation investigation and the fact that Dr. Weilenman did not recommend additional testing (by either herself or another expert), the Court finds that the state

court reasonably concluded that Petitioner's trial counsel acted reasonably in not retaining additional experts such as Dr. James, Dr. Ash, and Dr. Garbarino. See Housel v. Head, 238 F.3d 1289, 1296 (11th Cir. 2001) (finding counsel reasonably forwent additional mental health investigation where a retained expert did not "offer[] any encouragement to proceed further"); see also Ward v. Hall, 592 F.3d 1144, 1168 (11th Cir. 2010) ("[E]ven when trial counsel's investigation is less complete than collateral counsel's, trial counsel has not performed deficiently when a reasonable lawyer could have decided, in the circumstances, not to investigate.").

While Petitioner highlights Davis's testimony asserting that she raised the need for a neuropsychological exam, a single page from Dr. Weilenman's notes that shows a list of purported experts and scientific literature, and trial counsel's impression that Petitioner "seemed young for his age," that evidence, at best, reveals contradictory evidence regarding whether Dr. Weilenman and Sparger discussed the need to retain *additional experts* to perform testing on Petitioner that Dr. Weilenman could not perform herself. (Doc. 65, p. 95; doc. 71, pp. 25–26.) Such contradictory testimony is not enough to overcome the "presumption of correctness" afforded to a "factual determination made by a state court" under the AEDPA, which requires "clear and convincing evidence." Consalvo v. Sec'y for Dep't of Corr., 664 F.3d 842, 845 (11th Cir. 2011); see also Williams v. Allen, 598 F.3d at 794 ("[W]here the record is incomplete or unclear about counsel's actions, we will presume that he did what he should have done, and that he exercised reasonable professional judgment."). The fact that Petitioner "later secured a more favorable opinion of an expert than the opinion of [Dr. Weilenman] does not mean that trial counsel's failure to obtain that expert testimony constituted deficient performance." McClain v. Hall, 552 F.3d 1245, 1253 (11th Cir. 2008). Based on the foregoing, the Court concludes that the state court reasonably determined

that trial counsel's decision not to retain additional experts was supported by "reasonable professional judgments."  Strickland, 466 U.S. at 690–91.

### 2. Prejudice

Furthermore, even if Petitioner showed that trial counsel's performance was deficient for not retaining experts such as Drs. James, Ash, and Garbarino, the state habeas court reasonably determined that Petitioner failed to establish prejudice for that deficiency.  Indeed, as the state habeas court determined, "[w]hile Petitioner's scientific evidence was persuasive, much of the subject matter raised by Petitioner's habeas witnesses was cumulative of the testimony actually presented at Petitioner's trial."  (Doc. 27-20, p. 5.)  "A petitioner cannot establish that the outcome of the proceeding would have been different when '[t]he "new" evidence largely duplicated the mitigation evidence at trial.'"  Raulerson, 928 F.3d at 999 (quoting Cullen, 563 U.S. at 200).  "Generally, 'evidence presented in postconviction proceedings is "cumulative" or "largely cumulative" to or "duplicative" of that presented at trial when it tells a more detailed version of the same story told at trial or provides more or better examples or amplifies the themes presented to the jury.'"  Ledford v Warden, Ga. Diagnostic & Classification Prison, 818 F.3d 600, 649 (11th Cir. 2016) (quoting Tanzi, 772 F.3d at 660).

Here, Dr. James, Dr. Ash, and Dr. Garbarino told "a more detailed version of the same story told at trial" and provided "more or better examples" of the "themes presented to the jury."  See id.  During the sentencing phase, Dr. Weilenman testified extensively about Petitioner's social history, a history that included the abuse, trauma, and neglect Petitioner suffered throughout his life. (Doc. 10-11, pp. 3–84.)  Specifically, Dr. Weilenman testified that Petitioner had a "history of instability" and "abandonment," which caused Petitioner to become "a follower . . . [and] d[o] what he felt to please others."  (Id. at pp. 48–52.)  Indeed, based on her own conversations with

Petitioner, Dr. Weilenman concluded that Petitioner was always trying to "please" her.  (Id. at p. 53.)  Furthermore, Dr. Weilenman testified that people like Petitioner will exhibit "inappropriate conduct or . . . inappropriate behavior at times" and "don't really think."  (Id. at p. 52.)

Concerning Dr. Ash and Dr. Garbarino, their testimonies in the state habeas proceeding did not differ greatly from Dr. Weilenman's testimony in the sentencing phase of trial.  First, their methods of evaluations were similar.  Dr. Weilenman interviewed Petitioner for ten to fifteen hours over five meetings, reviewed Davis's mitigation evidence, and conducted interviews with other witnesses.  Both Dr. Ash and Dr. Garbarino formed their opinions by conducting two-and-a-half-hour interviews with Petitioner and reviewing relevant documents in Petitioner's social history.  (Doc. 13-17, pp. 24–26, 30–41; doc. 13-21, pp. 69–70.)  Second, Dr. Ash and Dr. Garbarino simply provided more detailed, scientific-based explanations of the same conclusions that Dr. Weilenman reached and testified about during the trial.  Indeed, Dr. Weilenman testified about Petitioner's mental development, noting that Petitioner suffered from post-traumatic stress disorder, ADHD, and an adjustment disorder with depressed features.  (Doc. 10-11, p. 54.)  Dr. Weilenman described how ADHD effects one's "executive functioning" (i.e., "how you think, how you process information, impulse control, [and] all of those things"), which is linked to the development of one's frontal lobe in the brain.  (Id. at p. 55.)   According to Dr. Weilenman, the brain's frontal lobe, which she described as the "thinking center," does not fully develop until the age of twenty-five.  (Id.)  Thus, as one gets older, the frontal lobe develops, and therefore, a person "may have better control over their behaviors as a mid-twenties than they did when they were fourteen."  (Id.)  When asked to compare Petitioner's executive functioning to that of a typical eighteen or nineteen-year-old, Dr. Weilenman stated that a typical eighteen or nineteen-year-old "is developing . . . some sense of internalizing external values."  (Id. at p. 59.)  Dr. Weilenman testified that a typical

late adolescent "[is] forming some sense of identity . . . know[s] what their belief systems are . . . [and] what they stand for, [and possesses] some sense of right and wrong." (<u>Id.</u>) However, according to Dr. Weilenman, Petitioner's instability and abandonment issues delayed his development of "that internal sense." (<u>Id.</u> at pp. 59–60.) Dr. Weilenman testified that Petitioner "was still more into peer pressure than you would have expected at that age" and, considering Petitioner's unstable life in the weeks leading up to his crimes, "needed to fit in." (<u>Id.</u> at pp. 60–61.) At bottom, Weilenman described Petitioner as someone who did not know who he was and interacted like a "twelve-year-old." (<u>Id.</u> at pp. 56, 58.)

Through his evaluation, Dr. Ash noticed the "psychological maltreatment" in Petitioner's life, including Petitioner's constant moves throughout his childhood and the "ongoing pattern of rejection." (Doc. 13-17, p. 30.) Furthermore, Dr. Ash testified about Petitioner's deficits in executive functioning, concluding that Petitioner was functioning at an "adolescent level" the night of his crimes. (<u>Id.</u> at pp. 51, 79–82, 86.) While Dr. Ash provided more details and scientific knowledge about the "prefrontal cortex" in the brain and how Petitioner's executive functioning was less than "one would expect from the normal person of his age at that time," (<u>id.</u> at pp. 79–82), his testimony simply provided a more detailed conclusion of what Dr. Weilenman testified about during the trial: that the trauma Petitioner suffered during his childhood delayed the development of his executive functioning and caused him to function at an adolescent level despite his age of eighteen years old.

Dr. Garbarino also testified about the severe psychological maltreatment Petitioner suffered during his childhood and adolescent years. (Doc. 13-21, pp. 72–78, 82–84.) According to Dr. Garbarino, the psychological maltreatment Petitioner suffered "undermined" Petitioner's development as a child and adolescent. (<u>Id.</u> at p. 114.) Therefore, at the time of the crime,

Petitioner was "an untreated, traumatized child . . . inhabit[ing] the body of an 18-year-old boy." (Id. at p. 145.)   Thus, Petitioner's ability to "resist the influence of Dorian O'Kelley was significantly impaired."  (Id.)  While Dr. Garbarino seemed to provide a better explanation of how the trauma Petitioner faced adversely impacted his neuropsychological development and grounded his testimony in scientific research more so than Dr. Weilenman, that testimony simply arrived at the same conclusion as Dr. Weilenman.   Indeed, like with Dr. Ash's testimony, the more scientifically founded testimony of Dr. Garbarino simply provided a better explanation and more detail regarding Petitioner's development: that Petitioner functioned as an adolescent and was more susceptible to outside influences and peer pressure.

Concerning Dr. James, she evaluated Petitioner's neurocognitive strengths and weaknesses using a neuropsychological examination she conducted on Petitioner during a six-hour meeting. (Doc. 13-20, p. 93.)  As part of this evaluation, Dr. James conducted a variety of different tests on Petitioner.  (Id. at pp. 99, 133.)   Dr. James testified that based on the results of her evaluation, Petitioner suffered from weaknesses in particular areas of executive functioning, including working memory, short-term memory, auditory attention, planning, and organization.  (Id. at p. 123.)  Dr. James then explained how those deficits in executive functioning contributed to his actions the night of the crime.  (Id. at pp. 154–55.)  Like with Dr. Ash and Dr. Garbarino, while this testimony was more rooted in science and *possibly* more convincing than Dr. Weilenman's testimony, the testimony still just provides a more detailed explanation of what Dr. Weilenman already testified to during the trial.  Indeed, Dr. Weilenman testified that Petitioner suffered from a lack of development in executive functioning that was caused by the trauma and abuse Petitioner suffered during his childhood and adolescent years.

As the Eleventh Circuit stated in Dallas v. Warden,

> In each of the key Supreme Court cases finding prejudice as a result of counsel's
> failure to offer mitigating evidence, the disparity between what was presented at
> trial and what was offered collaterally was vast.  In other words, the balance
> between the aggravating and mitigating evidence at trial and in postconviction
> proceedings shifted enormously, so much so as to have profoundly altered each of
> the defendants' sentencing profiles.

964 F.3d 1285, 1312 (11th Cir. 2020) (citing Wiggins v. Smith, 539 U.S. 510, 535 (2003);

Williams v. Taylor, 529 U.S. at 369–70; Porter, 558 U.S. at 32–36; Andrus v. Texas, 140 S. Ct.

1875, 1881 (2020) (per curiam)).

In this case, the new mitigating evidence provided by Drs. James, Ash, and Garbarino

"would barely have altered the sentencing profile presented" at Petitioner's trial.  Strickland, 466

U.S. at 700.  Indeed, the mitigating evidence Petitioner's trial counsel introduced sufficiently

showed that Petitioner suffered from an abusive and unstable childhood, functioned at an age

below his chronological age of eighteen when he committed his crimes, lacked executive

functioning compared to similarly aged peers, and was uniquely susceptible to peer pressure.  As

described above, the testimonies of Drs. James, Ash, and Garbarino simply amplified these themes,

albeit in a more detailed approach.  Thus, the Court cannot say that "the disparity between what

was presented at trial and what was offered collaterally" was so great as to create a reasonable

probability that the jury's result would have changed.  See Dallas, 964 F.3d at 1312 ("Recognizing

that the vast majority of the allegedly new mitigating evidence presented . . .  did no more than

amplify the themes presented at trial, we think it wholly unlikely that the additional evidence would

have changed the jury's result.").

Furthermore, considering the substantial aggravating evidence that the State presented

during the sentencing phase, this is a case in which the new evidence presented at the state habeas

hearing "would barely have altered the sentencing profile presented" to the jury.  Strickland, 466

U.S. at 700.  "In a case challenging a death sentence, 'the question is whether there is a reasonable

probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.'" Cooper v. Sec'y, Dep't of Corr., 646 F.3d 1328, 1353 (11th Cir. 2011) (quoting Strickland, 466 U.S. at 695). In determining whether there is a reasonable probability that the "additional mitigating evidence would have changed the weighing process so that death is not warranted," the Court considers the totality of the evidence by weighing the mitigating evidence that was presented, and that which was not presented, "against the aggravating circumstances that were found." Hardwick v. Crosby, 320 F.3d 1127, 1166 (11th Cir. 2003). Here, the evidence against Petitioner was highly aggravating. (See doc. 23-4, pp. 259–61; doc. 23-5, pp. 146–47; doc. 27-20, pp. 83–84.) As the Court quoted above in the factual background of this Order, the Georgia Supreme Court summarized numerous abhorrent and depraved actions that Petitioner participated in with his cohort, including: a crime spree that included the burglary of another home and entry into the victims' home after cutting the power to the home; beating the mother of a thirteen-year old girl with a walking cane, flashlight, and lamp and fatally stabbing the mother in the chest and abdomen all while the daughter could hear her mother's screams; binding, gagging, and raping the thirteen-year-old girl; additional torture of the thirteen-year-old-girl including beating her with a baseball bat, slitting her throat, attempting to suffocate her, stabbing her, and throwing objects at her all while she was still bloody from the rape; and ultimately setting fire to the home and leaving the child to suffocate amidst the flames and smoke while Petitioner watched from across the street. Stinski v. State, 691 S.E.2d at 862–63. Furthermore, the jury recommended the death sentence based on nine aggravating factors. (Doc. 8-1, pp. 210–13.) Among these factors were: (1) the murder of Susan Pittman "was outrageously or wantonly vile, horrible, or inhuman in that it involved the depravity of mind of" Petitioner; (2) the murder of Susan Pittman "was outrageously or wantonly vile, horrible, or

inhuman in that it involved an aggravated battery to the victim before death;" (3) Petitioner "was engaged in the commission of arson in the first degree" when murdering Kimberly Pittman; (4) the murder of Kimberly Pittman "was outrageously or wantonly vile, horrible, or inhuman in that it involved tortur[ing] . . . the victim before death;" (5) the murder of Kimberly Pittman "was outrageously or wantonly vile, horrible, or inhuman in that it involved the depravity of mind of" Petitioner; and (6) the murder of Kimberly Pittman "was outrageously or wantonly vile, horrible, or inhuman in that it involved an aggravated battery to the victim before death."  (Id.)

