**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
SAVANNAH DIVISION**

DARRYL SCOTT STINSKI,

          Petitioner,

   v.

WARDEN BENJAMIN FORD,

          Respondent.

CIVIL ACTION NO. 4:18-cv-66

**O R D E R**

In 2007, following a trial in the Superior Court of Chatham County, a jury convicted Petitioner Darryl Stinski of two counts of malice murder, two counts of felony murder, and other related crimes for the murders of Susan Pittman and her thirteen-year-old daughter, Kimberly Pittman. (Doc. 7-11, pp. 34–37.) Petitioner was sentenced to death on June 13, 2007. (Doc. 8-1, pp. 210–215.) After the completion of his direct appeal and state habeas corpus proceedings, Petitioner filed a Petition for Writ of Habeas Corpus in this Court, pursuant to 28 U.S.C. § 2254, challenging his conviction and death sentence. (Doc. 1.) On December 15, 2021, the Court denied Petitioner's Petition for Writ of Habeas Corpus and denied him a Certificate of Appealability. (Doc. 72.) Petitioner has now filed a Motion to Alter or Amend Judgment, pursuant to Federal Rule of Civil Procedure 59(e), asking the Court to reconsider its decision. (Doc. 74.) For the reasons set forth below, the Court **GRANTS in part** and **DENIES in part** Petitioner's Motion to Alter or Amend Judgment. (Id.) Specifically, the Court **GRANTS** Petitioner a Certificate of Appealability on the issue of whether the Court properly applied Sections 2254(d)(2) and 2254(e)(1) of the AEDPA in the Habeas Order when evaluating

Petitioner's ineffective assistance of counsel claim. The remainder of the Court's prior Order, (doc. 72), remains unchanged and in full force and effect.

## BACKGROUND[1]

In 2007, Petitioner faced trial for the murders of Susan Pittman and her 13-year-old daughter, Kimberly Pittman, and other related crimes he and Dorian O'Kelley committed. (See doc. 72, p. 3.) Attorneys Michael Schiavone, Steven Sparger, and Willie Yancy were appointed to represent Petitioner, with Schiavone serving as lead counsel and Sparger in charge of mitigation. (Doc. 27-20, pp. 8–9; see doc. 72, p. 3.) On June 8, 2007, a Georgia jury found Petitioner guilty on all counts. (Doc. 7-11, pp. 34–37; see doc. 72, pp. 1–3; see also Stinski v. State, 691 S.E.2d 854, 862 n.1 (Ga. 2010).) Shortly after the guilt phase of Petitioner's trial concluded, the sentencing phase of trial began. (Doc. 10-8, pp. 145, 167–68; see doc. 72, p. 3.) Petitioner's trial counsel called twenty-six witnesses to testify during the sentencing phase of trial, including mitigation specialist Dale Davis and Dr. Jane Weilenman, a psychologist. (Doc. 27-20, pp. 43–47, 61–68; see doc. 72, p. 3.)

Davis's role in Petitioner's case was to "take [Petitioner] and find out every single thing [she could] find out about [him] from [his] birth, even pre-birth, up until [the crime]." (Doc. 10-9, p. 78.) Davis also testified during the sentencing phase of trial. (See doc. 72, pp. 5–7.) In short, Davis testified extensively about Petitioner's abusive childhood; his family history; and his medical records and conditions, including ADHD, depression, post-traumatic stress disorder, and a psychotic disorder for which Petitioner received medication. (See id.) For her part in Petitioner's case, Dr. Weilenman conducted a psychological evaluation of Petitioner and helped

---

[1] The Court set out the facts and procedural background of this case in detail in its December 15, 2021, Order denying Petitioner's Petition for Writ of Habeas Corpus (the "Habeas Order") and need not fully recount them here. (See doc. 72, pp. 1–15.)

create a social history for Petitioner.  (See id. at pp. 7–8.)  Dr. Weilenman testified about, among other things, Petitioner's background (including issues of neglect, abandonment, and abuse), his mental health, his development, and his juvenile conduct.  (See id. pp. 7–10.)

The jury ultimately recommended the death sentence for Petitioner based on the murders of Susan and Kimberly Pittman, finding that the existence of nine aggravating circumstances across the two murders warranted such a sentence.[2]  (Doc. 8-1, pp. 210–13.)  In addition to the death sentence, Petitioner was sentenced to a total of 140 years of confinement for his other crimes.  (Id. at pp. 214–15.)  Petitioner subsequently filed a motion for a new trial, which was denied.  (Doc. 27-20, p. 2.)  The Georgia Supreme Court then affirmed Petitioner's convictions and death sentence.  See Stinski v. State, 691 S.E.2d at 874-75.

On September 12, 2011, Petitioner filed a petition for writ of habeas corpus in the Superior Court of Butts County, (doc. 11-19), and later amended the petition, (doc. 12-24).  In the petition, Petitioner argued, among other things, that his trial counsel rendered ineffective assistance of counsel during the sentencing phase of trial and that he is ineligible for the death penalty under Roper v. Simmons, 543 U.S. 551 (2005), because he was the functional equivalent of an adolescent at the time of his crimes.  (Doc. 12-24, pp. 9–24, 29–30; see doc. 72, pp. 11–12.)  The state habeas court held an evidentiary hearing in which twenty witnesses testified,

---

[2]  The nine aggravating circumstances were: (1) Petitioner was "engaged in the commission of a burglary" while murdering Susan Pittman; (2) the murder of Susan Pittman "was outrageously or wantonly vile, horrible, or inhuman in that it involved the depravity of mind of" Petitioner; (3) the murder of Susan Pittman "was outrageously or wantonly vile, horrible, or inhuman in that it involved an aggravated battery to the victim before death"; (4) Petitioner was committing "another capital felony" while murdering Kimberly Pittman; (5) Petitioner "was engaged in the commission of a burglary" while murdering Kimberly Pittman; (6) Petitioner "was engaged in the commission of arson in the first degree" while murdering Kimberly Pittman; (7) the murder of Kimberly Pittman "was outrageously or wantonly vile, horrible, or inhuman in that it involved tortur[ing] . . . the victim before death"; (8) the murder of Kimberly Pittman "was outrageously or wantonly vile, horrible, or inhuman in that it involved the depravity of mind of" Petitioner; and (9) the murder of Kimberly Pittman "was outrageously or wantonly vile, horrible, or inhuman in that it involved an aggravated battery to the victim before death."  (Doc. 8-1, pp. 210–13.)

including family members, friends, acquaintances, and medical professionals.  (See doc. 27-20, p. 2.)  Among medical professionals, Petitioner called a clinical neuropsychologist, Dr. Joette James; a forensic psychiatrist, Dr. Peter Ash; and a developmental psychologist, Dr. James Garbarino.  (Doc. 13-20, pp. 84–196; doc. 13-17, pp. 5–169; doc. 13-21, pp. 56–179; see doc. 72, pp. 12–13.)  After conducting the evidentiary hearing, the Superior Court denied the petition on January 15, 2017.  (Doc. 27-20.)  Petitioner then filed an Application for Certificate of Probable Cause to Appeal in the Georgia Supreme Court, (doc. 27-22), which the Georgia Supreme Court denied, (doc. 27-24).

On March 26, 2018, Petitioner filed his Petition for Writ of Habeas Corpus in this Court pursuant to 28 U.S.C. § 2254 (the "Petition").  (Doc. 1.)  Petitioner subsequently filed the Brief on the Merits in support of his Petition.  (Doc. 65.)  In his Brief in support of the Petition, Petitioner asserted two general claims: (1) his trial counsel rendered ineffective assistance of counsel at the sentencing phase of his trial in violation of his Sixth and Fourteenth Amendment rights, (id. at pp. 87–133), and (2) his execution would constitute cruel and unusual punishment in violation of the Eighth and Fourteenth Amendments and the United States Supreme Court's decision in Roper v. Simmons, 543 U.S. 551 (2005), because he was the equivalent of a juvenile when he committed his crimes, (id. at pp. 133–150).  The Court denied the Petition and denied him a Certificate of Appealability ("COA").  (Doc. 72.)

Petitioner then filed the at-issue Motion to Alter or Amend Judgment, pursuant to Federal Rule of Civil Procedure 59(e), asking the Court to reconsider its decision.   (Doc. 74.)  Specifically, Petitioner argues that the Court committed "manifest errors of fact and law" when it denied his claim for ineffective assistance of counsel at the penalty phase of his trial and requests

that the Court amend its prior ruling to grant him a COA on that claim and his Eighth Amendment claim.  (Id. at pp. 2, 10–13.)