Weighing the mitigating evidence that was presented, and that which was not presented, against the aggravating circumstances found by the jury, the Court concludes that Petitioner has failed to show prejudice.  See Callahan v. Campbell, 427 F.3d 897, 938 (11th Cir. 2005) ("[T]he state court found three aggravating factors: the crime was committed while Callahan was under sentence of imprisonment; the defendant had been previously convicted of a crime of violence; and the murder was committed during a kidnapping.  We have previously noted that [m]any death penalty cases involve murders that are carefully planned, or accompanied by torture, rape, or kidnapping.  In these types of cases, this court has found that the aggravating circumstances of the crime outweigh any prejudice caused when a lawyer failed to present mitigating evidence.") (internal quotations and citation omitted) (alteration in original); Brown v. Jones, 255 F.3d 1273, 1280 (11th Cir. 2001) (citing "the heinous nature of the crime" as support for the conclusion that "[petitioner] has failed to show that [his trial counsel's] decision . . . resulted in prejudice sufficient to satisfy the second prong of Strickland"); Gilreath v. Head, 234 F.3d 547, 552 (11th Cir. 2000) ("We are unconvinced that a reasonable probability exists that the testimony of the other character witnesses would have changed the balance of aggravating and mitigating circumstances [because] [t]he State's evidence of aggravating circumstances was strong.").  The evidence that Petitioner's

actions were outrageously and wantonly vile, horrible, inhuman, and depraved, was so strong that it is hard to imagine that any amount of mitigating evidence could have outweighed it.

Based on the foregoing, the Court finds that the state habeas court reasonably determined that Petitioner failed to show that his trial counsel acted deficiently for failing to retain experts such as Drs. James, Ash, and Garbarino.  Further, even if Petitioner did make the requisite showing that his trial counsel acted deficiently, he failed to show that deficiency prejudiced his defense. Accordingly, Petitioner failed to show that the state habeas court's decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).

### B.      Failure to Obtain Testimony from Additional Witnesses

Petitioner next argues that his trial counsel's performance was objectively unreasonable because counsel failed to obtain testimony from Tony Raby, Linda Herman, and Sean Proctor. (Doc. 65, pp. 101–08.)

### 1.      Tony Raby

According to Petitioner, testimony from Tony Raby, Petitioner's half-brother, "would have been critical to present the jury with a first-hand account about what it was like to grow up with [Petitioner's] biological parents and his stepfather, the abuse that [Petitioner's] father and stepfather directed toward [Petitioner] and his brothers and his mother's indifference to it and abandonment of her sons."  (Id. at p. 102.)  Petitioner's trial counsel tried to locate Raby but was unable to do so.  Nonetheless, Petitioner argues that his trial counsel was ineffective "for failing to make greater efforts to locate" Raby, including reaching out to Raby through his mother.  (Id.)

The state habeas court rejected Petitioner's claim, finding that the record showed that trial counsel "made concerted efforts to contact" Raby by telephone, even leaving messages for him. (Doc. 27-20, p. 75.)  The state habeas court further found that Petitioner failed to demonstrate that attempting to contact Raby through his mother would have been successful because "the record demonstrates [that] . . . Raby was never contacted by Petitioner's mother or grandmother about Petitioner's case and according to . . . Raby, they were 'afraid [he] would tell the truth and air the family's dirty laundry.'"  (Id.)  Finally, the state habeas court found that Petitioner failed to show any prejudice occurred because Raby's testimony would have been cumulative of testimony Petitioner's counsel presented through other witnesses at the trial.  (Id. at p. 76.)

Petitioner argues that the state habeas court's decision was unreasonable because "there is no record evidence that the defense team even asked Mr. Raby's mother to contact him on their behalf or otherwise to put the defense team in contact with him."  (Doc. 65, p. 103.)  Petitioner further argues that "even had the defense team made that request unsuccessfully in addition to their one attempt to reach Mr. Raby by phone, their efforts would have been constitutionally insufficient."  (Id.)  Relying on the Georgia Supreme Court's decision in Perkins v. Hall, 708 S.E.2d 335 (Ga. 2011), Petitioner contends that trial counsel was ineffective because "their attempts to contact [Raby] 'were limited to . . . making some telephone calls that were never returned.'"  (Doc. 71, p. 41 (quoting Perkins, 708 S.E.2d at 340–41).)

As the state habeas court found, trial counsel retained Davis as a mitigation expert.  Davis interviewed many witnesses and reached out to several more.  Relevant to Raby, Davis attempted to contact him by telephone on more than one occasion and left messages for him.  (Doc. 24-3, p. 200; doc. 24-10, p. 21.)  However, neither she nor Sparger heard from or could locate Raby.  (Doc. 13-15, p. 154; doc. 13-16, p. 100; doc. 13-19, p. 102–03; doc. 23-5, p. 11–12.)  Furthermore, Raby

testified during the state habeas proceedings that he "was never contacted by anybody" about Petitioner's trial, including his mother or grandmother.  (Doc. 13-18, pp. 18, 51.)  Raby believed that his mother and grandmother did not contact him because he would "tell the truth and air the family's dirty laundry."  (Id. at p. 51.)  These facts sufficiently support the state habeas court's finding that Petitioner's trial counsel was not unreasonable in failing to locate and contact Raby. See DeYoung v. Schofield, 609 F.3d 1260, 1290 (11th Cir. 2010) ("As to not calling the [petitioner's brother] to testify in the penalty phase, the state habeas court found that [the petitioner's trial counsel] made reasonable efforts to contact [him] to secure his testimony, but [he] did not return their calls, indicating he 'had no intention of assisting the defense in Petitioner's case.'  The evidence in the state habeas proceeding amply supported this finding.").  Furthermore, Petitioner's trial counsel's calling numerous other family members to testify distinguishes the present case from Perkins, where, unlike here, "nothing in the trial or habeas records . . . suggest[ed] that trial counsel attempted to contact any of the numerous other family members and friends who testified in the habeas court."  Perkins, 708 S.E.2d at 341.  Based on the foregoing, the Court finds that Petitioner failed to show that the state habeas court's decision "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law" or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).

Moreover, even if the trial counsel reasonably should have expended more effort to contact Raby, Petitioner failed to show that he was prejudiced as a result.  Where "'new' evidence largely duplicate[s] the mitigation evidence at trial," there is "no reasonable probability that the additional evidence [the petitioner] presented in his state habeas proceedings would have changed the jury's verdict."  Cullen, 563 U.S. at 200.  To determine whether the state habeas court unreasonably

concluded that evidence would have been cumulative, the Court "compare[s] the trial evidence with the evidence presented during the state postconviction proceedings." Holsey v. Warden, Ga. Diagnostic Prison, 694 F.3d 1230, 1260 (11th Cir. 2012). As directed by the Eleventh Circuit, the Court must

> keep in mind that the United States Supreme Court, [the Eleventh Circuit], and other circuit courts of appeals generally hold that evidence presented in postconviction proceedings is "cumulative" or "largely cumulative" to or "duplicative" of that presented at trial when it tells a more detailed version of the same story told at trial or provides more or better examples or amplifies the themes presented to the jury.

Id. at 1260–61 (citing Cullen, 563 U.S. at 200); see also Wong v. Belmontes, 558 U.S. 15, 22 (2009) ("[S]ome of the evidence was merely cumulative of the humanizing evidence Schick actually presented; adding it to what was already there would have made little difference."); Boyd v. Allen, 592 F.3d 1274, 1298 (11th Cir. 2010) ("[M]uch (although not all) of the 'new' testimony introduced at the post-conviction hearing would simply have amplified the themes already raised at trial and incorporated into the sentencing judge's decision to override the jury.") (collecting cases).

Petitioner asserts that his defense was prejudiced by his trial counsel's failure to contact Raby because Raby's testimony "would have provided first-hand testimony from a victim of, and witness to, the abuse that [Petitioner's] family inflicted on him and his brothers rather than second-hand . . . or self-serving accounts offered by the abusers." (Doc. 65, p. 123.) During the state habeas proceeding, Raby did testify about his family's unstable and abusive background. (Doc. 13-18, pp. 15–68.) Raby testified that Petitioner's biological father was "pretty distant" and abusive. (Id. at pp. 22–23.) Raby also noted how the biological father's neglect led to a car hitting Petitioner when Petitioner was three-years old. (Id. at p. 22.) Raby further testified about Petitioner's stepfather and the stepfather's relationship with Petitioner and his brothers. (Id. at pp.

29–38.)  When describing the stepfather's "role as a father" for Petitioner and his brothers, Raby stated the role was "nonexistent" and that "it was more of a fear and control thing."  (Id. at p. 34.)  Raby testified that the stepfather "liked to control [him and his brothers] by fear" and would hit them with a belt or paddle if they did "something wrong."  (Id. at pp. 35–36.)  Raby also testified about his mother's relationship with her kids, stating that "she really tried" and "had our best interests at heart" but that "sometimes some of the decisions she made probably weren't the best at the time."  (Id. at p. 36.)

As the state habeas court concluded, "Raby's testimony would have been largely cumulative of testimony counsel presented through numerous witnesses at Petitioner's trial." (Doc. 27-20, p. 76.)  Indeed, several of Petitioner's family members and friends testified during the sentencing phase of the trial.  For example, Sharlene Riley, Petitioner's material grandmother, testified about Petitioner's family history of alcoholism and abuse.  (Doc. 10-9, pp. 30–34.) Specifically, Riley testified that Petitioner's biological father "drank heavily" and was "very abusive."  (Id. at p. 34.)  Riley also recounted multiple stories illustrating Petitioner's father's neglect as a parent, including the incident in which a car struck Petitioner.  (Id. at pp. 34–36.) Moreover, Riley testified that Petitioner's mother divorced his father because "[s]he got tired of hi[m] being drunk and passing out on the floor with a gun or knife in his hand."  (Id. at p. 38.) Riley further testified about Petitioner's stepfather, calling him a "heavy drinker[]" and "control freak[]," and about Petitioner's frequent moves and instability during his childhood.  (Id. at pp. 37–38, 44, 63.)

Trial counsel also presented testimony from Davis, the mitigation specialist, and introduced numerous records concerning Petitioner's childhood and unstable and dysfunctional home life. Davis testified that Petitioner's parent's divorce records showed that his mother filed for divorce

...

due to a "pattern and practice of alcohol and/or substance abuse." (Doc. 10–9, p. 109; see also doc. 27-20, p. 46.)  Indeed, Davis testified that Petitioner's father had "a real serious drinking problem." (Doc. 10-9, p. 109.)  Davis also testified that Petitioner's stepfather was listed as a suspect in a police report for criminal domestic violence and simple assault for pushing Petitioner's brother. (Id. at p. 110–11; see also doc. 27-20, p. 46.)  The police report also states that Petitioner's mother refused to press charges against the stepfather even though he was under the influence of alcohol during the domestic violence altercation. (Doc. 10-9, pp. 111–12; see also doc. 27-20, p. 46.)  Furthermore, Davis discussed Petitioner's brother's mental health records, which showed a "history of alcohol abuse and mental illness in [Petitioner's] family." (Doc. 10-9, p. 113; see also doc. 27-20, p. 47.)  Davis also testified that "depression ran through [Petitioner's family]" and that "[t]here were a number of suicides and suicide attempts." (Doc. 10-9, p. 124; see also doc. 27-20, p. 47.)

While Petitioner emphasizes that Raby was a "first-hand witness to the familial abuse that [Petitioner] suffered," (doc. 71, p. 40), Raby's testimony—at most—simply "tells a more detailed version of the same story told at trial" and "provides more or better examples or amplifies the themes presented to the jury." Holsey, 694 F.3d at 1260–61.  Such "duplicative" testimony is insufficient to establish prejudice under Strickland.  See id.  Thus, Petitioner failed to establish that his defense suffered prejudice from his trial counsel's failure to contact Raby more vigorously. See, e.g., Cullen, 563 U.S. at 200–01 ("The 'new' evidence largely duplicated the mitigation evidence at trial.  School and medical records basically substantiate the testimony of Pinholster's mother and brother.  Declarations from Pinholster's siblings support his mother's testimony that his stepfather was abusive and explain that Pinholster was beaten with fists, belts, and even wooden

boards.").  Moreover, as discussed in Discussion Section I.A.2, <u>supra</u>, the extent of the aggravating factors present in this case further negates a finding of prejudice.