## STANDARD OF REVIEW

The granting of a motion to reconsider or a motion to alter or amend a judgment pursuant to Federal Rule of Civil Procedure 59(e), is "an extraordinary remedy, to be employed sparingly."  Smith ex rel. Smith v. Augusta-Richmond County, No. 1:10-cv-126, 2012 WL 1355575, at *1 (S.D. Ga. Apr. 18, 2012) (citation omitted).  The decision to grant a motion for reconsideration is committed to the sound discretion of the district court.  See Fla. Ass'n of Rehab. Facilities, Inc. v. State of Fla. Dep't of Health and Rehab. Servs., 225 F.3d 1208, 1216 (11th Cir. 2000).  "A movant must set forth facts or law of a strongly convincing nature to induce the court to reverse its prior decision."  Smith, 2012 WL 1355575, at *1 (internal quotations omitted).  Rule 59(e) does not specifically provide any basis for relief, but district courts in the Eleventh Circuit have recognized three grounds that justify reconsidering a judgment: (1) an intervening change in controlling law; (2) the availability of new evidence; or (3) the need to correct clear error or prevent manifest injustice.  See, e.g., Ctr. for Biological Diversity v. Hamilton, 385 F. Supp. 2d 1330, 1337 (N.D. Ga. 2005); Richards v. United States, 67 F. Supp. 2d 1321, 1322 (M.D. Ala. 1999); Aird v. United States, 339 F. Supp. 2d 1305, 1312 (S.D. Ala. 2004) (quoting Pac. Life Ins. Co. v. Am. Nat'l Fire Ins. Co., 148 F.3d 396, 403 (4th Cir. 1998)).  A clear error must be a "clear and obvious error which the interests of justice demand that [the Court] correct."  Am. Home Assurance Co. v. Glenn Estess & Assocs, Inc., 763 F.2d 1237, 1239 (11th Cir. 1985).  A Rule 59(e) motion cannot be used "to relitigate old matters, raise argument or present evidence that could have been raised prior to the entry of judgment."  Jacobs v.

Tempur-Pedic Int'l, Inc., 626 F.3d 1327, 1344 (11th Cir. 2010) (quoting Arthur v. King, 500 F.3d 1335, 1343 (11th Cir. 2007)).

**DISCUSSION**

I.   **Ineffective Assistance of Counsel at Sentencing Phase of Trial**

Petitioner argues that the Court's denial of his claim for ineffective assistance of counsel at the penalty phase of his trial is based on "manifest errors of fact and law."  (Doc. 74, p. 2.) Specifically, Petitioner argues that (1) the Court "overlooked the critical distinction between [his] social history and the missing explanation for his criminal conduct"; (2) the Court's "conclusion that [his] trial counsel acted reasonably is manifestly incorrect"; and (3) the Court's "prejudice determination is based on manifest errors of fact and law."  (Id. at pp. 2–10.)

A.   **Whether the Court "overlooked the critical distinction between [Petitioner's] social history and the missing explanation for his criminal conduct"**

Petitioner first argues in his Motion to Amend or Alter Judgment that the Court "overlooked the critical distinction between [his] social history and the missing explanation for his criminal conduct."  (Id. at p. 2.)  In his Petition, Petitioner argued that his trial counsel rendered ineffective assistance of counsel at the sentencing phase of his trial, in part, because his trial counsel failed to retain additional experts like Dr. James, Dr. Ash, and Dr. Garbarino and present their testimonies during sentencing.  (See doc. 65, pp. 87–101.)  The state habeas court rejected this argument, finding that "Petitioner's scientific evidence . . . was cumulative of the testimony actually presented at [his] trial" and that "the extensive evidence presented by trial counsel in mitigation more than adequately addressed the subject matter raised by Petitioner's witnesses . . . ."  (Doc. 72, pp. 21–22 (quoting doc. 27-20, p. 5).)  In the Habeas Order, the Court concluded that the state habeas court reasonably determined that Petitioner's trial counsel was not deficient for failing to provide testimony from such experts.  (Id. at p. 22.)  In reaching this

conclusion, the Court found that Petitioner's trial counsel "conducted an extensive mitigation investigation" and relied on Davis as a "mitigation specialist" and Dr. Weilenman as a "retained clinical psychologist." (Id. at pp. 22–24.) The Court further found that trial counsel's "extensive mitigation investigation" distinguished Petitioner's case from other cases in which the United States Supreme Court and Eleventh Circuit Court of Appeals had determined that trial counsel had conducted inadequate mitigation investigations. (Id. at pp. 24–25 (citing Williams v. Taylor, 529 U.S. 362, 369–70 (2000); Porter v. McCollum, 558 U.S. 30, 40 (2009); Hardwick v. Sec'y, Fla. Dep't of Corr., 803 F.3d 541, 553 (11th Cir. 2015)).)

Petitioner now argues that the Habeas Order "misse[d] the crux of [his] trial counsel's ineffectiveness at the sentencing stage." (Doc. 74, p. 3.) Specifically, Petitioner argues that "[t]he Court relie[d] on the wrong principle to deny [his] claim of ineffective assistance of counsel" when the Court "compare[d] [his] case to those in which trial counsel did virtually nothing to prepare for the penalty phase of a capital trial." (Id. at p. 4.) Petitioner asserts that the Court's "denial of [his] claim for ineffective assistance of counsel at the sentencing phase ignores trial counsel's failure to connect the dots between the experts' testimony and [Petitioner's] actions." (Id. at p. 2.)

To the extent Petitioner argues that the Court relied on the "wrong principle" in the Habeas Order, that argument is unpersuasive. In the Petition, Petitioner argued that his trial counsel performed an inadequate mitigation investigation, in part, because his trial counsel failed to retain additional experts like Dr. James, Dr. Ash, and Dr. Garbarino and present their testimonies at the sentencing phase of trial. (See doc. 65, pp. 87–101.) However, as noted in the Habeas Order, while "[c]ounsel representing a capital defendant must conduct an adequate background investigation, . . . it need not be exhaustive." Raulerson v. Warden, 928 F.3d 987,

997 (11th Cir. 2019); (see doc. 72, p. 22.)  "The scope of counsel's investigation, like all other actions undertaken by counsel, need only be objectively reasonable under the circumstances to satisfy constitutional demands."  Gissendaner v. Seaboldt, 735 F.3d 1311, 1322 (11th Cir. 2013).  In addition, "the Supreme Court of the United States has held that trial counsel's investigation is not deficient 'when counsel gather[s] a substantial amount of information and then ma[kes] a reasonable decision not to pursue additional sources.'"  (Doc. 72, p. 22 (quoting Porter, 558 U.S. at 40).)  In the Habeas Order, the Court concluded that Petitioner's trial counsel conducted an "extensive mitigation investigation and hired two experts for the sentencing phase in this case: Davis, as the mitigation expert, and Dr. Weilenman, as a clinical psychologist."  (Doc. 72, p. 23.)  The Habeas Order further details the "extensive work" performed by Davis and Dr. Weilenman for Petitioner's case, which distinguished Petitioner's case "from other cases in which trial counsel was deemed to have inadequately investigated a petitioner's background for mitigation purposes."  (See id. at pp. 5–11, 23–25.)

While Petitioner now relies on the Supreme Court's decision in Sears v. Upton, 561 U.S. 945, 954–55 (2010), for the proposition that "counsel's effort to present *some* mitigation evidence should [not] foreclose an inquiry into whether a facially deficient mitigation investigation might have prejudiced the defendant," the mitigation investigation conducted by Petitioner's trial counsel was far more extensive than the "facially inadequate mitigation investigation" in Sears.  561 U.S. at 952.  Indeed, in Sears, the trial counsel presented evidence describing the petitioner's childhood "as stable, loving, and essentially without incident."  Id. at 947.  Specifically, the petitioner's trial counsel called "[s]even witnesses [who] offered testimony along the following lines: [the petitioner] came from a middle-class background; his actions shocked and dismayed his relatives; and a death sentence . . . would devastate the

family."  <u>Id.</u>  In the state postconviction evidentiary hearing, however, the mitigation evidence "demonstrate[d] that [the petitioner] was far from 'privileged in every way.'"  <u>Id.</u> at 948. Instead, the mitigation evidence in <u>Sears</u> showed, among other things, that the petitioner's parents were in a physically abusive relationship and divorced when he was young, that petitioner was sexually abused as a minor, that his father was verbally abusive, and that the petitioner suffered from "substantial behavior problems from a very young age" and severe learning disabilities.  <u>Id.</u>  This evidence was not heard by a jury or known to the petitioner's trial counsel because trial counsel failed to conduct an adequate mitigation investigation.  <u>Id.</u> at 951. In Petitioner's case, however, as detailed in the Habeas Order, trial counsel performed an "extensive mitigation investigation" with Davis as a "mitigation specialist" and Dr. Weilenman as a "retained clinical psychologist."  (<u>See</u> doc. 72, pp. 5–10, 22–24 (describing Dr. Weilenman and Davis's extensive work on Petitioner's case.)  Thus, the decision in <u>Sears</u> is distinguishable from Petitioner's case.