### 2.     Linda Herman

Petitioner also argues that his trial counsel was ineffective for failing to present testimony from Linda Herman, Petitioner's high school principal at Windsor Forest High School in Savannah.  (Doc. 65, pp. 103–07.)  According to Petitioner, Herman would have been a "critical witness to [Petitioner's] downward spiral and increasingly desperate condition shortly before his crimes."  (<u>Id.</u> at p. 103.)  Petitioner asserts that "Herman's testimony would have been important evidence to show that in the week before the crimes [Petitioner] was a desperate kid looking for help from available adults in his life—not a depraved murderer deserving of the death penalty."  (<u>Id.</u> at p. 104.)  However, Petitioner's trial counsel did not contact Herman.  Petitioner argues that the failure to contact Herman constitutes ineffective assistance of counsel.  (<u>Id.</u> at 104.)

The state habeas court rejected Petitioner's claim, finding "that counsel understood . . . Herman would not have testified on Petitioner's behalf during the sentencing phase" and that "harmful information could have been elicited from . . . Herman during cross-examination."  (Doc. 27-20, p. 76.)  According to the state habeas court,

> The record reflects that counsel understood Ms. Herman would not have testified on Petitioner's behalf during the sentencing phase.  Trial counsel's files contained an investigative report prepared by the District Attorney's Investigator Ricky Becker which indicates that Ms. Herman informed Investigator Becker that she was unwilling to testify on Petitioner's behalf.  Moreover, the record shows that harmful information could have been elicited from Ms. Herman during cross-examination by the state.  Specifically, Ms. Herman told the District Attorney's investigator that Petitioner was "always showing his tattoos and gave the appearance that he just did not wish to be in school."  In addition. Dr. Weilenman's file contained handwritten notes on the District Attorney's investigative report that Petitioner had "[t]ongue – earrings – blue – punk" and "we don't want your kind at this school."  This statement was corroborated by Petitioner, who reported to Ms. Davis that he tried to reenroll in school and was told by Ms. Herman that they "don't want your kind in here."

(Id. at p. 76.) Based on the above findings, the state habeas court determined that Petitioner failed to establish deficiency or prejudice from his trial counsel's failure to present testimony from Herman. (Id.)

Petitioner argues that the state habeas court's decision was unreasonable because the state court's finding that Herman was not willing to testify on Petitioner's behalf is contradicted by Herman's sworn testimony that she would have testified at trial had she been asked. (Doc. 65, p. 104.) Petitioner further argues that the state court's finding that "harmful information could have been elicited from . . . Herman during cross-examination" was unreasonable because the State "failed to elicit such harmful testimony on cross-examination at the state-court hearing" and because other witnesses testified about Petitioner's appearance. (Id. at pp. 105–07.)

The Court concludes that Petitioner failed to show that the state habeas court's decision regarding trial counsel's failure to call Herman was unreasonable as the record amply supports the state habeas court's findings. In his report, the district attorney's investigator typed,

On 6/1/07, I spoke with Linda Herman . . . .

Linda Herman retired as principal of Windsor Highschool in July 2006. Herman said that she remembered [Petitioner] as an emotionally disturbed but non-violent student who often skipped school. [Petitioner] was *always showing his tattoos and gave the appearance that he just did not wish to be in school.*

Herman said that [Petitioner] quit twice and was re-enrolled once and asked her to re-enroll again a day or so prior to the murders. Ms. Herman said that it was too late in the school year and she did not re-enroll [Petitioner].

Herman said she has not spoken to the defense, that she has not been subpoenaed and *would not testify* on [Petitioner's] behalf.

(Doc. 23-21, p. 238 (emphasis added).) Furthermore, the copy of the investigator's report in Dr. Weilenman's file contained handwritten notes stating "tongue–earrings–blue–punk" and "we don't want your kind at this school." (Id.) The Court must evaluate trial counsel's performance

without the benefit of hindsight and from counsel's perspective at the time.  Strickland, 466 U.S. at 689.  The record shows that, at the time of trial, trial counsel had good reason to think that Herman either would not testify on Petitioner's behalf or would provide harmful testimony on cross examination.  The fact that Herman later stated that she would have testified and that the State failed to elicit harmful testimony on cross-examination during the state habeas hearing does not preclude the state habeas court's finding that at the time of trial, trial counsel had reason to believe otherwise.  See, e.g., White v. Singletary, 972 F.2d 1218, 1220 (11th Cir. 1992) ("Courts . . . should always avoid second guessing with the benefit of hindsight.") (citing Strickland, 466 U.S. at 689).

Furthermore, even if Petitioner showed that his trial counsel was deficient for failing to contact Herman and call her as a witness during sentencing, the Court finds that the state habeas court reasonably concluded that Petitioner failed to show prejudice.  Like Raby's testimony, Herman's testimony regarding Petitioner's "downward spiral" in the time leading up to his crimes "tells a more detailed version of the same story told at trial" and "provides more or better examples or amplifies the themes presented to the jury."  Holsey, 694 F.3d at 1260–61.  For example, Dr. Weilenman testified that Petitioner was "trying to find a place to sleep [and] food to eat" at the time of his crimes and was seeking out friends and adults who would "tolerate him" living with them.  (Doc. 10-11, pp. 60–61.)  Thus, the Court finds Herman's testimony would have been cumulative of other evidence that was presented during the sentencing phase.  See, e.g., Cullen, 563 U.S. at 200–01 ("The 'new' evidence largely duplicated the mitigation evidence at trial. School and medical records basically substantiate the testimony of Pinholster's mother and brother.  Declarations from Pinholster's siblings support his mother's testimony that his stepfather was abusive and explain that Pinholster was beaten with fists, belts, and even wooden boards.").

eventual

Moreover, the possibility of the prosecution eliciting harmful testimony from Herman on cross-examination regarding Petitioner's appearance and frequent absence from school further negates a finding of prejudice.  See Cullen, 563 U.S. at 201 (finding that the failure to present new mitigating evidence was not prejudicial because the evidence "would have opened the door to rebuttal by a state expert"); see also DeYoung, 609 F.3d at 1291 (discounting the possibility of prejudice because the new mitigating circumstances evidence "would have opened the door to harmful testimony which may well have eliminated any mitigating weight in the overall equation"); Ledford, 818 F.3d at 649 ("Prejudice is . . . not established when the evidence offered in mitigation is not clearly mitigating or would open the door to powerful rebuttal evidence."). Finally, as discussed in Discussion Section I.A.2, supra, the extent of the aggravating factors present in this case further negates a finding of prejudice.

### 3. Sean Proctor

Petitioner also argues that his trial counsel was ineffective for failing to present testimony from Sean Proctor, a friend of Petitioner from Savannah.  (Doc. 65, pp. 107–08.)  According to Petitioner, Proctor "would have been another critical witness to [Petitioner's] downward spiral after he was kicked out of his brother's house in Savannah."  (Id. at p. 107.)  Trial counsel spoke with Proctor and prepared him to testify at Petitioner's trial.  However, during a break in the trial, trial counsel decided not to call Proctor as a witness.  Petitioner argues the "there was no strategic reason for failing to call . . . Proctor."  (Id.)

The state habeas court rejected this claim, finding that

[t]he record shows Ms. Davis initially interviewed Mr. Proctor on October 30, 2003.  As previously stated, Ms. Davis described Mr. Proctor as a "stereotypical punk" and that "[h]e swaggers and postures while he talks and, while he tried to be helpful to me, he is a smart-mouth kid who uses drugs."  Additionally, in March and April of 2007, the record shows trial counsel attempted to contact Mr. Proctor by telephone and on May 11, 2007 had a conference with Mr. Proctor, which lasted

approximately thirty-six minutes.  Mr. Schiavone made the strategic decision that Mr. Proctor would not be called as a witness.  Mr. Schiavone told Mr. Sparger, "We don't want him.  We need to get him out of here."  Following the trial, Mr. Sparger sent Mr. Proctor a thank you letter and explained "[s]ince what you had told me was not consistent with what you had told our investigator, Dale Davis, I was very concerned about calling you, because I was not sure what you would say.  I know you care very much for [Petitioner], but we do not want you to try to describe him as the perfect All-American teenager, if he was actually something quite different."

(Doc. 27-20, pp. 76–77.)  Based on these findings, the state habeas court found that Petitioner failed to established deficiency or prejudice as to trial counsel's failure to call Proctor as a witness. (Id. at p. 77.)

Petitioner argues that the state court's findings are unreasonable because Davis's observations about Proctor occurred in October 2003, over three years before Petitioner's trial. (Doc. 65, p. 107.)  According to Petitioner, the state habeas court ignored evidence that Proctor "did not present the same way he did when he spoke to Ms. Davis years earlier," as he was sober, working full time, and dating his current wife by the time of trial.  (Id. at p. 108.)  Petitioner also argues that the state habeas court ignored Sparger's testimony that the reason provided in the letter for not calling Proctor was pretextual.  (Id.)  Thus, according to Petitioner, "there was no strategic reason for failing to call Mr. Proctor."  (Id. at p. 107.)

The Court concludes that the record sufficiently supports the state habeas court's finding that trial counsel made a strategic decision to not call Proctor as a witness, a decision that is "presumptively correct."  Fotopoulos v. Sec'y, Dep't of Corr., 516 F.3d 1229, 1233 (11th Cir. 2008) ("The question of whether an attorney's actions were actually the product of a tactical or strategic decision is an issue of fact, and a state court's decision concerning that issue is presumptively correct.").  "Which witnesses, if any, to call, and when to call them, is the epitome of a strategic decision, and it is one that we will seldom, if ever, second guess."  Waters v. Thomas, 46 F.3d 1506, 1512 (11th Cir. 1995).  Indeed, the record confirms that after Davis interviewed

Proctor, she described him as a "stereotypical 'punk'" and a "smart-mouth kid who uses drugs." (Doc. 26-17, p. 163.)  On May 11, 2007, (less than one month before trial) trial counsel held a telephonic conference with Proctor that lasted approximately thirty-six minutes.  (Doc. 24-10, p. 37.)  After Proctor showed up at trial ready to testify, lead counsel Schiavone, who Petitioner agrees "was the most experienced member of the defense team," (doc. 65, p. 56), decided not to call Proctor as a witness for the sentencing phase.  (Doc. 13-15, pp. 206–07.)  According to Sparger, Schiavone told him that "[w]e don't want [Proctor].  We need to get him out of here." (Doc. 13-16, p. 110.)  Sparger then "sugarcoated some reason" and told Proctor he could leave.[6] (Doc. 13-15, p. 207.)  After the trial, Sparger sent Proctor a letter stating, "Since what you had told me was not consistent with what you had told our investigator Dale Davis, I was very concerned about calling you, because I was not sure what you would say.  I know you care very much for [Petitioner], but we did not want to try to describe him as a perfect all-American teenager if he was actually something quite different."  (Doc. 13-16, p. 114.)  These findings amply support the state habeas court's decision.

Petitioner is correct that Sparger testified that the letter does not "describe the strategy for not calling" Proctor because Sparger did not make that decision.  (Id. at p. 114.)  Furthermore, Sparger stated that he could not "recall Schiavone telling [him] the reason [for not calling Proctor]. Although, it may have been appearance, maybe a tattoo, or a piercing or something that seemed inappropriate."  (Id. at p. 115.)  This evidence shows, at most, that the record is ambiguous as to the *actual* reason Schiavone decided to not call Proctor as a witness at the sentencing phase. However, "[a]n ambiguous or silent record is not sufficient to disprove the strong and continuing presumption [in favor of competence].  Therefore, where the record is incomplete or unclear about

---

[6]  Sparger testified that although he "was doing the mitigation," Schiavone was "still lead counsel" so Sparger "follow[ed] his direction."  (Doc. 13-15, p. 207.)

[counsel's] actions, the Court must presume that [counsel] did what he should have done, and that he exercised reasonable professional judgment." Chandler v. United States, 218 F.3d 1305, 1314 n.15 (11th Cir. 2000) (internal quotations omitted).

Moreover, while Petitioner argues that the state habeas court ignored evidence that Proctor was "sober," "working full-time", and "dating his current wife," the record indicates that trial counsel held a conference call with Proctor a few weeks before the trial and did not decide to dismiss Proctor as a witness until *after* Proctor showed up at trial. Thus, trial counsel would have had an opportunity to see Proctor's appearance before deciding to not call him as a witness. Furthermore, while it may be true that Proctor was sober, working full time, and dating his now wife, the Court must "avoid second guessing with the benefit of hindsight." White v. Singletary, 972 F.2d at 1220; see also Thompson v. Wainwright, 784 F.2d 1103, 1106 (11th Cir. 1986) ("Hindsight, however, is not the appropriate perspective for a court to examine counsel's effectiveness."). "As is often said, 'Nothing is so easy as to be wise after the event.'" Atkins v. Singletary, 965 F.2d 952, 958 (11th Cir. 1992). In the years leading up to trial, Davis's observations showed that Proctor was "a smart-mouth kid who uses drugs," was "headed for more trouble because of his drug use," "introduced [Petitioner] to drugs," and lasted only three days in a five-month program "for kids with problems." (Doc. 26-17, pp. 163–64.) Then, after Proctor showed up to testify, trial counsel decided not to call him as a witness. (Doc. 13-15, pp. 206–07.) Thus, the Court cannot say that trial counsel's decision not to call Proctor was "so patently unreasonable that no competent attorney would have chosen it." Dingle v. Sec'y for Dep't of Corr., 480 F.3d 1092, 1099 (11th Cir. 2007). Based on the foregoing, the Court concludes that Petitioner failed to show that his trial counsel acted deficiently when Schiavone decided to not call Proctor as a witness.