Finally, to the extent Petitioner argues that his trial counsel was ineffective for failing to "connect the dots between the experts' testimony and [his] actions," (doc. 74, p. 2), that argument is also unpersuasive.  As the Court pointed out in the Habeas Order, trial counsel asked Dr. Weilenman, "What happens when you have someone like [Petitioner] . . . meet[] [Dorian O'Kelley,] who's been described as manipulative and . . . compared to Charles Manson?"  (Doc. 72, p. 10 (quoting doc. 10-11, pp. 60–61).)  Dr. Weilenman responded that Petitioner "did what he [did] at that time, listening to [O'Kelley], as a follower . . . and not questioning it.  He needed to fit in with that group."  (<u>Id.</u> (quoting doc. 10-10, p. 61).)  Furthermore, as discussed in the Habeas Order, Dr. Weilenman testified about Petitioner's mental health, development, and juvenile conduct, including Petitioner's lack of "executive functioning."  (<u>See</u> <u>id.</u> at pp. 9–10

(citing doc. 10-11, pp. 54–55, 59–60).)  While the Court recognizes that the additional expert testimony Petitioner believes his trial counsel should have presented during sentencing was more "scientific-based" and "possibly more convincing" than Dr. Weilenman's testimony, (doc. 72, p. 30), "the mere fact a defendant can find, years after the fact, a mental health expert who will testify favorably for him does not demonstrate that trial counsel was ineffective for failing to produce that expert at trial." Reed v. Sec'y, Fla. Dep't of Corr., 593 F.3d 1217, 1242 (11th Cir. 2010).  The Court's conclusion is further supported by the fact that the state habeas court determined that Petitioner's trial counsel, during closing argument, (1) compared O'Kelley to Charles Manson; (2) argued that O'Kelley was very manipulative and held control over Petitioner due to Petitioner's lack of development; and (3) argued that Petitioner was the product of his upbringing, could not think for himself, lacked logic skills, and was a "young boy." (See doc. 27-20, pp. 68–69.)  Thus, the Court finds this argument unpersuasive as well.

**B.** **Whether the Court's ruling that Petitioner's trial counsel acted reasonably is manifestly incorrect**

Petitioner next argues that the Court's conclusion that Petitioner's trial counsel acted reasonably is based on a clear error of facts.  (See doc. 74, pp. 4–7.)  In his Brief, Petitioner argued that his trial counsel's mitigation investigation was inadequate because his counsel overlooked "[s]everal red flags" that should have placed them on notice that additional experts were needed.  (See doc. 65, pp. 94–96; see also doc. 72, p. 25.)  Among these supposed "red flags" was Davis's advice to trial counsel that additional experts could explain how Petitioner's mental state impacted his actions and inactions at the time of his crimes.  (Doc. 65, pp. 94–95; see doc. 72, p. 25.)  The Court was unpersuaded by this argument, finding that the argument "overlooks the fact that the state habeas court found that Dr. Weilenman, the expert responsible for performing the psychological evaluation of Petitioner, did not recommend further testing by

additional experts." (Doc. 72, p. 25 (citing doc. 27-20, p. 38).)  The Court further found that, at

best, contradictory evidence existed as to whether Dr. Weilenman and Sparger "discussed the

need to retain *additional experts* to perform testing on Petitioner that Dr. Weilenman could not

perform herself" and that "contradictory testimony is not enough to overcome the 'presumption

of correctness' afforded to a 'factual determination made by a state court' under the AEDPA,

which requires 'clear and convincing evidence.'"  (Id. at pp. 25–26 (quoting Consalvo v. Sec'y

for Dep't of Corr., 664 F.3d 842, 845 (11th Cir. 2011).)  The Court noted that Sparger testified,

> If I had been told that testing was needed and it wasn't testing that [Dr.
> Weilenman] was going to perform, I would have said, "Well, who do we need?"
> and then it would have been getting the motion, getting the funds to go to the next
> person.  And that never happened because I was never told . . . by Dr. Weilenman,
> by Ms. Davis, or anyone that there was testing [that needed to be done].

(Id. at p. 25 (quoting doc. 13-16, p. 89).)  The Court also noted, however, that Dr. Weilenman's

notes showed a purported list of experts and scientific literature, Davis recommended the need

for a neuropsychological exam, and trial counsel believed that Petitioner "seemed young for his

age." (Id. at p. 26.)

Petitioner now argues that the Court's conclusion that contradictory evidence exists as to

whether Sparger discussed the need for additional expert assistance with other members of the

defense team "rests on manifest errors of fact." (Doc. 74, pp. 4–5.)  Specifically, Petitioner

points to an email Davis sent to Sparger about the possibility of additional testing, Davis's

testimony of a purported meeting in which Davis mentioned retaining additional experts, and a

single page from Dr. Weilenman's notes with a list of experts in the field of adolescent crimes

and examples of their scholarship.  (See id. at pp. 5–6.)  From this evidence, Petitioner argues

that his defense team "set out a plan to engage at least one additional expert." (Id. at p. 6.)  The

Court, again, disagrees.

As an initial matter, Petitioner already made this argument before the Court.  (See doc. 65, pp. 94–96.)   In his Brief, Petitioner argued that Sparger was "on notice that neuropsychological testing and the retention of other appropriate experts was necessary."  (Id. at p. 94.)  In support of this argument, Petitioner cited to much of the same evidence Petitioner cites in his Motion to Amend, including the January 2005 meeting in which Davis supposedly recommended the need to consult an additional expert.  (Id. at p. 95.)  In the Habeas Order, the Court rejected this argument, stating that "[w]hile Petitioner highlights Davis's testimony asserting that she raised the need for a neuropsychological exam[] [and] a single page from Dr. Weilenman's notes that shows a list of purported experts, that evidence . . . reveals contradictory evidence regarding whether Dr. Weilenman and Sparger discussed the need to retain *additional experts*."  (Doc. 74, p. 26.)  While Petitioner appears to wish to reargue this issue, "motions for reconsideration may not be used to present the court with arguments already heard and dismissed or to repackage familiar arguments to test whether the court will change its mind."  Bryan v. Murphy, 246 F. Supp. 2d 1256, 1259 (N.D. Ga. 2003).

Moreover, Petitioner overstates what the evidence represents.  For example, Petitioner asserts that "Sparger recalled a meeting with [Davis and Dr. Weilenman] in which they discussed additional expert testing after . . . Sparger learned he would be conducting the mitigation phase [of the trial]."  (Doc. 74, p. 5 (citing doc. 13-15, pp. 158–59).)   However, Sparger further testified that this meeting occurred a mere six weeks to two months before the start of Petitioner's trial and that any reference to an additional expert was made "almost in passing." (Doc. 13-15, pp. 157–59.)  Furthermore, Sparger testified that the meeting was the "the first mention" of any need to retain *additional* experts and that he was "surprised to hear that there was *other* testing . . . that people thought was necessary."  (Id. at 159 (emphasis added).)  Thus,

this meeting hardly represents "a plan" to retain an additional expert.  Furthermore, the fact that Davis sent Sparger an email discussing her opinion that they needed a "specialist in [developmental issues] to explain [Petitioner's] impulsiveness [and] lack of judgment" is not relevant to whether *Dr. Weilenman* recommended retaining an additional expert to perform tests she could not perform herself.  (<u>See</u> doc. 19-9, p. 184.)

Finally, Petitioner overlooks Sparger's own testimony which indicates that Sparger was not aware of a need for additional experts.  While Davis testified that she had recommended to Petitioner's trial counsel and Dr. Weilenman during a January 2005 meeting that they retain an additional expert, (doc. 13-19, pp. 37–39), Sparger's testimony clearly contradicts Davis's testimony.   Sparger testified that "the first mention" of an additional expert occurred approximately six weeks before the start of Petitioner's trial, which began on May 24, 2007. (Doc. 13-15, p. 159.)  Furthermore, as noted in the Habeas Order, Sparger testified:

> If I had been told that testing was needed and it wasn't testing that [Dr. Weilenman] was going to perform, I would have said, "Well, who do we need?" and then it would have been getting the motion, getting the funds to go to the next person.  *And that never happened because I was never told . . . by Dr. Weilenman . . . that there was testing* [*that needed to be done*].

(Doc. 72, p. 25 (quoting doc. 13-16, p. 89) (emphasis added).)   Sparger's reliance on Dr. Weilenman's opinion regarding further testing is further exemplified by his testimony that he thought Dr. Weilenman "would do . . . what psychologists do: you meet them, you talk to them, and you get an idea, and you determine the appropriate tests."  (Doc. 13-16, p. 88.)  Thus, as the Court found in the Habeas Order, contradictory evidence exists as to whether Dr. Weilenman and Sparger "discussed the need to retain *additional experts* to perform testing on Petitioner that Dr. Weilenman could not perform herself."  (Doc. 72, pp. 25–26.)  Furthermore, as the Habeas Order states, "contradictory testimony is not enough to overcome the 'presumption of correcteness'

afforded to 'a factual determination made by a state court' under the AEDPA, which requires 'clear and convincing evidence.'"  (Doc. 72, p. 26 (quoting Consalvo, 664 F.3d at 845).)  While Petitioner asserts that "Sparger's . . . inability to recall the plan years later does not contradict the defense team's documented strategy to seek additional expert assistance," Sparger's testimony does not conclusively show that he had an "inability to recall" such a plan.  Rather, Sparger expressly testified that he "was never told . . . by Dr. Weilenman . . . that there was testing [that needed to be done]."  (Doc. 13-16, p. 89.)  Therefore, as the Court determined in the Habeas Order, Petitioner failed to show the "clear and convincing" evidence necessary to "overcome the 'presumption of correctness' afforded to a 'factual determination made by a state court' under the AEDPA."  Consalvo, 664 F.3d at 845; (see doc. 72, p. 26.)