Based on the foregoing, the Court concludes that the state habeas court reasonably determined that Petitioner failed to show that his trial counsel's performance was deficient for failing to call Raby, Herman, or Proctor as witnesses during the sentencing phase. Moreover, even if Petitioner had showed trial counsel acted deficiently, the state habeas court reasonably concluded that Petitioner failed to show prejudice. This is especially true considering the cumulative nature of the testimony and, as discussed in Discussion Section I.A.2, supra, the highly aggravating factors present in this case. Accordingly, Petitioner failed to show that the state habeas court's decision regarding trial counsel's failure to call Proctor as a witness "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law" or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

### C.     Presenting Davis's Testimony and Producing Memoranda

Petitioner next argues that his trial counsel was ineffective for calling Davis as a witness at the sentencing phase and producing Davis's memoranda and notes to the prosecution. (Doc. 65, pp. 108–113.) Specifically, Petitioner contends that trial counsel's decision to call Davis "was not strategic" and only occurred because "[counsel] forgot to act on [Davis's] recommendation to retain a social worker to introduce records." (Id. at pp. 108–09.) Petitioner also argues that because Davis was not qualified to testify about "the impact of the information in the record she obtained on "[Petitioner]," the prosecution on cross-examination was "able to highlight unhelpful matters in the records" that Davis could not "put . . . in their proper context." (Id. at p. 109.) Finally, Petitioner asserts that trial counsel "exacerbated the situation" by "unreasonably" and "voluntarily" producing Davis's interview memoranda and notes she created and accrued during her investigation to the prosecution. (Id.) According to Petitioner, producing Davis's memoranda

and notes prejudiced the defense because it gave the prosecution "a window into the defense strategy and material that the prosecution used to impeach other witnesses." (Id.)

### 1.    Trial Counsel's Decision to Call Davis as a Witness

The state habeas court rejected Petitioner's claim that calling Davis as a witness was unreasonable. (Doc. 27-20, p. 69.) According to the state habeas court,

> Ms. Davis was an experienced mitigation specialist having worked on more than thirty death penalty cases in state and federal courts. Ms. Davis was utilized by counsel at Petitioner's trial to introduce records relating to Petitioner, rather than explain the potential impact of Petitioner's social history. Early in her testimony, Ms. Davis explained her role as a mitigation specialist and provided details of how she had prepared her social history of Petitioner.
>
> Through Ms. Davis's testimony, Petitioner's attorneys were able to introduce volumes of mitigation documentation including: birth records; prenatal and delivery records; hospital records; school records; Shawano County (Wisconsin) Department of Social Services and Family Court records; counseling records; Chatham County Detention Center medical and mental health records; divorce records of Petitioner's parents; South Carolina Department of Mental Health records on Petitioner's brother Donald; marriage records for Petitioner's mother and Frank Sutton, and; a police report on Frank Sutton. Given Ms. Davis's extensive experience as a mitigation specialist and the scope of her testimony, counsel's decision to have her testify in mitigation to introduce Petitioner's social history was reasonable.
>
> Moreover, as previously shown, trial counsel chose Dr. Weilenman as the final witness in the sentencing phase to testify to the potential impact of Petitioner's social history. Petitioner has failed to show trial counsel's decision to utilize Ms. Davis in conjunction with Dr. Weilenman fell below the standard of reasonableness. As held by the Eleventh Circuit Court of Appeals, the test of reasonableness "has nothing to do with what the best lawyers would have done. Nor is the test even what most good lawyers would have done. We ask only whether some reasonable lawyer at the trial could have acted, in the circumstances, as defense counsel acted at trial." Bates v. Florida, 768 F.3d 1278, 1295 (11th Cir. 2014) [()citing Waters v. Thomas, 46 F.3d 1506, 1512 (11th Cir. 1995) (en banc) ()]. As Petitioner has failed to show trial counsel's conduct fell below that of a reasonable competent counsel, his claim is denied.

(Id. at pp. 70–71.) Petitioner argues that the state habeas court's decision was unreasonable because "it ignores the uncontradicted record evidence that Ms. Davis testified only because Mr.

Sparger failed to follow through on her advice that he retain a social worker so that she would not have to testify."  (Doc. 65, p. 112.)

After reviewing the evidence presented at trial and at the state habeas hearing, the Court finds that the state habeas court's decision was not unreasonable.  Indeed, Petitioner failed to meet the requisite showing of an ineffective assistance of counsel claim under Strickland.  As the state habeas court properly determined, the reasonableness test under Strickland asks, "whether some reasonable lawyers at the trial could have acted, in the circumstances, as defense counsel acted at trial." Bates v. Florida, 768 F.3d 1278, 1295 (11th Cir. 2014).  The reasonableness test "has nothing to do with what the best lawyers would have done.  Nor is the test even what most good lawyers would have done." Id.  Here, Davis was an experienced mitigation expert, had worked on more than thirty death penalty cases in state and federal courts, and gathered the extensive mitigation evidence.  (Doc. 27-20, p. 70.)  Furthermore, through Davis, trial counsel introduced extensive mitigation evidence.  (Id.)  Finally, Petitioner used Davis in conjunction with Dr. Weilenman to testify about the potential impact of Petitioner's social history.  (Id.)  The record sufficiently supports the state habeas court's finding that trial counsel acted reasonably in allowing Davis to testify during sentencing.

To the extent Petitioner asserts that trial counsel needed to hire a social worker or a "record custodian" to render effective assistance of counsel or that Davis was unqualified to give testimony at trial, (see doc. 71, pp. 44–45), the Court emphasizes that "there is no general requirement that counsel retain a social worker or any other expert for the penalty phase, even if doing so is a sensible and widely accepted practice." Waldrop v. Thomas, No. 3:08-CV-515-WKW, 2014 WL 1328138, at *62 (M.D. Ala. Mar. 31, 2014).  Indeed, Petitioner has not highlighted any evidence indicating that "prevailing professional norms" in Georgia dictate hiring and calling a social

49

worker or record custodian to testify rather than a mitigation expert such as Davis.  See Morrow v. Warden, 886 F.3d 1138, 1150 (11th Cir. 2018) ("Morrow also fails to establish that contemporary 'prevailing professional norms' in Georgia dictated hiring a social worker for capital cases.").

### 2.    Producing Memoranda to Prosecution

Petitioner further contends that trial counsel "exacerbated the situation when he unreasonably [and] voluntarily produced Ms. Davis's privileged and confidential interview memoranda and notes to the State." (Doc. 65, p. 109.)  According to Petitioner, this production "prejudiced the entire defense sentencing phase presentation going forward by giving the prosecution a window into the defense strategy and material that the prosecution used to impeach other witnesses." (Id. at pp. 109–10.)  During the period leading up to Petitioner's trial, Georgia enacted O.C.G.A. § 17-16-1, et seq., which provides that a criminal defendant "must disclose[] five days before trial the identity of witnesses the defendant[] intends to call at sentencing and must disclose at or before the guilt/innocence verdict any non-privileged statements of those witnesses that are in the defendant's possession."  Stinski v. State, 642 S.E.2d 1, 7 (Ga. 2007) (emphasis added) (citing O.C.G.A. § 17-16-4(b)(3)(C)).  Notably, O.C.G.A. § 17-6-1 provides that a "'[s]tatement of a witness' . . . does not include notes or summaries made by counsel."  O.C.G.A. § 17-16-1.  Trial counsel objected to the criminal discovery procedure outlined in O.C.G.A. § 17-6-1, et seq., on interim appeal, arguing that the statutory scheme was unconstitutional.  See Stinski v. State, 642 S.E.2d at 7–8.  The Georgia Supreme Court rejected trial counsel's arguments on interim appeal, id., and trial counsel, attempting to comply with the statutory requirements, produced Davis's notes and memoranda over to the prosecution in accordance with the criminal discovery procedure statute.  (Doc. 27-20, p. 71.)  Trial counsel later argued on direct appeal that

the "criminal discovery procedure interferes with trial counsel's ability to use mitigation specialists to assist trial counsel in preparing for the sentencing phase of death penalty trials" because "statements of witnesses discovered by mitigation specialists and reported on in writing to trial counsel would be discoverable by the State under O.C.G.A. § 17-16-4(b)(3)(C), while statements of witnesses discovered by trial counsel directly would not be." Stinski v. State, 691 S.E.2d at 865. The Georgia Supreme Court again disagreed with trial counsel's arguments but clarified the reach of the statute, stating:

> We have held that work "done by [an investigator] under the attorney's instruction and supervision was as much a part of the attorney's work as if he had done it himself." Similarly, we hold that "notes and summaries" made by a mitigation specialist who is working at the discretion of trial counsel in a death penalty case should be regarded as "notes and summaries made by counsel" within the meaning of the criminal discovery procedure.

Id. at 865. Thus, the Georgia Supreme Court determined that "there is no merit to Stinski's argument that a death penalty defendant's ability to employ a mitigation specialist to assist in investigation is unduly hampered by the criminal discovery procedure." Id. at 865–66.

The state habeas court concluded that "trial counsel's performance cannot be found below that of reasonable competent counsel where a rule of law such as the [one announced on direct appeal] is rendered subsequent to [their] representation. As established in Strickland, trial counsel's performance must be evaluated without the benefit of hindsight and from counsel's perspective at the time." (Doc. 27-20, p. 71 (citing Strickland, 466 U.S. at 689).) The Court agrees. As the state habeas court found, trial counsel only produced Davis's notes and memoranda to comply with the Georgia Supreme Court's decision that the criminal discovery statute applied to Petitioner's case. (Doc. 27-20, p. 71); see Stinski v. State, 642 S.E.2d at 6–7. Indeed, the Georgia Supreme Court did not rule until nearly three years after Petitioner's trial that a mitigation specialist's notes and summaries fall within the "notes and summaries made by counsel" exception

to the statute.  See Stinski v. State, 691 S.E.2d at 865.  As the state habeas court concluded, "until the Georgia Supreme Court issued its direct appeal decision in the instant case, trial counsel was not on notice that the materials produced by Ms. Davis in her role as a mitigation specialist were not discoverable."  (Doc. 27-20, p. 71.); see Diaz v. United States, 799 F. App'x 685, 688 (11th Cir. 2020) ("If a legal principal is unsettled, counsel is not deficient 'for an error in judgment.' Thus, if an attorney could have reasonably reached the incorrect conclusion concerning an unsettled question of law, 'that attorney's performance will not be deemed deficient for not raising that issue to the court.'") (quoting Black v. United States, 373 F.3d 1140, 1144 (11th Cir. 2004)).

While Petitioner generally argues that trial counsel did not need a clear decision by the Georgia Supreme Court to reasonably know that the requirements under the criminal discovery statute did not encompass Davis's notes and memoranda, the Court must review trial counsel's decisions without the benefit of hindsight.  See Strickland, 466 U.S. at 689.  "Even if many reasonable lawyers would not have done as defense counsel did at trial, no relief can be granted on ineffectiveness grounds unless it is shown that no reasonable lawyer, in the circumstances, would have done so." Rogers v. Zant, 13 F.3d 384, 386 (11th Cir. 1994).  Considering the Georgia Supreme Court's decision on interim appeal that rejected trial counsel's arguments that the criminal discovery procedure was unconstitutional and the Georgia Supreme Court's need on direct appeal to clarify whether the criminal discovery statute encompassed a mitigation specialist's notes and memoranda, the Court finds that Petitioner failed to carry his "heavy burden" to show that "no reasonable lawyer" would have done the same.  Id.  Indeed, this case is distinguishable from other cases, such as Lawhorn v. Allen, where trial counsel failed "to conduct adequate legal research in support of [their] decision[s]," 519 F.3d 1272, 1298 (11th Cir. 2008), as Petitioner's trial counsel seemingly anticipated the potential adverse effect the criminal

discovery procedure could have had on Petitioner's case and sought relief through interim appeal. Thus, the Court finds that the state habeas court reasonably determined that Petitioner failed to show his trial counsel's conduct was deficient.  See Strickland, 466 U.S. at 690 ("[A] court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct.").

>        3.        Prejudice

Furthermore, even if Petitioner satisfied his burden under Strickland to show deficiency in his trial counsel's conduct regarding Davis, the Court finds that Petitioner failed to show he was prejudiced by trial counsel's decision to call Davis as a witness at the sentencing phase or by his trial counsel's production of Davis's memoranda and notes.  Regarding Davis's testimony, Petitioner asserts that "on cross-examination[,] the State was able to highlight unhelpful matters in the records and Ms. Davis was unable to put those matters in perspective."  (Doc. 65, p. 109.) However, Petitioner's briefings fail to cite to or point to either the "unhelpful matters" the prosecution asked Davis about during cross-examination or how the discussion of those matters resulted in a "substantial likelihood of a different result" in the sentencing phase of the trial. Harrington v. Richter, 562 U.S. 86, 112 (2011); (see also docs. 65, 71.).  Furthermore, Petitioner failed to adequately show what exactly a different social worker or a record custodian would have testified to or how his or her testimony would have been substantially likely to lead to a different result during sentencing.  (See docs. 65, 71; see also Durr v. Mitchell, 487 F.3d 423, 437 (6th Cir. 2007) ("The affidavit does not even discuss the potential effect such an expert would have had on the jury's decision to return a death sentence or not.  Durr fails to show how the absence of this expert resulted in prejudice under Strickland.").