### C. Whether the Court's prejudice determination is based on manifest errors of law and fact

Petitioner next argues that that the Court's "prejudice determination is based on manifest errors of fact and law."  (Doc. 74, pp. 7–10.)  Petitioner argues that the Court (1) improperly treated this "highly aggravated case[] as incapable of producing any sentence other than death," which is "contrary to established federal law" and (2) discounted "compelling mitigating evidence presented by Drs. James, Ash, and Garbarino" in its prejudice determination contained in the Habeas Order.  (Id.)  The Court disagrees.

Regarding his first argument, Petitioner contests the Court's statement that "[t]he evidence that Petitioner's actions were outrageously and wantonly vile, horrible, inhuman, and depraved, was so strong that it is hard to image that any amount of mitigating evidence could have outweighed it."  (Doc. 74, pp. 7–9.)  According to Petitioner, that statement "is contrary to established federal law that treating highly aggravated cases as incapable of producing any sentence other than death would unreasonably discount the mitigation evidence presented at

postconviction proceedings." (<u>Id.</u> at pp. 7–8 (citing <u>Porter</u>, 558 U.S. at 42–43).) Petitioner contends that he is "entitled to an individualized sentencing determination based on what *he* did and *his* character, which requires a presentation of neuropsychological assessments not presented at the sentencing hearing." (<u>Id.</u> at p. 8.) Petitioner further asserts, "To rule out consideration of such assessments in its prejudice determination, on the grounds that [his] case is highly aggravated, would be a manifest error of law and fact." (<u>Id.</u>)

However, Petitioner misinterprets the Habeas Order. In the Habeas Order, the Court concluded that Petitioner's trial counsel's failure to present additional expert witnesses at the sentencing phase did not prejudice him, in part, because "the new mitigating evidence provided by Drs. James, Ash, and Garbarino 'would barely have altered the sentencing profile presented' at Petitioner's trial." (Doc. 72, p. 31 (quoting <u>Strickland v. Washington</u>, 466 U.S. U.S. 668, 700 (1984)).) In reaching this conclusion, the Court thoroughly analyzed the mitigation evidence that was and was not presented at Petitioner's sentencing phase, (<u>id.</u> at pp. 27–30), and carefully weighed that evidence against the aggravating circumstances present in Petitioner's case, (<u>id.</u> at pp. 31–34). Specifically, the Court examined the testimonies of Dr. Ash, Dr. Garbarino, and Dr. James from the state habeas proceeding and compared those testimonies to the testimony of Dr. Weilenman during the sentencing phase. (<u>See id.</u>) The Court also detailed the aggravating factors the jury determined existed in Petitioner's case. (<u>Id.</u> at pp. 31–33 ("Among these [aggravating] factors were: (1) the murder of Susan Pittman 'was outrageously or wantonly vile, horrible, or inhuman in that it involved the depravity of mind of' Petitioner; (2) the murder of Susan Pittman 'was outrageously or wantonly vile, horrible, or inhuman in that it involved an aggravated battery to the victim before death;' (3) Petitioner 'was engaged in the commission of arson in the first degree' when murdering Kimberly Pittman; (4) the murder of Kimberly Pittman

'was outrageously or wantonly vile, horrible, or inhuman in that it involved tortur[ing] . . . the victim before death;' (5) the murder of Kimberly Pittman 'was outrageously or wantonly vile, horrible, or inhuman in that it involved the depravity of mind of' Petitioner; and (6) the murder of Kimberly Pittman 'was outrageously or wantonly vile, horrible, or inhuman in that it involved an aggravated battery to the victim before death.'").)  Such an analysis is required by Eleventh Circuit precedent.  As the Court stated in the Habeas Order,

> 'In a case challenging a death sentence, "the question is whether there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death."'  Cooper v. Sec'y, Dep't of Corr., 646 F.3d 1328, 1353 (11th Cir. 2011) (quoting Strickland, 466 U.S. at 695).  In determining whether there is a reasonable probability that the 'additional mitigating evidence would have changed the weighing process so that death is not warranted,' *the Court considers the totality of the evidence by weighing the mitigating evidence that was presented, and that which was not presented,* 'against the aggravating circumstances that were found.'  Hardwick v. Crosby, 320 F.3d 1127, 1166 (11th Cir. 2003)

(Id. at pp. 31–32 (emphasis added).)  Based on this analysis, the Court found that "the new mitigating evidence . . . 'would barely have altered the sentencing profile presented at' Petitioner's trial," (id. at p. 31 (quoting Strickland 466 U.S. at 700)), and that "the evidence against Petitioner was highly aggravating," (id. at p. 32).  Thus, contrary to Petitioner's assertion, the Court did properly consider "the totality of the evidence" by examining the mitigation evidence that was and was not presented at Petitioner's trial and weighing it against the aggravating circumstances present in the case.  (Id. at pp. 27–34.)

Petitioner also argues that the Court improperly discounted "compelling mitigating evidence presented by Drs. James, Ash, and Garbarino" in its prejudice determination.  (Doc. 74, pp. 9–10.)  According to Petitioner, "[u]nder clearly established federal law, a finding of prejudice is not foreclosed merely because some evidence submitted at [his] postconviction

proceeding concerned the same subject matter as evidence submitted at his trial.  Yet[,] that is what the Court has done here."  (Id. at p. 9.)  Petitioner also appears to contest the Court's finding that the testimonies of Dr. James, Dr. Ash, and Dr. Garbarino are "cumulative and duplicative" of the evidence presented at Petitioner's trial.  (See id. at p. 9.)  However, Petitioner again misinterprets the Court's analysis in the Habeas Order.

The Supreme Court and Eleventh Circuit have both consistently held that no prejudice occurs when the new mitigating evidence "would barely have altered the sentencing profile presented" to the decisionmaker.  Strickland, 466 U.S. U.S. at 700; see, e.g., Johnson v. Upton, 615 F.3d 1318, 1344 (11th Cir. 2010) ("[T]his is a case in which the new evidence would barely have altered the sentencing profile presented to Johnson's jury.  It was thus not unreasonable for the state habeas court to conclude that Johnson had failed to show a reasonable probability that he would receive a different sentence.") (internal citations and quotations omitted).  Indeed, numerous federal courts have found no prejudice where the new mitigating evidence is cumulative of the evidence presented at the original trial.  See Dallas v. Warden, 964 F.3d 1285, 1308 (11th Cir. 2020) ("When reweighing the aggravating circumstances against the totality of the mitigating evidence—again, what was introduced at his original trial and what Dallas presented in his postconviction proceedings—*we consider the cumulative nature of the evidence*.") (emphasis added); Ledford v. Warden, Ga. Diagnostic & Classification Prison, 818 F.3d 600, 649–50 (11th Cir. 2016) ("[N]o prejudice can result from the exclusion of cumulative evidence.").  "Mitigating evidence in postconviction proceedings is cumulative when it tells a more detailed version of the same story told at trial or provides more or better examples or amplifies the themes presented to the jury."  Dallas, 964 F.3d at 1308.