Moreover, regarding trial counsel's decision to produce Davis's notes and memoranda, Petitioner failed to show that there is a "reasonable probability that the outcome of his sentencing would have been different" had trial counsel not produced those documents.  Strickland, 466 U.S. at 694.  Petitioner asserts his defense was prejudiced because "[s]ome of the witnesses were confronted with unhelpful details from those memoranda on cross-examination."  (Doc. 65, pp. 74, 109.)  As an example, Petitioner points to the testimony of Matt Correll.[7]  (Id.)  According to Petitioner, because trial counsel produced Davis's notes, the prosecution was able to elicit testimony from Correll on cross examination that Petitioner had been "verbally abusive" to one of his sons.  (Doc. 65, pp. 74–75; see also doc. 10-10, p. 86.)  However, after stating that he "believe[d]" Petitioner had been "verbally abusive," Correll clarified that Petitioner was never physically violent "with anybody in [his] house" and would have let Petitioner come back to stay with him and his family had Petitioner asked, seemingly minimizing any prejudicial effect of his testimony that Petitioner had been verbally abusive.  (Doc. 10-10, p. 86.)  Finally, as discussed in Discussion Section I.A.2, supra, the highly aggravating factors present in this case further negate a finding of prejudice.  Accordingly, Petitioner failed to show that his trial counsel's conduct regarding Davis and the production of her memoranda and notes "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law" or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).

---

[7]  Petitioner stayed with Correll and his two sons for a few months in 2000.  (Doc. 10-10, pp. 81–84.) Correll's son asked him if Petitioner could stay with them because Petitioner "was about to be homeless." (Id. at p. 81.)

### D.      Rebuttal Evidence regarding Petitioner's Remorse

Petitioner next argues that his trial counsel unreasonably failed to rebut the prosecution's evidence that Petitioner was unremorseful about committing his crimes.  (Doc. 65, pp. 114–18.) According to Petitioner, his supposed lack of remorse for his crimes was a "major theme" of the trial, which the prosecution emphasized by referring to it during their opening statement and closing argument and by playing portions of Petitioner's videotaped statement to police in which Petitioner looked "flat" when discussing his crimes.  (Id. at p. 114 (quoting doc. 10-8, p. 177; doc. 10-11, pp. 111–12, 121).)   Petitioner asserts that his trial counsel should have rebutted the prosecution's arguments by (1) introducing testimony from an expert like Dr. Garbarino about children's response to trauma and (2) calling Alton VanBrackle as a witness.  (Id. at pp. 114–15.)

Alton VanBrackle was a prisoner who was housed in the same jail unit as Petitioner.  (Doc. 19-20, p. 107.)   While they were together in jail, Petitioner confessed to VanBrackle that he committed the crimes and expressed remorse for those crimes.  (Doc. 13-15, p. 143; doc. 25-23, pp. 105–19, 229; see also doc. 27-20, p. 35.)  Davis interviewed VanBrackle for several hours and notified trial counsel that VanBrackle described instances in which Petitioner was "crying and praying" at night, upset, and depressed.  (Doc. 19-20, pp. 107–08.)  Davis also informed trial counsel that VanBrackle told her that Petitioner could not "get the 'stuff'" out of his head.  (Id. at p. 107.)   Based on Davis's interview, trial counsel determined that VanBrackle could be an important sentencing phase witness because he provided evidence of Petitioner's remorse.  (Doc. 13-16, p. 49; doc. 25-23, p. 247; see also doc. 27-20, p. 35.)  However, trial counsel also expressed concerns about VanBrackle's testimony, namely that VanBrackle's roommate was a relative of the victims and that "there was [sic] some things in his statement . . . that [trial counsel] wished [were not] in it."  (Doc. 13-15, p. 190; doc. 23-4, p. 288–89; doc. 24-11, p. 14; doc. 25-23, p. 247; see

also doc. 27-20, p. 35.)  These concerns were further exacerbated when, around the time of trial, trial counsel learned that VanBrackle was living with the victim's son and had "backed way off" what he previously told Davis during their interview.  (Doc. 13-16, p. 51; doc. 25-23, p. 120; see also doc. 27-20, p. 35.)  Specifically, VanBrackle was only willing to testify about Petitioner's confession to him about the crimes and not his remorse.  (Doc. 25-23, p. 120; see also doc. 27-20, p. 35.)  VanBrackle eventually "came back around," but trial counsel was still nervous about calling him as a witness.  (Doc. 13-16, p. 51; see also doc. 27-20, p. 35.)

Furthermore, the state trial court's decision regarding VanBrackle's testimony complicated matters further.  After trial counsel announced their intent to call VanBrackle as a witness during the sentencing phase, the prosecution argued that if VanBrackle testified regarding Petitioner's confession to him, then the prosecution would impeach that testimony with a statement made by Petitioner to police that trial counsel believed was more incriminating than his confession to VanBrackle and contained more details about the crime.[8]  (Doc. 10-10, pp. 128–29, 178–79; doc. 13-16, p. 55; see also doc. 27-20, pp. 72–73.)  Indeed, keeping the more incriminating statement out of evidence was part of trial counsel's trial strategy, for trial counsel was concerned that if VanBrackle took "one step the wrong way, [it would] open[] the door to [Petitioner's] second statement . . . which was not going to help [Petitioner] in mitigation."  (Doc. 13-16, pp. 55, 58; see also doc. 27-20, pp. 73–74.)  The state trial court ruled that if VanBrackle were to testify regarding the facts of the crime as told by Petitioner, it would open the door for the prosecution to impeach him using Petitioner's more incriminating statement to police.  (Doc. 10-10, p. 188.)  The Georgia Supreme Court affirmed this decision, stating that "the trial court properly cautioned [Petitioner] that his alleged out-of-court statement, if he chose to present hearsay testimony recounting it at

---

[8]  This statement to the police had previously been suppressed.  (Doc. 10–10, pp. 130–31; see also doc. 27-20, p. 72.)

trial, could be impeached by the State by use of his previously-suppressed videotaped statement." Stinski v. State, 691 S.E.2d at 872–74; (see also doc. 27-20, pp. 72–73.)

The state habeas court ruled that trial counsel was not deficient for failing to call VanBrackle as a witness and that even if trial counsel was deficient for that decision, Petitioner failed to show that it was prejudicial. (Doc. 27-20, pp. 73–74.) The state habeas court determined that trial counsel made a "strategic decision" not to present the testimony of VanBrackle given their concerns about the scope of his testimony and his relationship with the victim's family. (Id. at p. 73.) The state habeas court further ruled that Petitioner failed to show prejudice because VanBrackle was a "risky witness" and putting him on the stand could have "opened the door" to Petitioner's damaging statement to police, effectively undercutting "any remorse argument Petitioner would have garnered." (Id. at p. 74.)

Petitioner argues that the state habeas court's decision was based on "an unreasonable determination of facts in the state court record." (Doc. 65, p. 117.) First, according to Petitioner, the state court ignored the trial court's ruling that Petitioner's more incriminating statement to police would remain inadmissible if Petitioner limited his testimony to Petitioner's remorse, which Petitioner believes is "something largely in control of trial counsel." (Id. at pp. 117–18.) Next, Petitioner asserts that the state habeas court ignored Sparger's testimony that VanBrackle "came back around" and was willing to testify by the time of trial. (Id. at p. 118.)

The Court finds that the state habeas court reasonably determined that Petitioner's trial counsel was not deficient for failing to present testimony from VanBrackle or an expert like Dr. Garbarino. Regarding Dr. Garbarino, the Court explained above that trial counsel reasonably failed to procure testimony from someone like her who is an expert in child trauma. See Discussion Section I.A.1, supra. Concerning VanBrackle, the state habeas court properly found that trial

counsel made a strategic decision to not call VanBrackle as a witness.  Indeed, "[w]hich witnesses, if any, to call, and when to call them, is the epitome of a strategic decision, and it is one that we will seldom, if ever, second guess." Waters, 46 F.3d at 1512; see also, e.g., Rhode v. Hall, 582 F.3d 1273, 1284 (11th Cir. 2009).  While Petitioner argues that trial counsel was "largely in control" of whether VanBrackle would testify about the facts of the crime (and, thus, could avoid opening the door to Petitioner's incriminating statement), trial counsel expressed legitimate concerns over their ability to do so, stating that "one step the wrong way" would "open[] the door to [Petitioner's] second statement . . . which [would] not . . . help [Petitioner] in mitigation." (Doc. 13-16, p. 58.)  Furthermore, even though VanBrackle "came back around," trial counsel was still "nervous about him" because of how he had communicated with trial counsel and because he was living with the victim's son. (Id. at p. 51.)  Based on the potentially harmful evidence, trial counsel, as the state habeas court found, made a reasonable strategic decision to not call VanBrackle as a witness. (Doc. 27-20, p. 73.)

Even if Petitioner showed that his trial counsel was deficient for not calling VanBrackle as a witness, the state habeas court reasonably determined that Petitioner failed to show prejudice. As the state habeas court found, Petitioner could not "establish that there is a reasonable probability that the outcome of his sentencing would have been different" had trial counsel called VanBrackle as a witness because VanBrackle could have "undercut any remorse argument Petitioner would have garnered," and "the evidence in aggravation was highly persuasive." (Id. at pp. 74–75); see Cullen, 563 U.S. at 201 (finding that the failure to present new mitigating evidence was not prejudicial because the evidence "would have opened the door to rebuttal by a state expert"); see also DeYoung, 609 F.3d at 1291 (discounting the possibility of prejudice because the new mitigating circumstances evidence "would have opened the door to harmful testimony which may

well have eliminated any mitigating weight in the overall equation"); <u>Ledford</u>, 818 F.3d at 649 ("Prejudice is . . . not established when the evidence offered in mitigation is not clearly mitigating or would open the door to powerful rebuttal evidence."); <u>see also</u> Discussion Section I.A.2, <u>supra</u> (finding that the highly aggravating factors present in Petitioner's case further negate the finding of prejudice).

### E.    Voir Dire Questions regarding Views about the Death Penalty

Petitioner next argues that trial counsel rendered ineffective assistance of counsel by failing to ask potential jurors during voir dire whether "they could fairly consider a life sentence in a case involving a child victim."  (Doc. 65, p. 119.)  Voir dire in this case lasted six days.  (<u>See</u> doc. 9-19; <u>see also</u> doc. 10-5.)  During voir dire, the prosecution objected to trial counsel asking questions that were too specific to Petitioner's case, and the state trial court agreed.  (Doc. 10-1, pp. 24–28.) Trial counsel then requested that they be allowed to ask potential jurors about their opinions on the death penalty "where a child is the victim in a case in which the person is accused of the murder of a child."  (<u>Id.</u> at p. 29.)  The state trial court initially reserved ruling on the request but then permitted trial counsel to ask the next potential juror such a question, over the prosecution's objection.  (<u>Id.</u> at pp. 34–35, 44–45.)  Petitioner, referencing several members of the jury who were not asked specifically about the death penalty in cases with juvenile victims, argues that his trial counsel's failure to ask that question of each juror violated his "constitutional right to an impartial jury" because the right "include[s] the right to a jury that could consider all sentencing options even in cases involving child victims."  (Doc. 71, p. 52; <u>see also</u> doc. 65, p. 119.)

The state habeas court rejected Petitioner's claim, ruling that Petitioner failed to show that his trial counsel was deficient for failing to ask the question of each potential juror and that Petitioner failed to show prejudice.  (Doc. 27-20, pp. 26–28.)   Regarding trial counsel's

performance, the state habeas court found that the jurors knew that Petitioner was charged with murdering a juvenile, that trial counsel did ask potential jurors the question, that certain potential jurors gave responses to other questions that were so favorable to the defense that trial counsel could have reasonably believed further questions would lead to challenges for cause by the prosecution, and that trial counsel's performance persuaded the state trial court to disqualify a potential juror.  (Id. at pp. 27–28.)  Regarding prejudice, the state habeas court determined that Petitioner did not demonstrate "that the jurors who ultimately sat on his jury could not fairly consider a life sentence in a case involving a child victim or were otherwise unqualified."  (Id. at p. 28.)