In the Habeas Order, the Court determined that the evidence presented by Drs. James, Ash, and Garbarino was cumulative of the evidence already presented at trial.  (See doc. 72, pp. 27–31.)  Petitioner argues that this ruling is in error because the evidence presented at trial did not relate to Petitioner's "specific neurological deficits."  (Doc. 74, p. 10.)  However, the jury already learned from Dr. Weilenman that Petitioner suffered from "an abusive and unstable childhood, functioned at an age below his chronological age of eighteen when he committed his crimes, lacked executive functioning compared to similarly aged peers, and was uniquely susceptible to peer pressure."  (Doc. 72, p. 31; see also id. at pp. 28–29.)  While it is true (as the Court acknowledged in the Habeas Order), that Drs. Garbarino, Ash, and James provided more "scientific" details about Petitioner's conditions during the sentencing phase, (id. at pp. 29–30), the effects of those conditions were similar to what Dr. Weilenman and other witnesses told the jury at trial.  For example, Dr. Ash testified about the "prefrontal cortex" in the brain and how Petitioner's executive functioning was less than "one would expect from the normal person of his age at that time."  (Doc. 72, p. 29 (quoting doc. 13-17, p. 30).)  However, the jury already heard from Dr. Weilenman that Petitioner's "executive functioning" was deficient relative to normal eighteen or nineteen-year-olds.  (Doc. 72, p. 28 (citing doc. 10-11, pp. 54–55, 59).)  Similarly, Dr. Garbarino testified that the severe psychological maltreatment Petitioner suffered during his childhood "undermined" his development and that he was "an untreated, traumatized child . . . inhabit[ing] the body of an 18-year-old boy."  (Id. at pp. 29–30 (citing (doc. 13-21, pp. 114, 145).)  However, the jury also heard this when Dr. Weilenman testified that Petitioner's instability and abandonment issues delayed his development and that he was abnormally susceptible to peer pressure for someone his age.  (See doc. 72, p. 29.)  Indeed, the cumulative nature of the scientific evidence during the sentencing phase is analogous to the cumulative

evidence present in <u>Dallas</u>.  <u>See</u> <u>Dallas</u>, 964 F.3d at 1310 ("Dr. Benedict's testimony would not have added much beyond the testimony the jury heard from Dr. Renfro.  While it is true that Dr. Benedict diagnosed Dallas with learning disorders and ADHD, the effects of these conditions were similar to what Dr. Renfro, Dallas himself, and other witnesses told the jury at trial. Benedict said that people with Dallas's learning and attention disorders are more likely to develop substance abuse disorders during early adolescence.  But the jury already learned, and in detail, from Dr. Renfro, from Dallas, and from his siblings that the defendant suffered from substance abuse and at a very early age.  Benedict also said these disorders often cause an individual to drop out of school.  But again, the jury heard from Dallas that he had difficulty in school and in fact dropped out in the sixth grade.  Most importantly, Benedict asserted that individuals with Dallas's combination of learning, attention, and other mental health issues are often 'unassertive' and 'passive-dependent.'  But still again the jury heard ample testimony at trial that Dallas was passive and unassertive, and that he was under the domination and control of Yaw.  Quite simply, Benedict's testimony would not have changed the characteristics and difficulties the jury heard and considered before it recommended that Dallas be sentenced to die, particularly since the jury already knew that Dallas's substance abuse and difficulties in school began at so young an age.  While it is true the learning disorders and ADHD diagnosis would have offered another possible explanation for some of his difficulties, the jury heard a great deal about the potential causes of those difficulties that were beyond Dallas's control, including the incredibly neglectful and abusive parenting he endured.").  Thus, the Court cannot find that its prejudice determination was tainted by a clear error of law or fact.  <u>See, e.g.</u>, <u>Sears</u>, 561 U.S. at 954 ("[W]e have explained that there is no prejudice when the new mitigating evidence would barely have altered the sentencing profile presented to the decisionmaker.") (internal quotations

omitted); <u>Brown v. United States</u>, 720 F.3d 1316, 1327 (11th Cir. 2013) ("[A]s in <u>Strickland</u> itself, '[t]he evidence that [the petitioner] says his trial counsel should have offered at the sentencing hearing would barely have altered the sentencing profile presented.'") (quoting <u>Strickland</u>, 466 U.S. at 669–700).

Petitioner relies on the Supreme Court's decision in <u>Wiggins v. Smith</u>, 539 U.S. 510 (2003), to argue that "a finding of prejudice is not foreclosed merely because some evidence submitted at [Petitioner's] postconviction proceeding concerned the same subject matter as evidence submitted at his trial." (Doc. 74, p. 9.)  However, like the Eleventh Circuit in <u>Dallas v. Warden</u>, 964 F.3d at 1312, the Court found <u>Wiggins</u> (and other similar cases) distinguishable. (<u>See</u> doc. 72, pp. 30–31.)  In <u>Dallas</u>, the Eleventh Circuit stated,

> In each of the key Supreme Court cases finding prejudice as a result of counsel's failure to offer mitigating evidence, the disparity between what was presented at trial and what was offered collaterally was vast.  In other words, the balance between the aggravating and mitigating evidence at trial and in postconviction proceedings shifted enormously, so much as to have profoundly altered each of the defendants' sentencing profiles.

<u>Dallas</u>, 964 F.3d at 1312 (citing <u>Wiggins</u>, 539 U.S. at 535; <u>Williams v. Taylor</u>, 529 U.S. at 369–70; <u>Porter</u>, 558 U.S. at 32–36; <u>Andrus v. Texas</u>, 140 S. Ct. 1875, 1881 (2020) (per curiam)).  The Eleventh Circuit then distinguished the facts in <u>Dallas</u> from those present in cases like <u>Wiggins</u>, stating:

> Unlike in <u>Wiggins</u>, in <u>Williams</u>, in <u>Porter</u>, and in <u>Andrus</u>, the new mitigating evidence contained in the 2007 affidavits "would barely have altered the sentencing profile presented" at Dallas's trial.  That profile amply painted a broad picture of Donald Dallas's life: an abusive childhood, violence, poverty, lack of guidance and role models, and substance abuse from an early age into adulthood. Recognizing that the vast majority of the allegedly new mitigating evidence presented in the 2007 affidavits did no more than amplify the themes presented at trial, we think it wholly unlikely that the additional evidence would have changed the jury's result.  Our confidence that the jury would have recommended death has not been undermined.  In the face of the horrific nature of Dallas's crimes and the brutality of [the victim's] death, and because the jury already knew much

about Dallas's life, there is no reasonable probability that, had the jury known the limited additional details presented in postconviction, they would have spared his life.

Id. at 1312–13 (citing Strickland, 466 U.S. at 700).  Here, the Court reached a similar conclusion in the Habeas Order.  (See doc. 72, pp. 30–34.)  Unlike the new mitigating evidence in Wiggins, the new mitigating evidence in this case "would have barely altered the sentencing profile presented" at Petitioner's trial.  (See id. at p. 31 (quoting Strickland, 466 U.S. at 700).)  Indeed, the profile presented at Petitioner's trial "amply painted a broad picture of [Petitioner's] life:" an abusive and unstable childhood, lack of executive functioning, susceptibility to peer pressure, and lack of development compared to other eighteen-year-olds.  Dallas, 964 F.3d at 1312.  Thus, "[i]n the face of the horrific nature of [Petitioner's] crimes and the brutality of the victim[s'] death[s], and because the jury already knew much about [Petitioner's] life, there is no reasonable probability that, had the jury" seen the new mitigating evidence, they would have spared Petitioner's life.  Id. at 1312–13.

Based on the foregoing, the Court finds that Petitioner failed to show the need to correct clear error in the Habeas Order's denial of his ineffective assistance of counsel claim or prevent any manifest injustice.

## II.     Certificate of Appealability

Petitioner next argues that the Court should amend its prior ruling and grant him a COA on his ineffective assistance of counsel claim and his Eighth Amendment claim because its decision not to do so was based on "manifest errors of law."  (Doc. 74, pp. 10–13.)  Under 28 U.S.C. § 2253(c)(1), an appeal cannot be taken from a final order in a habeas proceeding unless a certificate of appealability is issued.  28 U.S.C. § 2253(c)(1).  A district judge should issue a COA "only if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  "Where a district court has rejected the constitutional claim on the merits, the showing required to satisfy [Section] 2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong."  Slack v. McDaniel, 529 U.S. 473, 484 (2000).  To make this showing, the petitioner must show "that jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further."  Miller-El v. Cockrell, 537 U.S. 322, 327 (2003).  "The COA inquiry . . . is not coextensive with a merits analysis."  Buck v. Davis, 137 S. Ct. 759, 773 (2017).  In the Habeas Order, the Court denied Petitioner a COA, finding that "Petitioner . . . failed to make a substantial showing of a denial of a constitutional right with respect to his ineffective assistance of counsel claims or his Eighth Amendment claim." (Doc. 72, p. 79.)

### A.     Ineffective Assistance of Counsel Claim

Petitioner appears to raise two arguments in support of his Motion to Amend the Court's ruling denying him a COA on his ineffective assistance of counsel claim.  (See doc. 74, pp. 11–13.)  First, Petitioner argues that he "is entitled to a [COA] where the district court decision on a

constitutional issue raised by [him] conflicts with decisions of other courts." (Id. at p. 11.) According to Petitioner, the Ninth and Tenth Circuit Courts of Appeals have "granted habeas relief under" circumstances similar to his case and that "[c]onsidering these decisions, it is . . . at least debatable whether [his] ineffective assistance of counsel claim is meritorious." (Id. at pp 11–12 (citing Hooks v. Workman, 689 F.3d 1148, 1204 (10th Cir. 2012); Lopez v. Att'y Gen., 845 F. App'x 549, 552–53 (9th Cir. 2021)). The Court finds this argument unpersuasive.