The Court finds that the state court reasonably concluded that Petitioner failed to show trial counsel acted deficiently during voir dire.  Effective assistance of counsel is required during voir dire.  See Brown, 255 F.3d at 1279.  However, trial counsel's "questions and tactics during voir dire are a matter of trial strategy."  Galin v. Sec'y, Dep't of Corr., No. 8:08-cv-254-T-23TBM, 2013 WL 1233125, at *6 (M.D. Fla. Mar. 27, 2013) (citing Hughes v. United States, 258 F.3d 453, 457 (6th Cir. 2001)); see also Head v. Carr, 544 S.E.2d 409, 418 (Ga. 2001) ("By [its] nature, trial counsel's conduct of voir dire . . . [is a] matter[] of trial tactics."); United States v. Battle, 264 F. Supp. 2d 1088, 1178 (N.D. Ga. 2003) ("[D]eference is to be given to counsel's actions during voir dire, as voir dire is recognized to involve considerations of strategy.").  Here, trial counsel engaged in a six-day long voir dire, requiring each potential juror to fill out a questionnaire and asking each individual potential juror about their opinions regarding the death penalty.  (See doc. 9-19 through doc. 10-5.)  Trial counsel also "strenuously objected" to the prosecution's motion to disallow certain questions and won the state trial court's approval to ask potential jurors specifically about the death penalty in cases involving juvenile victims.  (See doc. 27-20, pp. 27–28.)  Indeed, trial

counsel ultimately asked some jurors specifically about the death penalty in cases with juvenile victims.  (<u>See</u> doc. 10-1, pp. 44–45.)  While trial counsel did not ask each potential juror such a question, that failure does not necessarily render their performance deficient as a plethora of reasons exists for why trial counsel could have refrained from asking each potential juror such a question.  For example, as the state habeas court found, some witnesses' responses to other questions could have been so favorable to the defense that trial counsel did not need to ask any further questions for fear of the prosecution challenging such a potential juror.  (<u>See</u> doc. 27-20, p. 28); <u>see</u> <u>Stanford v. Parker</u>, 266 F.3d 442, 454 (6th Cir. 2001) ("[I]f the jury pool was satisfactory, defense counsel may have calculated that asking additional life-qualifying questions might aid the prosecution in deciding how to use its peremptory challenges.").  Considering the deference afforded to trial counsel on matters of trial strategy, the Court cannot conclude that Petitioner's trial counsel did not fall "within the wide range of reasonable professional assistance." <u>Strickland</u>, 466 U.S. at 689; <u>see also</u> <u>Teague v. Scott</u>, 60 F.3d 1167, 1172 (5th Cir. 1995) ("A decision regarding trial tactics cannot be the basis for a claim of ineffective assistance of counsel unless counsel's tactics are shown to be so ill chosen that it permeates the entire trial with obvious unfairness.") (internal quotations omitted).

Even if Petitioner showed that his trial counsel acted deficiently during voir dire, the state habeas court reasonably concluded that Petitioner failed to show prejudice for that deficiency.  As the state habeas court found, "Petitioner has not demonstrated that the jurors who ultimately sat on his jury could not fairly consider a life sentence in a case involving a child victim or were otherwise unqualified."  (Doc. 27-20, p. 28.)  Trial counsel asked each person who ultimately sat on the jury the following question: "If the defendant is found guilty of the offense of murder, would you automatically vote for the death penalty, regardless of the evidence in the case?"  (Doc. 9-20, p.

165–66; doc. 10-1, pp. 114, 186–87, 217; doc. 10-2, pp. 13, 210–11; doc. 10-3, pp. 59, 129; doc 10-4, p. 51.)  Every juror affirmed that he or she would not automatically impose the death penalty if Petitioner was found guilty of murder and would instead consider all the evidence before making such a decision.  (Id.)  Moreover, trial counsel asked questions which bore on potential jurors' willingness to consider various sentencing options, including life imprisonment, in a murder case. (Doc. 9-20, p. 164; doc. 10-1, pp. 116–17, 185–87, 219–20; doc. 10-2, pp. 13–14, 214–15; doc. 10-3, pp. 60–61, 130–131; doc 10-4, p. 52–54.)  Again, every juror affirmed their willingness to consider voting to impose a life sentence if that penalty were warranted under the circumstances. (Id.)  Crucially, at the time these questions were asked, the potential jurors already knew that one of the victims was a child.  (See doc. 27-20, p. 27.)  Therefore, the Court concludes that Petitioner failed to establish that he was prejudiced by trial counsel's failure to expressly ask each potential juror whether he or she would consider a sentence of life imprisonment in a murder case where the victim was a child.  See Brown, 255 F.3d at 1280 (finding that petitioner failed to show prejudice for trial counsel's failure to make a "reverse-Witherspoon" inquiry where petitioner "failed to adduce any evidence that any juror was biased in favor of the death penalty."); see also Stanford, 266 F.3d at 455 (finding against prejudice where "there is no evidence that any potential jurors were inclined to always sentence a capital defendant to death[,] . . . nothing in the record indicates that counsel's failure to ask life-qualifying questions led to the impanelment of a partial jury[,] . . . [and] considering the totality of the evidence, there is no reasonable probability that, even if defense counsel erred, the sentencer would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.").

In summary, the Court finds that the state habeas court reasonably determined that Petitioner failed to show that trial counsel acted deficiently by (1) not presenting mental health

mitigation evidence, including testimonies from experts such as Dr. James, Dr. Ash, and Dr. Garbarino; (2) not obtaining testimony from Tony Raby, Linda Herman, and Sean Proctor; (3) presenting Davis as a witness and producing her memoranda and notes to the prosecution; (4) not calling VanBrackle as witness to rebut the prosecution's evidence regarding Petitioner's lack of remorse; and (5) not questioning every juror of his or her's opinion on the death penalty in cases involving juvenile victims.   Moreover, even if Petitioner carried his burden to show his trial counsel functioned deficiently, the Court finds that the state habeas court reasonably determined that Petitioner failed to show that these deficiencies prejudiced his defense.   After examining the effect of these supposed deficiencies individually as well as *cumulatively,* the Court finds that the effect of trial counsel's supposed deficiencies during the sentencing phase of trial were not so great as to create a reasonable probability that Petitioner's sentence would have changed.[9]  This is especially true considering the cumulative nature of the additional mitigating evidence presented during the state habeas hearing and the extent of the aggravating factors present in this case, as discussed in Discussion Section I.A.2, supra.   Accordingly, Petitioner failed to show that the state habeas court's decision "resulted in a decision that was contrary to, or involved an unreasonable

---

[9]  Petitioner argues that the state habeas court's decision on prejudice was contrary to clearly established federal law because the state habeas court failed to address the "cumulative effect of his trial counsel's errors." (Doc. 65, pp. 125–26.) Specifically, Petitioner contends that the "state court considered whether Mr. Stinski was prejudiced by each independent instance of deficient performance rather than considering the effect of all of counsels' errors on the total mix of mitigating and aggravating evidence as Strickland requires." (Id. at p. 125.) Petitioner is incorrect because the state habeas court considered the cumulative effect of trial counsel's supposed errors at the end of its order. (See doc. 27-20, pp. 80–85.)  Moreover, while it is true that the state habeas court also evaluated the prejudicial effect of each alleged instance of deficient performance, the Eleventh Circuit explained in Allen v. Secretary, Florida Department of Corrections that "[t]he existence of item-by-item analysis . . . is not inconsistent with a cumulative analysis," as the "only way to evaluate the cumulative effect is to first examine each piece standing alone." 611 F.3d 740, 749 (11th Cir. 2010); (see generally doc. 27-20.) That is the case here. Thus, because the state habeas court analyzed both the prejudicial effect of each claimed error as well as their cumulative effect, the Court finds that its decision on prejudice was not contrary to clearly established law.

application of, clearly established Federal law" or "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).

## II.     Eighth Amendment Cruel and Unusual Punishment

Under the Eighth Amendment, "[e]xcessive bail shall not be required, nor excessive fines imposed, *nor cruel and unusual punishments inflicted*."   U.S. Const. amend. VIII (emphasis added).   Furthermore, in <u>Roper v. Simmons</u>, the Supreme Court held that the imposition of the death penalty on those who were younger than eighteen years old when they committed their crimes constitutes "cruel and unusual" punishment in violation of the Eighth Amendment.  543 U.S. 551, 568 (2005).  Petitioner, while acknowledging that he was eighteen years old at the time he committed his crimes, argues that the Eighth Amendment, as interpreted by the Supreme Court in <u>Roper</u>, bars his execution.  (Doc. 65, pp. 133–50.)

### A.     Applicable Standard of Review

The parties dispute the applicable standard of review for Petitioner's Eighth Amendment claim.   Petitioner argues that the AEDPA's standard of review does not apply to his Eighth Amendment claim and that the Court should instead review the claim *de novo* for two reasons: (1) the state court did not "adjudicate[] . . . the merits" of the Eighth Amendment claim as required by 28 U.S.C. § 2254(d), and (2) his death penalty sentence violates "a substantive rule of constitutional law that would be retroactive on collateral review under the Supreme Court's decision in <u>Teague v. Lane</u>, 489 U.S. 288 (1989)."  (Doc. 65, pp. 133–36.)

#### 1.     Adjudication on the Merits

The AEDPA's deferential standard of review under 28 U.S.C. 2554(d) only applies where a petitioner's claim "was adjudicated on the merits in State court proceedings."  28 U.S.C. § 2554(d).  In the state habeas proceedings, the state court determined that the Eighth Amendment

claim was "non-cognizable" under O.C.G.A. § 9-14-42(a), and, alternatively, that the claim failed

on the merits. (Doc. 27-20, pp. 87–88.) While Petitioner concedes that a "state court's alternative

holding typically counts as an adjudication on the merits for purposes of Section 2254(d)," he

contends that this rule does not apply "where the state court's primary holding is that it lacks

jurisdiction over the dispute." (Doc. 65, p. 134.) Petitioner argues that because the state court's

"primary holding" was that the Eighth Amendment claim was "non-cognizable," the state court

lacked jurisdiction to rule on the merits of that claim. (Id. (citing Cognizable, Black's Law

Dictionary (11th ed. 2019) ("Capable of being judicially tried or examined before a designated

tribunal; within the court's jurisdiction.").) Thus, according to Petitioner, the state court failed to

adjudicate the merits of the claim for purposes of Section 2554(d). (Id.)

The only authority Petitioner cites in support of this argument is the Sixth Circuit Court of

Appeal's decision in Gumm v. Mitchell, 775 F.3d 345, 362 (6th Cir. 2014). In Gumm, the Sixth

Circuit addressed the question of whether the AEDPA's standard of review applied to a state

appellate court's alternative merits ruling on the petitioner's Brady claim after the state appellate

court determined that it lacked subject matter jurisdiction to "entertain" that claim under Ohio

Revised Code § 2953.23(A).[10]  See id. at pp. 358, 362; see also State v. Gumm, 864 N.E.2d 133,

141 (Oh. Ct. App. 2006). Interpreting Ohio law, the Sixth Circuit found that Ohio state courts had

(1) "clearly indicated that [Section] 2953.23 denies courts subject matter jurisdiction over claims

---

[10] Ohio Revised Code § 2953.23(A) imposes a time limit on filing a post-conviction relief petition. It provides, "whether a hearing is or is not held on a petition filed pursuant to section 2953.21 of the [Ohio] Revised Code, a court may not entertain a petition filed after the expiration of the period prescribed in division (A) of that section or a second petition or successive petitions for similar relief on behalf of a petitioner unless division (A)(1) or (2) of this section applies." Ohio Revised Code § 2953.23(A). In State v. Gumm, the Ohio appeals court held that Section 2953.23(A) deprived it of subject matter jurisdiction because "the time for filing [petitioner's] petition expired," and the record did not demonstrate the existence of any exceptional circumstances carved out by the statute. 864 N.E.2d at 141; see Ohio Revised Code § 2953.23(A)(1)-(2).

that cannot meet the statute's stringent requirements" and (2) "interpreted [Ohio law] to conclude that where a court lacks jurisdiction, any judgment on the merits is rendered void ab initio." Gumm, 775 F.3d at 362. Thus, the Sixth Circuit ruled that the Ohio state court did not "adjudicate [the] claim on the merits" for purposes of Section 2254(d) because the state court did not "address the issue in an opinion in which the court had jurisdiction over the matter." Id.

As an initial matter, the Court emphasizes that the Sixth Circuit's decision in Gumm relied on its interpretation of *Ohio* law and is not binding on this Court. See, e.g., Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc) ("Under the established federal legal system the decisions of one circuit are not binding on other circuits.").[11] Moreover, Petitioner failed to cite to—and the Court's own search failed to reveal—any binding legal precedent establishing either that a state habeas court lacks jurisdiction over a petition that does not comply with O.C.G.A § 9-14-42(a) or that the AEDPA's standard of review is inapplicable to a state habeas court's alternative merits ruling.

Finally, as Petitioner concedes, it is well-established that "a state court's alternative holding is an adjudication on the merits" for purposes of Section 2254(d). Raulerson, 928 F.3d at 1001; (see doc. 65, p. 134.) Indeed, "alternative holdings are not dicta, but instead are binding as solitary

---

[11] The Court notes that the persuasiveness of Gumm v. Mitchell is diminished by the differences between the reasoning underlying the Ohio appellate court's decision regarding the petitioner's Brady claim in State v. Gumm and the state habeas court's ruling on Petitioner's Eighth Amendment claim in this case. In State v. Gumm, the Ohio Court of Appeals declined to adjudicate the petitioner's Brady claim because his post-conviction petition was "tardy," i.e., it was not filed within the time frame established by Ohio Revised Code Section 2953.23(A). 864 N.E.2d at 141. However, the state habeas court in this case found that O.C.G.A. § 9-14-42(a) barred Petitioner's Eighth Amendment claim not because it was untimely but because Petitioner's amended habeas petition "fail[ed] to allege a constitutional violation in the proceeding which resulted in Petitioner's conviction and sentence." (Doc. 27-20, p. 87). Then, in its Order regarding issues of procedural default, the Court subsequently determined that Petitioner did state a cognizable claim under the Eighth Amendment. (Doc. 60, p. 17.) Thus, the Court finds the Sixth Circuit's decision in Gumm v. Mitchell unpersuasive. See generally Riechmann v. Fla. Dep't of Corr., 940 F.3d 559, 580 (11th Cir. 2019) (applying AEDPA's deferential standard of review to the Florida Supreme Court's alternative ruling on petitioner's Brady claim which "was barred due to [petitioner's] failure to raise it on direct appeal.").

holdings." <u>Bravo v. United States</u>, 532 F.3d 1154, 1162 (11th Cir. 2008); <u>see also</u> <u>Hitchcock v. Sec'y, Fla. Dep't of Corr.</u>, 745 F.3d 476, 484 n.3 (11th Cir. 2014) (collecting cases).  Thus, the state habeas court's alternative ruling that Petitioner's Eighth Amendment claim fails on the merits constitutes an "adjudication on the merits" for purposes of Section 2254(d), and the AEDPA's standard of review, therefore, applies.  <u>See</u> <u>Riechmann</u>, 940 F.3d at 580 ("This 'alternative holding on the merits' constitutes 'an "adjudication on the merits" within the meaning of § 2254(d),' and we may not grant federal habeas relief unless the state unreasonably applied <u>Brady</u>.") (quoting 28 U.S.C. §2254(d)).  Considering the lack of binding legal authority for Petitioner's argument and the Eleventh Circuit's clear and established precedent that "a state court's alternative holding is an adjudication on the merits" for purposes of Section 2254(d), the Court finds Petitioner's first argument unpersuasive.  <u>Raulerson</u>, 928 F.3d at 1001.