The Ninth and Tenth Circuit cases Petitioner cites are distinguishable from his case. In Hooks, the Tenth Circuit concluded that the petitioner's mitigation case "failed to meet the standards [it] ha[s] set out for counsel in capital-sentencing proceedings." 689 F.3d at 1203. In reaching this conclusion, the Tenth Circuit stated that "[e]vidence of family and social history was sorely lacking; the mental-health evidence presented was inadequate and quite unsympathetic; and [the petitioner] not only failed to rebut the prosecution's case in aggravation but actually bolstered it by his own statements." Id. Specifically, the petitioner's mitigation case included only three witnesses: his sister, his mother, and a psychologist who administered "psychological examinations" of petitioner. Id. at 1202–03. The sister was only asked four questions while testifying, and her "testimony fill[ed] little more than a page of the trial transcript." Id. at 1202. The mother's testimony was "only slightly less brief." Id. The Tenth Circuit concluded that their testimonies were "perfunctory, to put it mildly," and failed to "educate the jury . . . on [the petitioner's] life circumstances and his tragic, chaotic upbringing," which included a "premature birth, an openly abusive father, frequent moves, educational handicaps, and personal family tragedies." Id. at 1203. Moreover, while the psychologist testified that the petitioner suffered "from a chronic form of psychosis," the psychologist's testimony also "worked in the [prosecution's] favor" as he testified that he "knew almost nothing

about [the petitioner's] case" and that the petitioner was "very, very violent" and "crazy."  Id. at

1203–04.  Indeed, the psychologist in Hooks admitted on cross-examination that he "had not

read the police reports pertaining [to the petitioner's crimes], had not listened to [the petitioner's]

tape-recorded confession, and had not seen any of the photographs in the case that depicted [the

victim] after her death."  Id.

      In contrast, here, Petitioner's trial counsel presented an extensive amount of mitigation

evidence.  Specifically, Petitioner's trial counsel called twenty-six witnesses to testify during the

sentencing phase.  (Doc. 72, p. 3 (citing (doc. 27-20, pp. 43–47, 61–68).)  These witnesses,

including Davis and Dr. Weilenman, provided an extensive amount of testimony regarding

Petitioner's life circumstances, his tragic upbringing, the neglect and abuse he suffered as a

child, and his poor development.  (Id. at pp. 5–10.)  In addition, Dr. Weilenman testified about

Petitioner's mental health, development, and juvenile conduct, including Petitioner's post-

traumatic stress disorder, ADHD, and an "adjustment disorder with depressed features."  (Id. at

p. 9.)  Dr. Weilenman further testified about Petitioner's lack of "executive functioning" and

development, emphasizing that Petitioner "was still more into peer pressure than you would have

expected" at his age.  (Id.)  Furthermore, unlike the psychologist in Hooks, Dr. Weilenman was

well acquainted with Petitioner and his case.  (See id. at pp. 5–10, 22–25.)  Indeed, Dr.

Weilenman met with Petitioner five times, interviewed him for approximately ten to fifteen

hours total, reviewed the documents, records, and interview notes procured by Davis, and re-

interviewed other witnesses.  (Id. at pp. 7, 23.)  While Petitioner, relying on the Tenth Circuit's

decision in Hooks, appears to argue that Dr. Weilenman's testimony "left [the jury] with almost

no explanation of how [the petitioner's] mental problems played into the murder of [the victim],"

689 F.3d at 1204; (doc. 74, p. 12), Dr. Weilenman did testify about how Petitioner's past

impacted his behavior regarding his crimes.  (See Discussion Section I.A., supra.)  Specifically,

Dr. Weilenman testified that Petitioner "was in a situation and, based on his personality as well,

[was] the follower, [and] he . . . [,]at that time, [was] listening to [O'Kelley], as a follower, . . .

and not questioning it.  He needed to fit in with that group."  (Doc. 10-11, p. 61.)  Furthermore,

to the extent that Petitioner argues that his *trial counsel* did not attempt to "connect the dots"

between Petitioner's mental health and the crimes, the Court finds that argument unpersuasive

because Petitioner's trial counsel argued in the sentencing phase's closing argument that

Petitioner was the product of his upbringing, could not think for himself, lacked logic skills, and

was a "young boy."  (See doc. 27-20, pp. 68–69.)  Furthermore, Petitioner's trial counsel

compared O'Kelley to Charles Manson, arguing that O'Kelley was very manipulative and held

control over Petitioner due to Petitioner's lack of development.  (Id. at p. 69.)  Finally, Petitioner

does not contend, like the petitioner in Hooks, that any portion of Dr. Weilenman's testimony

assisted the prosecution.  (See doc. 74, pp. 11–12.)  Therefore, the Court finds Hooks and the

Ninth Circuit's unpublished opinion[3] in Lopez distinguishable from this case.  Cf. Lopez, 845 F.

App'x at 552–53 (finding trial counsel's performance deficient where counsel "pursued a

mitigation strategy of . . . attributing [the petitioner's] conduct to his childhood neglect and

abuse," but "the only penalty-phase evidence counsel introduced was lay witness testimony

about [the petitioner's] family from [the petitioner's] uncle").  Thus, the Court declines to amend

the Habeas Order on this basis.

     Petitioner's second argument, however, is more convincing than his first.  Petitioner

contests the Court's application of 28 U.S.C. §§ 2254(d)(2) and 2254(e)(1) in the Habeas Order.

(Doc. 74, p. 12; see doc. 71, pp. 11–12.)  According to Petitioner, the Court should amend its

---

[3]  The Court notes that the Ninth Circuit's Local Rule 36-3(a) provides that "[u]npublished dispositions and orders of this Court *are not precedent*."  Ninth Circuit Rule 36-3(a) (emphasis added).

judgment to grant him a COA on his ineffective assistance of counsel claim because reasonable jurists could disagree as to the "correct application" of Sections 2254(d)(2) and 2254(e)(1).  (See doc. 74, pp. 12–13.)  Specifically, Petitioner points to a split among circuit courts as the reason he is entitled to a COA on this issue.  (See id.)

While the Supreme Court has "not defined the precise relationship between [Section] 2254(d)(2) and [Section] 2254(e)(1)," Burt v. Titlow, 571 U.S. 12, 18 (2013), the Supreme Court has clarified that

> [a] federal court's collateral review of a state-court decision must be consistent with the respect due state courts in our federal system.  Where 28 U.S.C. § 2254 applies, our habeas jurisprudence embodies this deference.  *Factual determinations* by state courts are presumed correct absent clear and convincing evidence to the contrary, [Section] 2254(e)(1), and *a decision* adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state-court proceeding, [Section] 2254(d)(2).

Miller-El, 537 U.S. at 340 (emphasis added).  Since the Court's decision in Miller-El, however, "precisely how subsections (d)(2) and (e)(1) relate to one another has remained an open question."  Hayes v. Sec'y, Fla. Dep't of Corr., 10 F.4th 1203, 1223 (11th Cir. 2021) (Newsom, J., concurring) (citing Rice v. Collins, 546 U.S. 333, 339 (2006)).

In the Habeas Order, the Court applied Sections §§ 2254(d)(2) and 2254(e)(1) as follows:

> Regarding Section 2254(d)(2), the Court must evaluat[e] whether a state court's *decision* was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.  When doing so, the Court may not characterize . . . state-court factual determinations as unreasonable merely because [the Court] would have reached a different conclusion in the first instance.  Section 2254(d)(2) . . . requires that federal courts afford state court factual determinations substantial deference.  If [r]easonable minds reviewing the record might disagree about the state court factfinding in question, on habeas review that does not suffice to supersede the state court's factual determination. The Court presume[s] *findings of fact* made by state courts are correct, unless a petitioner rebuts that presumption by clear and convincing evidence.

(Doc. 72, p. 17 (emphasis added) (internal quotations omitted) (quoting <u>Daniel v. Comm'r, Ala. Dep't of Corr.</u>, 822 F.3d 1248, 1259 (11th Cir. 2016); <u>Brumfield v. Cain</u>, 576 U.S. 305, 313–14 (2015)).)  In other words, the Court—in the Habeas Order—examined whether the state habeas court's *decision* was based on an unreasonable determination of facts under Section 2254(d)(2), (<u>see, e.g.</u>, doc. 72, pp. 26–27, 34, 47, 53, 57, 60), and presumed that *individual findings of fact* made by the state habeas court were correct absent clear and convincing evidence to the contrary, (<u>see, e.g.</u>, <u>id.</u> at pp. 25–26, 44).   Thus, in the Habeas Order, the Court applied both Section 2254(d)(2) and Section 2254(e)(1).