### 2.   <u>Teague</u> and 28 U.S.C. § 2254(d)(1).

Concerning Petitioner's second argument, the Court finds that argument unavailing as well. Petitioner asserts that the AEDPA standard of review does not apply because his death penalty sentence violates "a substantive rule of constitutional law that would be retroactive on collateral review under the Supreme Court's decision in <u>Teague v. Lane</u>, 489 U.S. 288 (1989)," in which the Supreme Court held that new constitutional rules of criminal procedure generally do not retroactively apply to convictions that were final when the new rule was announced.  (Doc. 65, pp. 134); <u>see</u> <u>Teague v. Lane</u>, 489 U.S. at 306–16.  Specifically, Petitioner contends that the Court should extend the Supreme Court's ruling in <u>Roper v. Simmons</u>, 543 U.S. 551 (2005), to protect "all emerging adults" (i.e., eighteen-to-twenty-year-old offenders) from capital punishment rather than just juveniles.  (Doc. 65, p. 136.)  Petitioner argues that, because such an extension of the <u>Roper</u> decision would constitute a new "substantive rule of constitutional law" under <u>Teague</u>, it

retroactively applies to bar Petitioner's death sentence and renders the AEDPA's standard of review inapplicable. (Id. at pp. 133–136.) The Court addresses this argument in two steps. First, the Court must determine whether Petitioner's proposed extension of Roper falls within one of Teague's two exceptions, and second, the Court must determine whether a rule that falls under one of Teague's exceptions evades the AEDPA's standard of review.

In Teague, 489 U.S. at 306–16, the Supreme Court held that "a new constitutional rule of criminal procedure does not apply, as a general matter, to convictions that were final when the new rule was announced," unless (1) the new rule is a "substantive rule[] of constitutional law" or (2) the new rule is a "watershed rule[] of criminal procedure implicating the fundamental fairness and accuracy of the criminal proceeding." Montgomery v. Louisiana, 577 U.S. 190, 198 (2016) (internal citations and quotation marks omitted). Thus, the Teague analysis requires the Court to perform "three steps." Caspari v. Bohlen, 510 U.S. 383, 390 (1994); see also Knight v. Fla. Dep't of Corr., 936 F.3d 1322, 1334 (11th Cir. 2019). First, the Court must "determine the date when the petitioner's conviction became final," which happens when the Supreme Court "affirms a conviction on the merits on direct review or denies a petition for a writ of certiorari, or when the time for filing a certiorari petition expires." Knight, 936 F.3d at 1334 (citing Clay v. United States, 537 U.S. 522, 527 (2003)). Second, "if the rule that the petitioner wants to apply had not been announced" prior to the final conviction, the Court must "'assay the legal landscape' as it existed at the time and determine whether existing precedent compelled the rule—that is, whether the case announced a new rule or applied an old one." Id. (quoting Beard v. Banks, 542 U.S. 406, 413 (2004)); see also id. ("If —and only if—the holding was dictated by precedent existing at the time the defendant's conviction became final, then the rule is not new[.] . . . And that is not a light test—a rule is not dictated by prior precedent unless it would have been apparent to all reasonable

jurists.") (internal quotations and citations omitted).  Third, assuming the rule petitioner wants to

apply constitutes a "new rule," the Court must determine whether the new rule fits within "either

of the two exceptions to nonretroactivity."  <u>Id.</u> at 1336.

Turning to the first step of the <u>Teague</u> analysis, the Supreme Court denied Petitioner's writ

of certiorari on November 1, 2010.  (Doc. 11-15.)  Thus, Petitioner's conviction became final then,

and the rule Petitioner wants to apply in this case—that <u>Roper</u>'s prohibition of the death penalty

applies to "all emerging adults"—had not been announced.  Regarding the second step, "[a] case

announces a new rule of constitutional law when it breaks new ground or imposes a new obligation

on the States or the Federal government."  <u>In re Henry</u>, 757 F.3d 1151, 1158 (11th Cir. 2014)

(citing <u>Teague v. Lane</u>, 489 U.S. at 301).  In other words, "a case announces a new rule if the result

was not dictated by precedent existing when the defendant's conviction became final."  <u>Id.</u> (citing

<u>Teague v. Lane</u>, 489 U.S. at 301).  Furthermore, a rule may be new if the petitioner seeks to apply

a prior decision's "old rule" to a novel setting, such that relief would create a new rule by the

extension of the precedent.  <u>Stringer v. Black</u>, 503 U.S. 222, 228 (1992); <u>see also</u> <u>In re Hammond</u>,

931 F.3d 1032, 1038 (11th Cir. 2019) ("The Supreme Court has noted that, even where a court

applies an already existing rule, its decision may create a new rule by applying the existing rule in

a new setting, thereby extending the rule 'in a manner that was not dictated by [prior] precedent.'")

(quoting <u>Stringer</u>, 503 U.S. at 228); <u>United States v. Reece</u>, 938 F.3d 630, 634 (5th Cir. 2019) ("A

new rule may be created, however, by extending an existing rule to a new legal setting not

mandated by precedent.") (citing <u>Stringer</u>, 503 U.S. at 222); <u>Matteo v. Superintendent, SCI Albion</u>,

171 F.3d 877, 903 (3d Cir. 1999) (Stapleton, J., concurring) ("[T]he Supreme Court has explained

that the principles of <u>Teague</u> also apply if a petitioner, although relying on an 'old' rule, seeks a

result in his case that would create a new rule 'because the prior decision is applied in a novel

69

setting, thereby extending the precedent.'") (quoting <u>Stringer</u>, 503 U.S. at 222).  Here, Petitioner asserts that the Court should extend the Supreme Court's ruling in <u>Roper</u> to encompass all "emerging adults."  (Doc. 65, p. 136.)  Such an extension would create a "new rule" for purposes of the <u>Teague</u> analysis in that it has not been previously dictated by federal law and would extend <u>Roper</u>'s ruling to a novel set of facts—namely, to an adult offender who possessed the attributes of a juvenile offender when he or she committed the crime.

Regarding the third step, Petitioner asserts that his proposed rule falls under <u>Teague</u>'s "substantive rule of constitutional law" exception.  (Doc. 65, pp. 135–36.)  A rule is "substantive" if it forbids "criminal punishment of certain primary conduct" or prohibits "a certain category of punishment for a class of defendants because of their status or offense."  <u>Montgomery</u>, 577 U.S. at 198.  <u>Teague</u>'s first exception requires both federal habeas courts and "state collateral review courts to give retroactive effect" to new substantive rules of constitutional law.  <u>Id.</u> at 198–200. Here, Petitioner's proposed rule that all "emerging adults" (i.e., those aged eighteen to twenty-years old) is substantive because, like the rule announced in <u>Roper</u>, it alters the class of persons eligible for the death penalty.  <u>See</u> <u>Montgomery</u>, 577 U.S. at 206 (noting that <u>Roper</u> announced a substantive rule); <u>Dingle v. Stevenson</u>, 840 F.3d 171, 174 (4th Cir. 2016) ("We readily grant that <u>Roper</u> announced a substantive rule . . . .").  Based on the above analysis, the Court finds that Petitioner's proposed rule applies retroactively under <u>Teague</u> as it would be a new rule of substantive constitutional law.

While the Court agrees with Petitioner that his proposed extension of <u>Roper</u> falls within <u>Teague</u>'s first exception, the Court's analysis does not end there.  As noted above, the Court must also determine whether the AEDPA's standard of review under 28 U.S.C. § 2254(d)(1) applies to new rules of constitutional law that fall under one of the exceptions to <u>Teague</u>.  As discussed

above, Teague requires federal and state habeas courts to give retroactive effect to new substantive rules of constitutional law.  However, Section 2254(d)(1) makes clear that

> [a]n application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim . . . resulted in a decision that was *contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States*.

28 U.S.C. § 2254(d)(1) (emphasis added).  Thus, "it is not clear whether a [Section] 2254 petitioner can rely on a rule that is considered 'new' under Teague (even if it falls within a Teague exception) because the rule will not also be 'clearly established' for purposes of [Section] 2254(d)(1)."  Martin v. Symmes, No. 10-cv-4753 (SRN/TNL), 2013 WL 5653447, at *14 n.12, (D. Minn. Oct. 15, 2013), *vacated and remanded on other grounds by* 820 F.3d 1012 (8th Cir. 2016).  Indeed, neither the Supreme Court nor the Eleventh Circuit have directly answered this question.  See Greene v. Fisher, 565 U.S. 34, 39 n.2 (2011) ("Whether [Section] 2254(d)(1) would bar a federal habeas petitioner from relying on a decision that came after the last state-court adjudication on the merits, but fell within one of the exceptions recognized in Teague . . . is a question we need not address to resolve this case."); Kilgore v. Sec'y, Fla. Dep't of Corr., 805 F.3d 1301, 1313 n.6 (11th Cir. 2015) ("[N]either this Court nor the Supreme Court has squarely answered '[w]hether [Section] 2254(d)(1) would bar a federal habeas petitioner from relying on a decision that came after the last state-court adjudication on the merits, but fell within one of the exceptions recognized in Teague.").

Petitioner asserts that the Supreme Court's decision in Montgomery v. Louisiana, 577 U.S. 190 (2016), establishes that "[w]here a petitioner claims relief based on a rule that would fall within one of Teague's exceptions, a federal habeas petitioner should be able to obtain relief even if the

state court decision did not yet violate 'clearly established' federal law under AEDPA." (Doc. 65, p. 135.)  According to Petitioner, the reasoning in Montgomery "suggests that substantive rules apply retroactively to habeas petitions subject to [Section] 2254(d)." (Id.)  In Montgomery, the Supreme Court held that "when a new substantive rule of constitutional law controls the outcome of a case, the Constitution requires state collateral review courts to give retroactive effect to that rule." 577 U.S. at 200.  However, the Court in Montgomery did not clarify how its decision coincides with the requirements of 28 U.S.C. § 2254(d)(1).  Indeed, the majority opinion in Montgomery did not mention Section 2254(d)(1) or the AEDPA at all.

Furthermore, while the Supreme Court has not addressed the exact issue the Court faces here, the Supreme Court has stated on multiple occasions that "the AEDPA and Teague inquiries are distinct." Horn v. Banks, 536 U.S. 266, 272 (2002) (per curiam); Greene, 565 U.S. at 39.  As the Supreme Court stated in Greene,

> The retroactivity rules that govern federal habeas review on the merits—which include Teague—are quite separate from . . . [the] AEDPA; neither abrogates or qualifies the other.  If [Section] 2254(d)(1) was, indeed, pegged to Teague, it would authorize relief when a state-court merits adjudication 'resulted in a decision that *became* contrary to, or an unreasonable application of, clearly established Federal law, *before the conviction became final*.'  The statute says no such thing, and we see no reason why Teague should alter AEDPA's plain meaning.

565 U.S. at 39; see also Edwards v. Vannoy, 141 S. Ct. 1547, 1565 (2021) (Thomas, J., concurring) ("[T]he Court's reliance on Teague today and in the past should not be construed to signal that . . . Teague could justify relief where AEDPA forecloses it.  AEDPA . . . . does not contemplate retroactive rules upsetting a state court's adjudication of an issue that reasonably applied the law at the time.").  Moreover, Section 2254(d)(1)'s plain text speaks in the past tense and only allows a writ to be granted where a decision "*was* contrary to, or *involved* an unreasonable application of, *clearly established* Federal law, as *determined* by the Supreme Court of the United States.  28

U.S.C. § 2254(d).  If Congress intended for federal courts to grant habeas petitions where a state decision *is* contrary to or *involves* an unreasonable application of *now* established law, it could have said so.  However, Congress included no such language and did not otherwise create a carve out within Section 2254(d) for claims based on a rule that would fall within one of <u>Teague</u>'s exceptions.   <u>See</u> 28 U.S.C. § 2254(d); <u>see also</u> <u>Edwards</u>, 141 S. Ct. at 1565 (Thomas, J., concurring) ("Section 2254(d)—the absolute bar on claims that state courts reasonably denied—has no exception for retroactive rights.  Congress' decision to create retroactivity exceptions to the [AEDPA's] statute of limitations and to the [AEDPA's] bar on second-or-successive petitions but not for [Section] 2254(d) is strong evidence that <u>Teague</u> could never have led to relief here.").  Finally, Petitioner failed to cite to any case law directly holding that <u>Teague</u>'s substantive rule exception prohibits a federal habeas court from applying the AEDPA's standard of review when reviewing a state court's adjudication.  (<u>See</u> doc. 65, pp. 133–36.)