Most courts appear to apply the same or similar analysis when evaluating habeas petitions under 28 U.S.C. § 2254.   <u>See</u> <u>Hayes</u>, 10 F.4th at 1223 ("Most courts that have addressed the subject seem to have held that [Section] 2254(e)(1) requires a federal court to presume that a state court's factual determinations are correct even in the context of a [Section] 2254(d)(2) challenge—and, thus, that the two subsections present separate barriers to relief.") (Newsom, J., concurring); <u>see also, e.g.</u>, <u>Lenz v. Washington</u>, 444 F.3d 295, 300 (4th Cir. 2006) (finding that a district court did not err when it applied Section 2254(e)(1) within the context of determining whether relief was appropriate under Section 2254(d)(2)); <u>Ben-Yisrayl v. Buss</u>, 540 F.3d 542, 549 (7th Cir. 2008) ("A petitioner's challenge to a state court decision based on a factual determination under [Section] 2254(d)(2) will not succeed unless the state court committed an 'unreasonable error,' and [Section] 2254(e)(1) provides the mechanism for proving unreasonableness."); <u>Collier v. Norris</u>, 485 F.3d 415, 423 (8th Cir. 2007) ("Because Norris concedes that both of these factual statements were erroneous, we will assume that Collier has overcome the presumption of their correctness by clear and convincing evidence.   <u>See</u> 28 U.S.C. § 2254(e)(1).  Notwithstanding this assumption, it does not necessarily follow that the state court

adjudication was based on an unreasonable determination of facts because [Section 2254(d)(2)] instructs federal courts to evaluate the reasonableness of the state court decision 'in light of the evidence presented in the State court proceeding.'  28 U.S.C. § 2254(d)(2).").

As Petitioner points out, however, the Ninth and Third Circuit Courts of Appeal appear to take a different approach.  (See doc. 74, pp. 12–13.)  The Ninth Circuit has held that Section 2254(d)(2) applies when a petitioner challenges the state court's findings based entirely on the state court record and that Section 2254(e)(1)'s presumption of correctness applies *only when the habeas petitioner presents new evidence for the first time in federal court*.  See Taylor v. Maddox, 366 F.3d 992, 1000 (9th Cir. 2004), *overruled on other grounds by* Murray v. Schriro, 745 F.3d 984 (7th Cir. 2014).  Somewhat similar to the Ninth Circuit, the Third Circuit has held that Section 2254(e)(1) "comes into play" when a habeas petitioner "attack[s] specific factual determinations that were made by the state court[] and that are subsidiary to the ultimate decision."  Lambert v. Blackwell, 387 F.3d 210, 235 (3d Cir. 2004).  According to the Third Circuit, a habeas petitioner "may develop clear and convincing evidence by way of a hearing in federal court as long as he satisfies the necessary prerequisites."  Id.

Though the Eleventh Circuit has "note[d] that the plain language of [Section] 2254 does not provide the basis" for the distinction drawn by the Ninth Circuit (and seemingly the Third Circuit), Prevatte v. French, 547 F.3d 1300, 1304 n.1 (11th Cir. 2008), the "interaction between [Sections 2254] (d)(2) and (e)(1) . . . is an open question," Landers v. Warden, Att'y Gen. of Ala., 776 F.3d 1288, 1293 n.4 (11th Cir. 2015); see Green v. Sec'y, Dep't of Corr., 28 F.4th 1089, 1128 (11th Cir. 2022) ("The precise relationship between the 'unreasonable application' standard of [Section] 2254(d)(2) and the 'clear and convincing standard of [Section] 2254(e)(1) when reviewing a state court's factual determinations under AEDPA is unclear."); Cave v. Sec'y

for Dep't of Corr., 638 F.3d 739, 747 (11th Cir. 2011) ("We have not yet had an occasion to completely define the respective purviews of [Sections 2254] (d)(2) and (e)(1) . . . ."); see also Prevatte, 547 F.3d at 1304 n.1.  However, the Eleventh Circuit has "given weight to [Section] 2254(e)(1)'s presumption without definitely determining how it relates to [Section] 2254(d)(2)." Hayes, 10 F.4th at 1223 (Newsom, J., concurring) (citing Newland v. Hall, 527 F.3d 1162, 1183– 84 (11th Cir. 2008); Mansfield v. Sec'y, Dep't of Corr., 679 F.3d 1301, 1310 (11th Cir. 2012)).

The Court finds that the split among circuit courts—combined with the lack of a binding decision[4] from the Eleventh Circuit—on the relationship between Section 2254(d)(2) and 2254(e)(1) is sufficient reason to amend its judgment and grant Petitioner a COA on this issue.[5]

---

[4]  The Eleventh Circuit has denied COAs where circuit splits exist on the relevant issues.  See, e.g., Lambrix v. Sec'y, Fla. Dep't of Corr., 851 F.3d 1158, 1171 (11th Cir. 2017); Hamilton v. Sec'y, Fla. Dep't of Corr., 793 F.3d 1261, 1266 (11th Cir. 2015); Aviles v. United States, No. 21-13303, 2022 WL 1439333, at *4 (11th Cir. Feb. 9, 2022).  However, in those cases, the Eleventh Circuit relied on the principle that "[n]o COA should issue where the claim is foreclosed by *binding circuit precedent* 'because reasonable jurists will follow controlling law.'"  Hamilton, 793 F.3d at 1266 ("[W]e are bound by our Circuit precedent, not by Third Circuit precedent."); see Lambrix, 851 F.3d at 1271 ("Lambrix points to an alleged circuit split, but we need not evaluate that circuit split because Lambrix's . . .argument is foreclosed by our binding precedent . . ., and his attempted appeal does not present a debatable question because reasonable jurists would follow controlling law."); Aviles, 2022 WL 1439333, at *4 ("[A]lthough Aviles argues that, due to a circuit split on the issue, reasonable jurists could debate whether controlling precedent precludes issuance of a COA, our binding precedent holds that a COA shall not issue if the claim is foreclosed by binding precedent.").  Here, however, as discussed above, there is no binding precedent; the relationship between Section 2254(d)(2) and Section 2254(e)(1) remains an open question in this circuit.

[5]  The Court notes that, in a concurring opinion in Hayes, Judge Newsom discussed the "relationship between subsections (d)(2) and (e)(1)" of Section 2254 and supported an analysis like the analysis the Court conducted in the Habeas Order.  See 10 F.4th at 1221–25 (Newsom, J., concurring).  In that concurring opinion, Judge Newsom stated:

> [C]areful attention to [Section] 2254's text shows that the two provisions play separate roles in federal habeas review.  .  .  .  [S]ubsection (e)(1) articulates a universal requirement: In every habeas proceeding initiated by an individual in state custody, any "determination of a factual issue" by the state court "shall be presumed correct," and the petitioner "shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."  .  .  .  Section 2254(d) is different—it explains how federal courts should review state-court "decision[s]" and generally prohibits a federal court from granting habeas relief unless a state court's "decision" itself was "unreasonable," either legally or factually.  .  .  .  [Section] 2254(d)(2) bars relief absent a showing that the state

See Lambright v. Stewart, 220 F.3d 1022, 1027–28 (9th Cir. 2000) ("[T]he fact that another circuit opposes our view satisfies the standard for obtaining a COA."); Rodella v. United States, 467 F. Supp. 3d 1116, 1126 (D.N.M. 2020) ("[B]ecause there is a Courts of Appeals split on a petitioner's burden of proof when arguing that the sentencing court relied upon an unconstitutional provision during sentencing, the Court will grant a certificate of appealability."); Garza v. United States, No. B-08-496, 2009 WL 10674261, at *2 (S.D. Tex. June 17, 2009) ("In his application for a COA Petitioner correctly identifies an existing circuit split as to whether a later habeas petition which raises issues that could have been raised in an initial habeas petition is barred as a second or successive petition under the AEDPA.  Because the right to effective assistance of counsel is a protected constitutional right, and because this Court holds that reasonable jurists could differ with its procedural conclusion, Petitioner's request should be

court's "decision" was "based on" an "unreasonable determination of the facts in light of the evidence presented in the State court proceeding." . . . [B]ecause a "decision" might comprise many "determination[s]"—some factual, some legal—[Section] 2254(d) prevents federal courts from granting relief because of errors that don't affect the ultimate reasonableness of the state court's decision.  Clearly, subsections (d)(2) and (e)(1) share some of the same space, and there is some logical relationship between them. . . . If the petitioner can't discharge his burden under [Section] 2254(e)(1) by proving clear and convincing evidence that *any* of the state court's individual factual "determinations" was erroneous, then it follows that he also can't demonstrate that the state court's "decision" was "based on" an "unreasonable determination of facts" within the meaning of [Section] 2254(d)(2).  The converse, though, is not necessarily true.  Even if a petitioner can prove—even clearly and convincingly—that a state court's factual determination (or determinations) was (or were) erroneous, he may yet be unable to make the required showing under [Section] 2254(d)(2)—namely, that the state court's factual error (or errors) resulted in a 'decision' that was "based on" an "unreasonable determination of the facts."  That's because a factual error, given its bigness or smallness, might or might not rise to the level that it renders the state court's ultimate "determination of the facts" unreasonable, or because, despite the error, the state court's "decision" might or might not have been "based on" it.  That is, a state court's "decision" can be reasonable even if some of its individual factual findings were erroneous—so long as the decision, taken as a whole, doesn't constitute an 'unreasonable determination of the facts' and isn't "based on" any such determination.