Based on the above, the Court finds it unlikely that the Supreme Court in <u>Montgomery</u> intended to abrogate the plain text of the AEDPA when a new substantive rule of constitutional law retroactively applies to a 28 U.S.C. § 2254 petitioner's claim under <u>Teague</u>.  <u>See</u> <u>Demirdjian v. Gipson</u>, 832 F.3d 1060, 1076 n.12 (9th Cir. 2016) ("Even if applying a rule retroactively would comport with <u>Teague</u>, we still must ask whether doing so would contravene [S]ection 2254(d)(1) by granting relief based on federal law not clearly established *as of the time the state court render[ed] its decision*.") (internal quotations and citations omitted) (emphasis in original); <u>Greene v. Palakovich</u>, 606 F.3d 85, 101 (3d Cir. 2010) ("[I]t seems a leap to assume that new rules that are deemed retroactive under <u>Teague</u> would be automatically deemed 'clearly established Federal law' for purposes of [Section] 2254(d)(1)."); <u>Pizzuto v. Blades</u>, No. 1:-5-cv-00516-BLW, 2016 WL 6963030, at *6 (D. Idaho Nov. 28, 2016) ("[T]o be eligible for relief under AEDPA, a

petitioner must show *both* that the rule he seeks to invoke is retroactive—either because it is not a new rule, it is a substantive rule, or that it is a watershed rule of criminal procedure—*and* that the state court's decision violated Supreme Court precedent that was clearly-established at the time of that decision . . . .").  Therefore, the Court reviews Petitioner's Eighth Amendment claim under the AEDPA's standard of review.

###    B.    Analysis

Regarding the merits of the Eighth Amendment claim, Petitioner argues that the state court unreasonably applied clearly established federal law in rejecting his Eighth Amendment claim. (Doc. 65, pp. 148–50.)  Specifically, Petitioner argues that his death sentence is unconstitutional because (1) the Eighth Amendment, as interpreted by the Supreme Court in Roper v. Simmons, 543 U.S. 551 (2005), bars the execution of all defendants who were eighteen or younger when they committed their crimes, (doc. 65, pp. 136–45), and (2) the Supreme Court's decision in Roper shields Petitioner from the death penalty because he was the "functional equivalent of a juvenile at the time" he committed his crimes, (id. at pp. 145–48).

The state habeas court rejected Petitioner's Eighth Amendment claim.  The state habeas court, relying on the Georgia Supreme Court's decision in Rogers v. State, 653 S.E.2d 31 (Ga. 2007), *overruled on other grounds by* State v. Lane, 838 S.E.2d 808 (Ga. 2020), first found that Petitioner's Eighth Amendment claim failed because "Petitioner himself conceded that he was eighteen and nine months old at the time of the crimes."[12]  (Doc. 27-20, p. 88.)  The state habeas court continued:

---

[12]  In Rogers v. State, the Georgia Supreme Court held that a defendant's death sentence did not violate his "equal protection and due process rights merely because, at age 19 when he committed the crimes, he may have possessed the same attributes of a juvenile offender that prompted the United States Supreme Court to prohibit the imposition of the death penalty on offenders under age 18."  653 S.E.2d at 35 (citing Roper, 543 U.S. at 574).

> Petitioner provides no legal support for extending the protections of <u>Rogers v. Simmons</u>, 543 U.S. 551 (2005), to legal adults. Petitioner was at the age of majority when he committed his crimes. As a result, Petitioner's death sentence does not violate his constitutional rights. Thus, even if this claim was cognizable in habeas, it would be denied.

(Doc. 27-20, p. 88.)

As discussed above, the Court examines the state habeas court's rejection of Petitioner's Eighth Amendment claim under the AEDPA's standard of review set out in 28 U.S.C. § 2554(d)(1). <u>See</u> Discussion Section II.A, <u>supra</u>. Under Section 2254(d)(1), the Court cannot grant a writ of habeas corpus unless the state habeas court's merits adjudication of a claim resulted in a decision that was either (1) "contrary to . . . clearly established Federal law," or (2) "involved an unreasonable application of[] clearly established Federal law." 28 U.S.C. § 2554(d)(1). For purposes of Section 2254(d)(1), only the Supreme Court can establish "clearly established Federal law." <u>Id.</u>; <u>see also</u> <u>Dombrowski v. Mingo</u>, 543 F.3d 1270, 1274 (11th Cir. 2008) ("[T]he 'clearly established law' requirement of [Section] 2254(d)(1) does not include the law of lower federal courts."). Furthermore, the "clearly established law" requirement "refers to the holdings, as opposed to the dicta, of [the] . . . [Supreme] Court's decisions as of the time of the relevant state-court decision." <u>Lockyer v. Andrade</u>, 538 U.S. 63, 71 (2003).

### 1.    Contrary to Clearly Established Federal Law

Here, Petitioner failed to show that the state habeas court's decision was "contrary to" clearly established federal law.

> It is well established in [the Eleventh Circuit] that a state court decision can be "contrary to" clearly established federal law "if either (1) the state court applied a rule that contradicts the governing law set forth by Supreme Court case law, or (2) when faced with materially indistinguishable facts, the state court arrived at a result different from that reached in a Supreme Court case."

Dombrowski, 543 F.3d at 1274–75 (quoting Putman v Head, 268 F.3d 1223, 1241 (11th Cir. 2001).

The United States Supreme Court has not extended Roper's protections to offenders who, while

legally an adult, possessed a "mental or emotional age" below eighteen when they committed their

crimes.  Barwick v. Crews, No. 5:12cv00159-RH, 2014 WL 1057088, at *14 (N.D. Fla. Mar. 19,

2014), affirmed by Barwick v. Sec'y, Fla. Dep't of Corr., 794 F.3d 1239, 1259 (11th Cir. 2015).

Indeed, Petitioner does not argue as much.  (See doc. 65, pp. 148–50.)  Therefore, the state habeas

court's rejection of Petitioner's Eighth Amendment claim was not contrary to "clearly established

Federal law, as determined by the Supreme Court of the United States."  28 U.S.C. § 2254(d)(1);

see also Dombrowski, 543 F.3d at 1274 ("[W]hen no Supreme Court precedent is on point, we

have held that a state court's conclusion cannot be contrary to clearly established Federal law as

determined by the U.S. Supreme Court."); see also Barwick v. Sec'y, Fla. Dep't of Corr., 794 F.3d

at 1258 (holding that a state supreme court's denial of a petitioner's claim that Roper protected

defendants with a mental or emotional age lower than eighteen but a chronological age greater

than seventeen at the time of the crime was not "contrary to" clearly established federal law).

### 2. Unreasonable Application of Clearly Established Federal Law

Petitioner instead argues that the state habeas court unreasonably applied clearly

established federal law when it rejected his Eighth Amendment claim.  (Doc. 65, pp. 148–50.)

According to Petitioner, the state habeas court "blindly relied on Rogers notwithstanding

significant changes in the law and science" and "fail[ed] to recognize that Roper's logic bars

[Petitioner's] execution."  (Doc. 65, pp. 148–49 (emphasis added).)  A state court unreasonably

applies clearly established federal law where it "correctly identifies the governing legal rule but

applies [the rule] unreasonably to the facts of a particular prisoner's case."  Williams v. Taylor,

529 U.S. at 408.  However, Section 2254(d)(1) "does not require state courts to extend [Supreme

Court] precedent or license federal courts to treat the failure to do so as error."  White v. Woodall, 572 U.S. 415, 426 (2014); see also Barwick v. Sec'y, Fla. Dep't of Corr., 794 F.3d at 1259 ("[S]tate courts are not obligated to extend legal principles set forth by the Supreme Court because the AEDPA requires only that state courts fully, faithfully and reasonably follow legal rules already clearly established by the Supreme Court.") (internal quotations omitted).  In White v. Woodall, the Supreme Court explained:

> If a habeas court must extend a rationale before it can apply to the facts at hand, then by definition the rationale was not clearly established at the time of the state-court decision.  AEDPA's carefully constructed framework would be undermined if habeas courts introduced rules not clearly established under the guise of extensions to existing law.
>
> This is not to say that [Section] 2254(d)(1) requires an identical factual pattern before a legal rule must be applied.  To the contrary, state courts must reasonably apply the rules squarely established by this Court's holdings to the facts of each case.  The difference between applying a rule and extending a rule is not always clear, but certain principles are fundamental enough that when new factual permutations arise, the necessity to apply the earlier rule will be beyond doubt.  The critical point is that relief is available under [Section] 2254(d)(1)'s unreasonable-application clause if, and only if, it is so obvious that a clearly established rule applies to a given set of facts that there could be no fairminded disagreement on the question.

572 U.S. at 426–27 (internal quotations and citations omitted).

In Roper, "the United States Supreme Court drew a bright line—age 18."  Barwick v. Crews, 2014 WL 1057088, at *14.  Indeed, the Supreme Court squarely held that "the death penalty cannot be imposed upon juvenile offenders."  Roper, 543 U.S. at 575.  While the Supreme Court acknowledged that "[t]he qualities that distinguish juveniles from adults do not disappear when an individual turns [eighteen]," the Supreme Court also stated that "a line must be drawn" and drew that line at eighteen.  Id. at 574.  Because Petitioner was eighteen years and nine months old when he committed his crimes, Roper does not apply.  Furthermore, Petitioner has not cited to any legal authority extending the protections of Roper to those who committed crimes between the ages of

eighteen and twenty or to those who committed crimes at the chronological age of eighteen but a mental or emotional age younger than eighteen.  Indeed, in 2015, the Eleventh Circuit rejected a similar argument in <u>Barwick v. Secretary, Florida Department of Corrections</u>, and held that a state supreme court did not unreasonably apply clearly established federal law when rejecting the petitioner's argument that <u>Roper</u>'s protection should be extended to those who are chronologically older than seventeen but mentally or emotionally younger than eighteen.  794 F.3d at 1258–59.[13] Based on the above, the Court concludes that the state habeas court did not unreasonably apply clearly established federal law when it rejected Petitioner's Eighth Amendment claim.

## III.    Certificate of Appealability

Federal Rule of Appellate Procedure 22(b)(1) states in part: "In a habeas corpus proceeding in which the detention complained of arises from process issued by a state court . . . , the applicant cannot take an appeal unless a circuit justice or a circuit or district judge issues a Certificate of Appealability under 28 U.S.C. § 2253(c)."  Pursuant to 28 U.S.C. § 2253(c)(2), a district judge should issue a COA "only if the applicant has made a substantial showing of the denial of a constitutional right."  Moreover, pursuant to Rule 11(a) of the Rules Governing Section 2254 Proceedings, the Court "must issue or deny a certificate of appealability when it enters a final order adverse to the applicant."  The United States Supreme Court has stated that "[t]he COA inquiry . .

---

[13]  The Court also notes that the state habeas court's reliance on the Georgia Supreme Court's decision in <u>Rogers</u> was not "blind."  Petitioner overlooks the fact that in <u>Rogers</u>, the Georgia Supreme Court straightforwardly applied <u>Roper</u> to reject an argument similar to the one Petitioner makes in this case: that <u>Roper</u> protects young adult offenders who had similar attributes to juvenile offenders when they committed their crimes.  See <u>Rogers</u>, 653 S.E.2d at 660; (see also doc. 27-20, p. 88.)  Like Petitioner, the petitioner in <u>Rogers</u> committed his crime when he was younger than twenty-years old and possessed juvenile characteristics.  <u>Rogers</u>, 653 S.E.2d at 660.  Furthermore, Petitioner fails to cite any authority which prohibits a state habeas court from relying upon a state supreme court's application and interpretation of clearly established United States Supreme Court precedent.  Thus, the Court cannot say that the state habeas court "unreasonably applied clearly established law" when it rejected Petitioner's Eighth Amendment claim based on the Georgia Supreme Court's application of <u>Roper</u> to circumstances like Petitioner's.

. is not coextensive with a merits analysis." <u>Buck v. Davis</u>, 137 S. Ct. 759, 773 (2017).  Rather, "[a]t the COA stage, the only question is whether the applicant had shown that 'jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further.'" <u>Id.</u> (quoting <u>Miller-El v. Cockrell</u>, 537 U.S. 322, 327 (2003)).

Here, Petitioner has failed to make a substantial showing of a denial of a constitutional right with respect to his ineffective assistance of counsel claims or his Eighth Amendment claim. The Court finds that no jurists could disagree with the Court's resolution of the issues presented in any of the claims Petitioner properly raised.  Accordingly, the Court **DENIES** Petitioner a COA for any of his claims.

**CONCLUSION**

Based on the foregoing, the Court **DENIES** Petitioner's Petition for Writ of Habeas Corpus.  (Doc. 1.)  Further, the Court **DENIES** Petitioner a Certificate of Appealability and **DIRECTS** the Clerk of Court to close this case.

**SO ORDERED**, this 15th day of December, 2021.

R. STAN BAKER
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF GEORGIA