Hayes, 10 F.4th at 1224–25 (11th Cir. 2021) (Newsom, J., concurring).  However, the Court's own research has not found any case law indicating that the Eleventh Circuit has adopted Judge Newsom's analysis as binding law in this circuit.

granted.") (internal citations omitted).   Indeed, the split among circuit courts shows "that the issue [Petitioner] presents is debatable among jurists of reason" and, thus, entitles Petitioner to a COA.  Wilson v. Sec'y Pa. Dep't of Corr., 782 F.3d 110, 115 (3d Cir. 2015) (internal quotations omitted).  Furthermore, pursuant to Federal Rule of Civil Procedure 59(e), the Court finds that "the interests of justice demand" that the Court correct its error in the Habeas Order and grant Petitioner a COA on this issue.  Am. Home Assurance, 763 F.2d at 1239.

In sum, the Court finds that Petitioner "made a substantial showing of the denial of a constitutional right" under 28 U.S.C. § 2253(c)(2) because reasonable jurists could disagree as to whether the Court properly applied Sections 2254(d)(2) and 2254(e)(1) of the AEDPA when evaluating Petitioner's ineffective assistance of counsel claim.   The Court also finds that Petitioner satisfied the standard under Federal Rule of Civil Procedure 59(e) by showing that the Court erred in denying him a COA on this issue in the Habeas Order and that the "interests of justice demand that [the Court] correct" that error.  Am. Home Assurance, 763 F.2d at 1239; see Fed. R. Civ. P. 59(e).  Therefore, the Court finds it appropriate to amend the Habeas Order and grant Petitioner a COA on the issue of whether the Court properly applied Sections 2254(d)(2) and 2254(e)(1) of the AEDPA when evaluating the state habeas court's decision and factual determinations.  That is, the Court grants Petitioner a COA on the issue of whether it was proper for the Court to apply Section 2254(d)(2)'s deference to the state habeas court's *decision* but apply Section 2254(e)(1)'s deference to the state habeas court's *individual findings of fact*.

### B.    Eighth Amendment Claim

Petitioner also argues that he is entitled to a COA on his Eighth Amendment claim because "the answer to the question of the application of [the] AEDPA to claims that the Eighth and Fourteenth Amendments bar the execution of defendants who are the functional equivalent

of juveniles is at least debatable." (Doc. 74, p. 13.) In his Brief, Petitioner argued that the Court should review his Eighth Amendment claim *de novo* (and not under the AEDPA's standard of review) because his death sentence violates "a substantive rule of constitutional law that would be retroactive on collateral review under the Supreme Court's decision in Teague v. Lane, 489 U.S. 288 (1989)." (Doc. 65, pp. 133–36; see doc. 72, p. 64.) The Court rejected this argument. (Doc. 72, pp. 67–74.) While the Court found that Petitioner's "proposed extension" of Roper falls within one of Teague's exceptions, the Court also found that it must "also determine whether the AEDPA's standard of review under 28 U.S.C. § 2254(d)(1) applies to new rules of constitutional law that fall under one of the exceptions to Teague." (Id. at p. 70.) The Court noted that "neither the Supreme Court nor the Eleventh Circuit ha[s] directly answered the question" of "whether a [Section] 2254 petitioner can rely on a rule that is considered 'new' under Teague (even if it falls within a Teague exception) because the rule will not also be 'clearly established' for purposes of [Section] 2254(d)(1)." (Id. at p. 71.) However, the Court ultimately decided that 28 U.S.C. § 2254(d)(1) applied and reviewed Petitioner's Eighth Amendment claim under the AEDPA's standard of review. (Id. at p. 74.)

Petitioner now appears to argue that because "neither the Supreme Court nor the Eleventh Circuit have directly answered" the question of "whether a [Section 2254] petitioner can rely on a rule that is considered 'new' under Teague . . . [but] not . . . 'clearly established' for purposes of [Section] 2254(d)(1)," (doc. 72, p. 71), the question "is at least debatable," (doc. 74, p. 13). However, Petitioner has failed to cite to any case law directly supporting his assertion that Teague's substantive rule exception prohibits a federal habeas court from applying the AEDPA's standard of review when reviewing a state court's adjudication. (See doc. 74, p. 13; see also doc. 65, pp. 133–36.) Instead, as the Court noted in the Habeas Order, the Supreme Court has "stated

on multiple occasions that 'the AEDPA and Teague inquiries are distinct.'"   (Doc. 72, p. 72

(citing Horn v. Banks, 536 U.S. 266, 272 (2002) (per curiam); Greene v. Fisher, 565 U.S. 34, 39

(2011)).   Indeed, in Greene, the Supreme Court stated:

> The retroactivity rules that govern federal habeas review on the merits—which
> include Teague—are quite separate from . . . [the] AEDPA; neither abrogates or
> qualifies the other.   If [Section] 2254(d)(1) was, indeed, pegged to Teague, it
> would authorize relief when a state-court merits adjudication 'resulted in a
> decision that *became* contrary to, or an unreasonable application of, clearly
> established Federal law, *before the conviction became final*.'   The statute says no
> such thing, and we see no reason why Teague should alter [the] AEDPA's plain
> meaning.

565 U.S. at 39; see also Edwards v. Vannoy, 141 S. Ct. 1547, 1565 (2021) (Thomas, J.,

concurring) ("[T]he Court's reliance on Teague today and in the past should not be construed to

signal that . . . Teague could justify relief where [the] AEDPA forecloses it.   [The] AEDPA . . . .

does not contemplate retroactive rules upsetting a state court's adjudication of an issue that

reasonably applied the law at the time.").   Other federal courts have reached similar conclusions.

See Ochoa v. Davis, 16 F.4th 1314, 1338 n.4 (9th Cir. 2021) ("The Teague and AEDPA inquiries

are distinct."); Demirdjian v. Gipson, 832 F.3d 1060, 1076 n.12 (9th Cir. 2016) ("Even if

applying a rule retroactively would comport with Teague, we still must ask whether doing so

would contravene [S]ection 2254(d)(1)[] by granting relief based on federal law not clearly

established *as of the time the state court render*[ed] its decision.") (internal quotations and

citations omitted) (emphasis in original); Greene v. Palkovich, 606 F.3d 85, 101 (3d Cir. 2010)

("[I]t seems a leap to assume that new rules that are deemed retroactive under Teague would be

automatically deemed 'clearly established Federal law' for purposes of [Section] 2254(d)(1).");

Pizzuto v. Blades, No. 1:05-cv-00516-BLW, 2016 WL 6963030, at *6 (D. Idaho Nov. 28, 2016)

("[T]o be eligible for relief under [the] AEDPA, a petitioner must show *both* that the rule he

seeks to invoke is retroactive—either because it is not a new rule, it is a substantive rule, or that

it is a watershed rule of criminal procedure—*and* that the state court's decision violated Supreme Court precedent that was clearly established at the time of that decision . . . ."). Furthermore, Section 2254(d)(1)'s plain text speaks in the past tense and only allows a writ to be granted where a decision "*was* contrary to, or *involved* an unreasonable application of, *clearly established* Federal law, as *determined* by the Supreme Court of the United States." 28 U.S.C. § 2254(d) (emphasis added). As the Court stated in the Habeas Order, "[i]f Congress intended for federal courts to grant habeas petitions where a state decision *is* contrary to or *involves* an unreasonable application of *now* established law, it could have said so." (Doc. 72, p. 73.) However, Congress did not include such language or otherwise create an exception to Section 2254(d)'s standard of review for claims based on a rule that would fall within one of <u>Teague</u>'s exceptions. <u>See</u> 28 U.S.C. § 2254(d); <u>see also</u> <u>Edwards</u>, 141 S. Ct. at 1565 (Thomas, J., concurring) ("Section 2254(d)—the absolute bar on claims that state courts reasonably denied— has no exception for retroactive rights. Congress' decision to create retroactivity exceptions to the [AEDPA's] statute of limitations and to the [AEDPA's] bar on second-or-successive petitions but not for [Section] 2254(d) is strong evidence that <u>Teague</u> could never have led to relief here."). Based on the foregoing, the Court finds that Petitioner failed to show the need to correct clear error in the Habeas Order's denial of a COA for Petitioner's Eighth Amendment claim or prevent any manifest injustice.

**CONCLUSION**

Based on the foregoing, the Court **GRANTS in part** and **DENIES in part** Petitioner's

Motion to Amend or Alter Judgment.  (Doc. 74.)  Specifically, the Court **GRANTS** Petitioner a

Certificate of Appealability on the issue of whether the Court properly applied Sections

2254(d)(2) and 2254(e)(1) of the AEDPA in the Habeas Order when evaluating Petitioner's

ineffective assistance of counsel claim.  The remainder of the Habeas Order remains in effect.

(Doc. 72.)

**SO ORDERED**, this 28th day of July, 2022.

_____
R. STAN BAKER
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF GEORGIA